# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**ROOSEVELT ROAD RE, LTD.,**                    **CASE NO. 1:25-cv-03386**
**individually, and as subrogee of**
**ACCREDITED CASUALTY AND**
**SURETY COMPANY, and**
**TRADESMAN PROGRAM MANAGERS, LLC**


                              **Plaintiffs,**


**v.**


**WILLIAM SCHWITZER & ASSOCIATES, P.C.;**
**WILLIAM SCHWITZER;**
**GIOVANNI "JOHN" C. MERLINO;**
**KOLB RADIOLOGY P.C.;**
**THOMAS M. KOLB, MD;**
**NYC MEDICAL & NEUROLOGICAL OFFICES, P.C.;**
**MEHRDAD GOLZAD, MD;**
**BROOKLYN MEDICAL PRACTICE, P.C.;**
**SAYEEDUS S. SALEHIN, M.D.;**
**ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C.;**
**STANISLAV B. AVSHALUMOV, D.O.;**
**COMMUNITY MEDICAL IMAGING OF BROOKLYN P.C;**
**ANDREW J. MCDONNELL, M.D.;**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC, s/d/b/a TOTAL**
**ORTHOPAEDICS & SPORTS MEDICINE;**
**VADIM LERMAN, D.O.;**
**ABHISHEK KUMAR, M.D.;**
**BIG APPLE PAIN MANAGEMENT, P.L.L.C.;**
**RICHARD APPLE, M.D.;**
**NORTH SHORE FAMILY CHIROPRACTIC, P.C.;**
**TODD LAWRENCE LEBSON, D.C.;**
**UNICORN ACUPUNCTURE, P.C.;**
**DEKUN WANG, L.Ac;**
**BL PAIN MANAGEMENT, P.L.L.C. d/b/a PAIN MANAGEMENT NYC;**
**PAIN PHYSICIANS NY, P.L.L.C.;**
**LR MEDICAL, P.L.L.C.;**
**BOLESLAV KOSHARSKYY, M.D.;**
**DEMETRIOS KOUTSOSPYROS, M.D.;**
**ALL COUNTY FOOT AND ANKLE, L.L.P.;**
**GIANNI PERSICH, DPM;**
**COMMUNITY PHYSICAL THERAPY REHAB PT PC;**
**CROSS BAY ORTHOPEDIC SURGERY P.C.;**

**PETER TOMASELLO, JR., DO;**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a**
**NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS;**
**KEVIN WRIGHT, M.D.;**
**KATZMAN ORTHOPEDICS P.C.;**
**BARRY KATZMAN, M.D.;**
**ALEXANDRE B. DE MOURA, M.D., P.C.**
**D/B/A NEW YORK SPINE INSTITUTE;**
**ALEXANDRE B. DE MOURA, M.D.;**
**INTERVENTIONAL PAIN MANAGEMENT & REHAB., P.C.**
**D/B/A MUSCULOSKELETAL RESOURCES PAIN AND INJURY;**
**VADIM ABRAMOV, MD;**
**PETER KWAN, M.D., P.C.;**
**PETER C. KWAN, M.D.;**
**JOHN DOE NOS. 1-25;**
**XYZ CORPORATION NOS. 1-25;**
**JOHN DOE NOS. 26-50; and**
**XYZ CORPORATION NOS. 26-50,**

**Defendants.**

# TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ................................................................................ 1

II.   PARTIES ............................................................................................................... 1

   A.   Plaintiffs ......................................................................................................... 1

   B.   Defendants ...................................................................................................... 2

      i.   Legal Service Defendants ............................................................................ 2

      ii.  Medical Provider Defendants ...................................................................... 2

      iii. Runner Defendants....................................................................................11

      iv.  Funding Defendants ................................................................................... 12

III.  FACTUAL BACKGROUND .................................................................................. 12

   A.   Fraud Scheme and Facts Common to All Claims ............................................. 12

   B.   Plaintiffs' Exposure as the Target of the Fraud Scheme ................................... 39

      i.   **Roosevelt's Assumption of Obligations and Liabilities as a Primary Carrier** ....... 41

      ii.  **Tradesman's Assumption of Obligations and Liabilities as a Primary Carrier** .... 43

   C.   Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme.... 48

      i.   **Claimant A** ........................................................................................... 48

      ii.  **Claimant B** ........................................................................................... 58

      iii. **Claimant C** ........................................................................................... 65

      iv.  **Claimant D** ........................................................................................... 76

   D.   Defendants' Participation in the Fraud Scheme ............................................... 84

      i.    **Legal Service Defendants' Participation in the Fraud Scheme** ............................... 84

      ii.   **Runner Defendants' Participation in the Fraud Scheme** ...................................... 86

      iii.  **Funding Defendants' Participation in the Fraud Scheme** ..................................... 87

      iv.   **Kolb Defendants' Participation in the Fraud Scheme** ........................................ 87

      v.    **NYC MNO Defendants' Participation in the Fraud Scheme** ................................. 89

      vi.   **Brooklyn Med Defendants' Participation in the Fraud Scheme** ............................ 91

      vii.  **Community Imaging Defendants** ................................................................ 93

      viii. **North Shore Defendants' Participation in the Fraud Scheme** .............................. 94

      ix.   **Unicorn Defendants' Participation in the Fraud Scheme** .................................... 96

      x.    **Apple Defendants' Participation in the Fraud Scheme** ...................................... 98

      xi.   **Total Defendants' Participation in the Fraud Scheme** ....................................... 99

**xii. BL Pain Defendants' Participation in the Fraud Scheme** ........................................ 101

**xiii. Katzman Defendants' Participation in the Fraud Scheme** ................................... 103

**xvi. Community PT's Participation in the Fraud Scheme** ............................................. 104

**xv. Cross Bay Defendants' Participation in the Fraud Scheme** ................................... 106

**xvi. McCulloch Defendants' Participation in the Fraud Scheme** ................................ 107

**xvii. NYSI Defendants' Participation in the Fraud Scheme** .................................... 109

**xviii. Interventional Defendants' Participation in the Fraud Scheme** ................... 110

E. Defendants' Pattern of Racketeering Activity .................................................................. 112

**i. Claimant A** .................................................................................................................. 1122

**ii. Claimant B** ................................................................................................................ 1277

**iii. Claimant C** ............................................................................................................... 1399

**iv. Claimant D** .............................................................................................................. 1555

F. Claimant Summary and Defendant's Participation in Pattern of Racketeering Activity 1644

IV. PLAINTIFFS' JUSTIFIABLE RELIANCE ................................................................. 1644

V. DAMAGES ...................................................................................................................... 167

VI. CAUSES OF ACTION .................................................................................................. 174

VII. JURY TRIAL DEMAND ............................................................................................. 1855

## FIRST AMENDED COMPLAINT

Plaintiffs ROOSEVELT ROAD RE, LTD. (hereinafter referred to as "Roosevelt") individually, and in its capacity as subrogee of **ACCREDITED CASUALTY and SURETY COMPANY** (hereinafter referred to as "**Accredited**") and TRADESMAN PROGRAM MANAGERS, LLC (hereinafter referred to as "Tradesman") (collectively referred to hereinafter as "Plaintiffs") by and through their attorneys THE WILLIS LAW GROUP, PLLC, allege as follows:

### I.     JURISDICTION AND VENUE

1.     This is a civil action arising out of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and 28 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this District under and pursuant to 18 U.S.C. § 1965, and pursuant to 28 U.S.C. § 1391, in that numerous of the acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District, and at least one of the Defendants reside in this District.

### II.     PARTIES

### A.  <u>Plaintiffs</u>

3.     Plaintiff Roosevelt Road Re, Ltd. is a foreign limited company duly organized and existing under the laws of Bermuda. At all times relevant herein, Roosevelt was authorized to conduct business in New York.

4.      Plaintiff Tradesman Program Managers, LLC is a limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Tradesman maintained its principal place of business in the State of New York and is authorized to conduct business in New York.

**B.   Defendants**

**i.   Legal Service Defendants**

5.      Defendant WILLIAM SCHWITZER & ASSOCIATES, P.C. ("Schwitzer Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Schwitzer Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

6.      Upon information and belief, Defendant WILLIAM SCHWITZER ("William Schwitzer") resides in and is a citizen of the State of New York. He is also the founder and managing partner of Schwitzer Firm. At all times relevant, William Schwitzer was licensed or otherwise authorized to practice law in the State of New York.

7.      Upon information and belief, Defendant GIOVANNI "JOHN" C. MERLINO ("John Merlino") resides in and is a citizen of the State of New York. He is also a long-time partner and employee of Schwitzer Firm and William Schwitzer. At all times relevant, John Merlino was licensed or otherwise authorized to practice law in the State of New York.

8.      Schwitzer Firm, William Schwitzer, and John Merlino are collectively referred to herein as the "Schwitzer Defendants" or the "Legal Service Defendants."

**ii.   Medical Provider Defendants**

9.      Defendant KOLB RADIOLOGY P.C. ("Kolb Practice") is a professional corporation duly organized and existing under the laws of the State of New York. At all times

relevant herein, Kolb Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

10.    Upon information and belief, Defendant THOMAS M. KOLB, MD ("Kolb" and together with Kolb Practice, the "Kolb Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Kolb has been licensed or otherwise authorized to practice medicine in the State of New York and/or State of New Jersey and was the owner, operator, officer, director and/or employee of Kolb Practice. Kolb is not currently authorized to treat Workers' Compensation patients in New York State.

11.    Defendant NYC MEDICAL & NEUROLOGICAL OFFICES, P.C. ("NYC MNO Practice") is a professional corporation duly organized and existing under the laws of the State of New York.  At all times relevant herein, the NYC MNO Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

12.    Defendant MEHRDAD GOLZAD, M.D. ("Golzad" and together with NYC MNO Practice, the "NYC MNO Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Golzad has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of NYC MNO Practice. Dr. Golzad is not currently authorized to treat Workers' Compensation patients in New York State as he resigned his authorization on August 14, 2025.

13.    Defendant BROOKLYN MEDICAL PRACTICE, P.C. ("Brooklyn Med") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein. Brooklyn Med maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Brooklyn Med maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

14.     Defendant SAYEEDUS S. SALEHIN, M.D. ("Salehin" and together with Brooklyn Med, the "Brooklyn Med Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Salehin has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Brooklyn Med.

15.     Defendant ADVANCED ORTHOPEDICS AND JOINT PRESERVATION P.C. ("Advanced Ortho") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein. Advanced Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Advanced Ortho also maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

16.     Defendant STANISLAV B. AVSHALUMOV, D.O. ("Avshalumov" and together with Advanced Ortho, the "Advanced Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Avshalumov has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Advanced Ortho.

17.     Defendant COMMUNITY MEDICAL IMAGING OF BROOKLYN P.C. ("Community Imaging") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Community Imaging maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

18.     Defendant ANDREW J. MCDONNELL, M.D. ("McDonnell" and together with Community Imaging, the "Community Imaging Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, McDonnell has been licensed or otherwise

authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Community Imaging.

19.     Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC a/k/a Total Orthopaedics & Sports Medicine ("Total Ortho") is a limited liability company apparently organized and existing under the laws of the State of New York in conjunction with Total Ortho Management Services, LLC and possibly as a successor to the defunct Total Orthopaedics & Sports Medicine LLP whose authorization was revoked in 2013. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

20.     Defendant VADIM LERMAN, D.O. ("Lerman") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho. Lerman is not currently authorized to treat Workers' Compensation patients in New York State.[1] **Exhibit A**, Deauthorization Letter from WCB to Defendant Vadim Lerman dated April 15, 2025.

21.     Defendant ABHISHEK KUMAR, M.D. ("Kumar" and together with Total Ortho, and Lerman, the "Total Orth Defendants") resides in and is a citizen of the State of New York. At

---

[1] Defendant Dr. Vadim Lerman was deauthorized by the New York Worker's Compensation Board from treating injured workers on April 15, 2025. The Worker's Compensation Board found that Defendant Lerman consistently failed to (1) provide or maintain adequate medical documentation, (2) to provide clinical rationales for seeking variance from the MTGs to justify the medical necessity of the variance, (3) repeatedly submitted PARs for services that have been denied without escalating them for MDO review, (4) repeatedly resubmit PARs for services that have already been denied, even when there has been no substantial interim change in the claimant's clinical or functional status to warrant such reconsideration, (5) performed invasive/risky procedures, without adequately exhausting more conservative (and less risky) treatment modalities, (6) repeatedly provided incomplete and/or inconsistent medical documentation, (7) failed to follow published Board processes for the submission of medical bills, (8) billed in excess of the Board's MFS, at times for **services of questionable necessity**, and (9) this conduct also amounts to professional misconduct pursuant to N.Y. Educ. Law §§ 6530(3), (5), (21) and (35).

all relevant times herein, Kumar has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho.

22.     Defendant BIG APPLE PAIN MANAGEMENT, P.L.L.C. ("Big Apple") is a professional limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Big Apple maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Big Apple also maintained an office at 410 Ditmas Avenue, Brooklyn, New York

23.     Defendant RICHARD APPLE, M.D. ("Apple" and together with Big Apple, the "Apple Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Apple has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Big Apple.

24.     Defendant NORTH SHORE FAMILY CHIROPRACTIC, P.C. ("North Shore") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, North Shore maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. North Shore also maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

25.     Defendant TODD LAWRENCE LEBSON, D.C. ("Lebson" and together with North Shore, the "North Shore Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Lebson has been licensed or otherwise authorized to provide chiropractic services in the State of New York and was the owner, operator, officer, director and/or employee of North Shore.

26.     Defendant UNICORN ACUPUNCTURE, P.C. ("Unicorn") is a professional corporation duly organized and existing under the laws of the State of New York. At all times

relevant herein, Unicorn maintained its principal place of business in the State of New York and is authorized to and conducts business in New York. Unicorn also maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

27.     Defendant DEKUN WANG, L.Ac. ("Wang" and together with Unicorn, the "Unicorn Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Wang has been licensed or otherwise authorized to practice acupuncture in the State of New York and was the owner, operator, officer, director and/or employee of Unicorn.

28.     Defendant BL PAIN MANAGEMENT, P.L.L.C. d/b/a Pain Management NYC ("BL Pain") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, BL Pain maintained its principal place of business in the State of New York and is authorized to and conducts business in New York. BL Pain also maintained an office at 95-27 Jamaica Avenue, Woodhaven, New York.

29.     Defendant PAIN PHYSICIANS NY, P.L.L.C. ("Pain Physicians") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, Pain Physicians maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

30.     Defendant LR MEDICAL, P.L.L.C. ("LR Med") is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, LR Medical maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

31.     Defendant BOLESLAV KOSHARSKYY, M.D. ("Kosharskyy") resides in and is a citizen of the State of New York. At all relevant times herein, Kosharskyy has been licensed or

---

**FIRST AMENDED COMPLAINT**                                                              7

otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of BL Pain and Pain Physicians.

32. Defendant DEMETRIOS KOUTSOSPYROS ("Koutsospyros" and together with BL Pain, Pain Physicians, LR Med and Kosharskyy, the "BL Pain Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Koutsospyros has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of BL Pain and Pain Physicians.

33. Defendant ALL COUNTY FOOT AND ANKLE, L.L.P. ("All County Practice") is a limited liability partnership duly organized and existing under the laws of the State of New York. At all times relevant herein, All County Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

34. Defendant GIANNI PERSICH, DPM ("Persich" and together with All County Practice, the "All County Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Persich has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of All County Practice.

35. Defendant COMMUNITY PHYSICAL THERAPY REHAB PT PC ("Community PT") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Community PT maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

36. Defendant CROSS BAY ORTHOPEDIC SURGERY P.C. ("Cross Bay Practice") is a professional corporation duly organized and existing under the laws of the State of New York.

At all times relevant herein, Cross Bay Practice maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

37.     Defendant PETER TOMASELLO, JR., D.O. ("Tomasello" and together with Cross Bay Practice, the "Cross Bay Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Tomasello has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Cross Bay Practice.

38.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch Ortho" or "NY S&J" when utilizing the alias) is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, McCulloch Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

39.     Defendant KEVIN WRIGHT, M.D. ("Wright" and together with McCulloch Ortho" and "NY S&J", the "McCulloch Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Wright has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

40.     Defendant KATZMAN ORTHOPEDICS P.C. ("Katzman Ortho") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Katzman Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

---

**FIRST AMENDED COMPLAINT**                                                                 **9**

41.      Defendant BARRY KATZMAN, M.D. ("Katzman" and together with Kaztman Ortho, the "Katzman Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Katzman has been licensed or otherwise authorized to provide orthopedic services in the State of New York and was the owner, operator, officer, director and/or employee of Katzman Ortho.

42.      Defendant ALEXANDRE B. DE MOURA, M.D., P.C. d/b/a NEW YORK SPINE INSTITUTE ("NYSI") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, NYSI maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

43.      Defendant ALEXANDRE B. DE MOURA ("de Moura" and together with NYSI, the "NYSI Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, de Moura has been licensed or otherwise authorized to provide orthopedic services in the State of New York and was the owner, operator, officer, director and/or employee of NYSI.

44.      Defendant INTERVENTIONAL PAIN MANAGEMENT & REHAB., P.C. d/b/a MUSCULOSKELETAL RESOURCES PAIN AND INJURY ("Interventional") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, Interventional maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

45.      Defendant VADIM ABRAMOV ("Abramov" and together with Interventional, the "Interventional Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Abramov has been licensed or otherwise authorized to provide orthopedic services in the State of New York and was the owner, operator, officer, director and/or employee of Interventional.

46.     Defendant PETER C. KWAN, M.D., P.C. ("Kwan, P.C.") is a professional corporation duly organized and existing under the laws of the State of New Jersey. At all times relevant herein, Kwan, P.C. maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

47.     Defendant PETER C. KWAN ("Kwan" and together with "Kwan, P.C." the "Kwan Defendants") resides in and is a citizen of the State of New York. At all relevant times herein, Kwan has been licensed or otherwise authorized to provide neurology services in the State of New York and was the owner, operator, officer, director and/or employee of Kwan, P.C.

48.     Kolb Defendants, NYC MNO Defendants, Brooklyn Med Defendants, Advanced Defendants, Community Imaging Defendants, Total Ortho Defendants, Apple Defendants, North Shore Defendants, Unicorn Defendants, BL Pain Defendants, All County Defendants, Community PT, Cross Bay Defendants, McCulloch Defendants, Katzman Defendants, NYSI Defendants, Interventional Defendants and Kwan Defendants are collectively referred to herein as the "Medical Provider Defendants."

### iii.  **Runner Defendants**

49.     Defendants JOHN DOE NOS. 1-25 (collectively "Runner Defendants") are persons of unknown citizenship who participated in the fraudulent scheme described below by recruiting construction workers into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

50.     Runner Defendants perform an essential function by bringing construction workers to Legal Defendants proximate to the dates of alleged injury, and may thereafter perform secondary functions, *inter alia,* accompanying claimants to doctors appointments and providing interpretation services, related to ensuring that claimants continue to participate in the scheme as directed by the Legal and Medical Provider Defendants.

51.    Similar to the scheme set forth in *United States v. Rainford et al.*, 110 F.4th 455 (2d Cir. 2024), Runner Defendants typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

### iv.  Funding Defendants

52.    Defendants XYZ CORPORATION NOS. 1-25 (collectively, the "Funding Defendants") are business entities of unknown organization that participated in the fraudulent scheme described below by providing funds directly and/or indirectly to the Legal Service Defendants, the Runner Defendants, the Claimants (defined below) and/or the Medical Provider Defendants.

53.    Defendants JOHN DOE NOS. 26-50 are medical providers who have treated one or more of the Claimants made the basis of this lawsuit who, however, without discovery, cannot be identified as knowing conspirators at this time.

54.    Defendants XYZ CORPORATION NOS. 26-50 are medical facilities who treated one or more of the Claimants made the basis of this lawsuit who, however, without discovery, their specific knowledge as to their roles in the scheme cannot be identified at this time.

55.    The Legal Service Defendants, Medical Provider Defendants, Runner Defendants, and Funding Defendants are collectively referred to herein as "Defendants."

### III.    FACTUAL BACKGROUND

### A.    Fraud Scheme and Facts Common to All Claims

56.    From at least 2018 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiffs and others by (i) unlawfully grooming and recruiting construction workers into staging and perpetuating fake construction accidents that occurred in New York and/or transforming legitimate minor or localized injuries into lucrative full-body

claims; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent workers' compensation claims and personal injury lawsuits on behalf of such construction workers; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such construction workers; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate settlement value (the "Fraud Scheme").

57.     Generally, under the New York Workers' Compensation Law, a worker injured on a construction site is entitled to prompt indemnity and medical compensation through a workers' compensation claim. Where the matter in which the worker is injured constitutes a violation of the New York Labor Law, the worker may also be entitled to compensation from the property owner or general contractor through a commercial general liability claim. Both claims are financially paid by insurance policies maintained by the respective entities, which are required in the State of New York.

58.     A worker's compensation claim is initiated by filing documents with the New York State Workers' Compensation Board ("NY WCB"). This is typically done by an attorney to establish injuries to specific body parts and to authorize medical treatment and indemnity payments for the claimant. This is determined through additional forms and documentation submitted to the New York State WCB by and through the claimant's attorney and directly by treating doctors and facilities. For Claimants treated by the Medical Provider Defendants and represented by Schwitzer Defendants in workers' compensation claims, the Medical Provider Defendants and the Schwitzer Defendants would have necessarily submitted documents to the NY WCB identifying alleged workplace accident and injuries as well as the medical services allegedly provided in connection

therewith. These forms and documentation, when they may facially appear to comply with the medical treatment guidelines or are presented as injuries needing treatment outside of such guidelines, are accepted and approved even when the information contained therein is in fact false. Essentially, these Defendants dupe the NY WCB into establishing faked or pre-existing injuries and authorizing medical treatment all stemming from the alleged accidents.

59.     A general liability claim is typically initiated through the filing of a lawsuit in one of the Supreme Courts of the State of New York.  It requires the filing of a verified Summons and Complaint, with the verification is often done by the claimants' attorney rather than the claimants themselves. Subsequent to the Summons and Complaint, additional documentation known as Bills of Particulars are prepared, verified by the claimant's attorney and served upon all parties to the lawsuit. In New York State, Bills of Particulars as required by CPLR § 3043 are designed to clarify factual key details of personal injury actions and must be supplemented in the event that further treatment, expenses or other material changes in the particulars of the action. For Claimants represented by Schwitzer Defendants in personal injury lawsuits, Schwitzer Defendants necessarily submitted documents attesting to the alleged workplace accident and associated injuries and amplified same by serving Bills of Particulars upon various entities.

60.     The documentation submitted through both the workers' compensation and general liability claims are thereafter used as a basis for to seek compensation for medical expenses, indemnity payments, settlement demands, and due to the strict nature of New York's workers' compensation and the New York Labor Law such demands often succeed.  When the documentation submitted is fraudulent or contains fraudulent information, as is the case in the scheme described herein, the settlements become exorbitant when settlements should either be

nominal or non-existent. Moreover, it causes increasing claim administration and litigation expenses that would not have been incurred otherwise.

61. The Legal Service Providers, Medical Service Providers and Runner Defendants acted in concert in a coordinated scheme in which claimants are instructed to feign or exaggerate injuries and undergo unnecessary, excessive, unwarranted, and costly medical services—often accompanied by false diagnoses and fabricated records—designed not for legitimate patient care but to justify lucrative surgeries for the purpose of inflating workers' compensation benefits and personal-injury settlement values, thereby generating unlawful ill-gotten gains from for attorneys, runners, and medical providers, to the detriment of insurance carriers (hereinafter the "Fraudulent Treatment Protocol").

62. The conspiracy shares many structural elements similar to those found in *United States v. Rainford*, *supra*, as summarized by the Second Circuit Court of Appeals in its recent decision affirming criminal convictions:

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

*United States v. Rainford et al.*, 110 F.4th at 468.

63. The Defendants together constituted an association-in-fact enterprise generally structured as depicted below in Figure 1. The Medical Provider Defendants as depicted below in Figure 2 identify which entities and individuals providing "evaluation" services perform gatekeeping functions.

**Figure 1.**



**Figure 2.**



64. Generally, as part of the Fraud Scheme, individuals known as "runners" ("Runners"), including the Runner Defendants, under the direction of the Schwitzer Defendants and in furtherance of and as a necessary step for the execution of the Fraud Scheme, recruited construction workers ("Claimants") into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

65. Upon information and belief, as part of the recruitment process, Claimants were told that they would be paid workers' compensation benefits for not working if they had a work-place injury and that they would receive money in addition to workers' compensation benefits in order to cover any theoretical gap in pay, in the form of litigation funding loans arranged by Schwitzer Defendants in conjunction with Funding Defendants.

66. Upon information and belief, and in furtherance of the recruitment process, Claimants were also told that the amount of their ultimate economic recoveries would increase if they had surgeries or rehabilitation, and that the economic benefits could continue for weeks or more so long as they continued to participate in the treatment protocol predetermined by Defendants.

67. Regardless of any actual bodily injury stemming from the purported construction accidents, these Claimants were instructed by the Runners, under the direction of the Legal Service Defendants and on behalf of the Defendants, to fake and claim certain bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would provide treatment in furtherance of the scheme.

68. After obtaining initial medical assessments, typically from Hospital emergency rooms, the Runners then referred and/or transported these Claimants to Schwitzer Firm, where attorneys and/or other employees of Schwitzer Firm met with these Claimants.

69.     The Schwitzer Firm, in coordination with Defendants, represented the Claimants in general liability lawsuits and workers' compensation claims made to the New York State Workers' Compensation Board ("NY WCB") against the various parties involved with the construction project (*e.g.*, owner, general contractor, construction manager, etc.) for purported injuries that resulted from alleged accidents on the construction projects.

70.     For most Claimants, both general liability lawsuits and workers' compensation claims were initiated and proceeded in parallel to maximize profit for the Schwitzer Firm, and ultimately all Fraud Scheme participants.

71.     In order to inflate settlement value and workers' compensation benefits and thereby effectuate higher profit for the Defendants, the Runners and/or attorneys and/or other employees of the Schwitzer Firm, and/or others under their control, directed the Claimants to seek medical diagnosis and treatment from certain associated medical providers with which the Defendants had an agreement or understanding as to the fraud scheme, including the Medical Provider Defendants, who provided a variety of services (radiology, physical therapy, pain management and orthopedic surgery) at facilities located in or to patients from multiple states, including New York and New Jersey. These services are intended to culminate in otherwise unnecessary spinal surgeries, which are invariably recommended pursuant to the protocol irrespective of the claimants' ages, actual injuries, response to conservative care, or the Worker's Compensation Medical Guidelines.

72.     These Medical Providers also had an agreement and understanding as to their involvement in the Fraud Scheme, including providing fraudulent, unwarranted, and/or treatment wholly unrelated to any purported accident, and provided such falsified medical documentation to the Schwitzer Firm for use as needed for higher settlement values, in furtherance of the Fraud Scheme and in exchange for Defendants continuing to funnel patients to their offices and additional

monies obtained via predatory litigation funding. In this respect, the scheme bears striking similarity not only to *Rainford, supra*, but also to the scheme as set forth in *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024), in which certain medical service providers "conduct initial examinations of patients at the gatekeeper clinics that are not intended to diagnose and treat patients' conditions but rather are predetermined to find various injuries requiring extensive treatment." *Id* at 73.

73.    As in *State Farm v. Tri-Borough*, implementation of the fraudulent treatment protocol requires that Medical Provider Defendants "routinely order unnecessary diagnostic tests for patients that do not affect their treatment, and that some of those tests are duplicative of information already obtained…." 120 F.4th at 74.

74.    Ten defendants, including Brooklyn Medical Practice, Sayeedus S. Salehin, M.D., Big Apple Pain Management, PLLC, Richard J. Apple, M.D., North Shore Family Chiropractic, P.C., Todd Lesbon, P.C., Unicorn Acupuncture, P.C., Dekun Wang, L.AC. Advanced Orthopedics and Joint Preservation, P.C. and Stanislav B. Avshalumov, D.O. (collectively the "410 Ditmas Defendants") all operated from the same address located at 410 Ditmas Ave. in Brooklyn, New York.

75.    In addition to shared buildings/addresses, several Medical Provider Defendants have utilized different corporate identities to at least partially hide what amounts to circles of self-referrals. For example, personnel from McCulloch Ortho will selectively use the NY S&J identity, and personnel from Pain Physicians will bill for certain services through LR Med and/or BL Pain to achieve the same purpose.

76.    According to long standing Total Ortho partner Defendant Vadim Lerman, M.D. Defendant Salehin of Brooklyn Med is/was an undisclosed partner in Total Ortho; thereby directly benefiting from every person referred for surgery to Total Ortho from Brooklyn Med.

77.    Defendant Lerman, in February 14, 2018 sworn testimony, confirmed the interrelated connection between the Brooklyn Med Defendants and Total Ortho Defendants as follows:

> Q    By the way, your partner is doctor -- you own this practice?  You are one of the owners of the practice?
>
> A    Yes, I am.
>
> Q    How many partners are there?
>
> A    There is three partners.
>
> Q    Who are they?
>
> A    Dr. Avanesov, Dr. Saleehin, Dr. Ruotolo and me.
>
> Q    There are four altogether?
>
> A    Dr. Avanesov is part of Advanced, and we are part of Total Orthopedics.
>
> Q    Explain that.  Who is Advanced?
>
> A    Advanced is Dr. Avanesov and Dr. Saleehin.
>
> Q    What does Advanced do?
>
> A    It's the same thing, spine surgery.  Dr. Avanesov and the others.  I am part of Total Orthopedics.
>
> Q    Dr. Avanesov is part of Total as well?
>
> A    Yes.

*See NYSCEF Doc. No. 15, Index No. 532614/2021; The Travelers Indemnity Company and Its Property Casualty Affiliates and Subsidiaries v. Avenue C Medical P.C. et al; Supreme Court of the State of New York; County of Kings, originally filed in Suffolk County under Index Number 617008/2020.*

78.    Federal Law, and specifically the Stark Law (42 U.S.C. 1395nn), prohibits with limited exceptions, that where "a physician has a financial relationship with an [specified entity],

---

**FIRST AMENDED COMPLAINT**                                                                          21

then (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a [prohibited referral]." Designated health services include: (B) Physical therapy services, (D) Radiology services, including magnetic resonance imaging, and (K) Inpatient and outpatient hospital services.

79.    Based upon Defendant Saleehin's financial interest in both Brooklyn Med and Advanced Ortho, all referrals from Brooklyn Med to Advanced Ortho (which conveniently both operate out of 410 Ditmas) constitutes substantial evidence of impermissibly interested [self] referral(s). The lack of proper disclosure and overlapping interests is part and parcel of the scheme alleged herein, and further directly creates an inference of engaging in deceptive trade practices.

80.    Both Claimants B and D underwent therapeutic treatment under the care of Defendant Saleehin of Brooklyn Med, and upon alleged failure of conservative treatment, underwent a series of cervical and lumber surgeries at Total Ortho (billed as "Orthopaedics Spine & Sports Medicine" omitting the distinguishing "Total" from the name of the billing entity to at least facially obscure the prohibited referral relationship.)

81.    Moreover, as of April 15, 2025, the Worker's Compensation Board declined to renew Defendant Lerman's authorization to treat workers' compensation claimants and to perform workers' compensation-related surgeries.  *See* Letter attached hereto as Exhibit "A". The WCB found that Dr. Lerman's treatment of injured workers did not comport with applicable Medical Treatment Guidelines and consisted of a series of noncompliance behaviors that deviated from the expected standard of care. The WCB found that Dr. Lerman's conduct:

1. exposes claimants to risks of injury and complications from invasive procedures; and at the same time;
2. lacks adequate and/or credible documentation, frequently failing to meet generally acceptable standards of medical record-keeping; and
3. lacks medical justification or clinical indications for these procedures, calling into question the clinical judgment utilized in this medical decision-making; and
4. demonstrates the submission of prior authorization requests (PAR) to perform procedures outside of those generally provided for within the MTGs (variance PARs) without the requisite supporting medical justification; and
5. exhibit billing irregularities in your billing practices for such procedures.

82.    Similarly here, utilizing the same fraudulent treatment protocol for which Dr. Lerman was delisted from worker's compensation authorized medical provider list, Dr. Lerman recommended an unnecessary invasive surgery, an anterior cervical discectomy and fusion on Claimant D, less than three months following the accident date, and performed a lumber discectomy and fusion on Claimant B (then 29 years old), just six months following the accident date.

83.    A medical provider's omission or misrepresentation of material facts can take many forms, including false and misleading information about (a) the ownership or control of a professional entity rendering the treatment, (b) the necessity of the treatment, and (c), more plainly, the contents of the treatment records themselves.

84.    A medical provider's representations about PC ownership and control are material because New York law requires that all professional medical service corporations be owned and controlled by appropriately licensed medical professionals. N.Y. Bus. Corp. Law §§ 1503, 1507.

85.    A medical provider's representations about the medical necessity of the treatment provided are material because proximate causation is a necessary element of a negligence claim, and where treatment was not medically necessary, the cost, expense, pain and suffering, and other

alleged damages resulting from such treatment are not proximately related to the subject incident, rendering such treatment impermissibly presented in building a claim for damages.

86.    A medical provider's representations contained within the records are plainly material, as they are source material for parties, the Court, and ultimately jurors, to ultimately render conclusions, findings of fact, and holdings in law.

87.    Here, the associated Medical Provider Defendants routinely ordered a predetermined array of imaging in every case – MRIs of cervical and lumbar spine, shoulders, knees, ankles, hands – from the Defendant Radiologists. The website of the American Board of Medical Specialties (https://www.abms.org/board/american-board-of-radiology/) [2] states that "A radiologist is a physician who uses imaging methodologies to diagnose and manage patients and provide therapeutic options." It further states that "A diagnostic radiologist uses X-rays, radionuclides, ultrasound and electromagnetic radiation *to diagnose and treat disease*" (emphasis added).

88.    The American Medical Association Code of Ethics makes it unmistakably clear that radiologists have an ethical obligation not to perform unnecessary imaging on a patient when such radiologist determines the imaging is medically unnecessary. [3]

89.    In the Fraud Scheme the Defendant Radiologists held a foundational role in diagnosing claimant conditions or recommending courses of treatment by generating a report,

---

[2] Last accessed September 10, 2025.
[3]*See Radiologists' Ethical and Professional Obligations*, AMA Journal of Ethics (Sept. 9, 2007), *available at:* https://journalofethics.ama-assn.org/article/radiologists-ethical-and-professional-obligations/2007-11#:~:text=When%20a%20radiologist%20receives%20an,known%20to%20the%20referring%20physician.
"Each time an imaging study is ordered, radiologists must ask whether exposure to radiation is warranted. Imaging should be recommended only when it is in the patient's best interest; that is, it should not be performed to avoid litigation, for financial gain, to reach a quota, when the outcome clearly will not affect the treatment plan…."

FIRST AMENDED COMPLAINT                                                                24

*regardless of the reality in the films*, that the referring doctor then uses to base causation and treatment.

90.     In furtherance of the Fraud Scheme, the Defendant Radiologists executed their vital function by creating the causal link between the alleged construction site traumatic accident and each claimants' injuries. Every radiological report generated by the Defendant Radiologists herein contained an "indication" (the reason for the imaging) or "history" field completed by the radiologist. Under that heading, "status post trauma" and/or another description of an acute onset is listed for each and every Claimant at issue in this action, which necessarily indicates that the Defendant Radiologists knew and were aware that the Claimants were presenting status-post a traumatic event, i.e., *an accident.*

91.     Then the Defendant Radiologist(s) issued reports containing findings that routinely deviate from the claimants' conditions as set forth by the imaging studies themselves, are not causally related, i.e. not status post trauma, or omitted degenerative origins in furtherance of the Fraud Scheme. The fraud perpetrated by Defendant Radiologists resulted from radiological reports which do not truthfully state the actual condition of the individual being imaged and reported on, concealing their fraud in facially valid reports.

92.     Exemplar Claimant A initially reported injuries to left shoulder and lower extremities, which upon examination in the emergency room revealed full range of motion in the upper and lower extremities resulting in discharge from the emergency room within two hours. Nevertheless, the Medical Provider Defendants referred Claimant A for imaging also of his brain, shoulders, knees, ankles, hips, hand, neck, back and other bodily areas that were not indicated for any injury based upon the initial accident and initial emergency room complaints. Despite the lack of any apparent injury to the lower extremities and neck, Kolb Radiology reported an ACL tear to

Claimants A's left knee, herniations in Claimant A's neck and linear focus of increased signal in right frontal white matter which may be posttraumatic in origin in his brain, despite no allegations that he hit his head or made any head complaints or had a loss of consciousness. In furtherance of the Fraudulent Treatment Protocol the associated medical service providers used these fraudulent imaging reports, but not the underlying imaging studies that either show degenerative conditions or fail to show any evidence of an acute injury, to justify months of physical therapy sessions, chiropractic treatments, and acupuncture treatments, for Claimants, which were then represented as being a course of allegedly failed conservative treatment in order to justify pain management injections and lucrative back and neck surgeries, shoulder surgeries, knee arthroscopies, etc.

93.     All operative interventions must be based upon positive correlation of clinical findings, clinical course and imaging and other diagnostic tests. A comprehensive assimilation of these factors must lead to a specific diagnosis with positive identification of pathologic condition(s). Here, the medical service providers routinely did not consult the MRI films themselves opting to instead rely upon reports calculated to misrepresent the claimants' conditions as causally related to the alleged incidents, so that the otherwise unnecessary procedures would present with the patina of legitimacy. While the specific body parts at issue may vary amongst the claimants, the underlying scheme remained the same, to inflate injuries and medical treatment securing ill-gotten gains for all Defendants to the detriment of Plaintiffs

94.     Upon information and belief, Schwitzer Defendants would provide personnel that sometimes consisted of Runners, employees, or outside personnel to accompany the Claimants to all independent medical examinations under the guise of protecting the Claimants' interests, but who in reality were positioned to ensure that Claimants presented their injuries, treatment and even their residences to comport with the protocol and the narrative crafted by Defendants to justify

same.  As described below, Schwitzer Defendants (through Runners, employees or outside personnel) also used this opportunity to interact with others undergoing independent medical examinations to lure them away from their existing attorneys.

95.    Specifically, in a New York State action captioned Index No. *159991/2018; Ginarte Gallardo Gonzalez & Winograd, LLP v. William Schwitzer et al; New York County Supreme Court* ("Ginarte Lawsuit"), the Schwitzer Defendants were sued, *inter alia*, for tortious interference with a contract, violation of New York Judiciary Law § 487, defamation, unfair competition, Civil RICO, conspiracy and unjust enrichment.  Allegations included the following:

> 2.    Mr. Schwitzer led this conspiracy in which Defendants and other unnamed co-conspirators engaged in a scheme involving classic ambulance-chasing; showing up at doctors' offices, offering patients/clients cash to retain Defendants as substitute counsel for Ginarte in their personal-injury cases, and falsely denigrating Ginarte's skills, abilities, experience, honesty and integrity as part of a high-pressure sales pitch to vulnerable and seriously-injured people.  As discussed *infra*, this is not the first time that Defendants have engaged in unlawful and unethical conduct.

*See* Complaint, ¶ 2, attached hereto as Exhibit "B".

96.    In a written statement filed in the Ginarte Lawsuit, a former employee of the Schwitzer Firm stated:

> "I have worked for about 3 years at William Schwitzer & Associates.  I along with other staff members of the firm was [sic] encouraged to attend I.M.E. and Doctor [sic] appointments with clients of the law firm.  My goal was if it was a good case I would call Mr. Schwitzer [to] explain the case and persuade the patients to come to our office with me now and **provide them with transportation to Mr. Schwitzer's office**.  The patient would **meet Mr. Schwitzer and an agreement was worked out** between them.  **If the patient now client would need cash Mr. Schwitzer would send them to Case Cash located at 520 8th Ave, NY, NY 10th floor to receive a top loan for the case.  [REDACTED] is managed by [REDACTED] an attorney but maybe owned by Mr. Schwitzer himself.**  Mr.

Schwitzer has about 30 to 35 paralegals working for his firm. Every paralegal had business cards to hand out to patients who could be potential clients."

"**Mr. Schwitzer also employs runners** that would go to accident scenes and sign up clients as well. One of these runners is [REDACTED] **who would sign clients up at either the hospital, accident scenes or doctor appointments.**"

"I once had a runner call me up and asked me for money up for a case that was yet to be signed up or brought into the firm. I **forwarded this call to John Merlino who is Mr. Schwitzers [sic] Partner.**"

"At some of these doctors appointments we would talk to the client and inquire how they got to doctor's appointments. If the [sic] told us public transportation **we would tell them we would provide an Uber for appointments. We would also say we never heard of that attorney and tell them we are a top 5 law firm and insure [sic] them we would get quicker workman's compensation payments through us** but would have to retain our law firm as representation for the lawsuit. We would try to sweeten the deal and point out what their present attorney was lacking. **We would target and push for cases that would reap a large settlement.**"

"I remember one construction case the guy's 1st name was [REDACTED] who lived upstate was already retained by Joe Ginarte firm in 2017. There was a tug of war over which firm he should use and he **switched to Schwitzer because he received five thousand dollars up front**. I am aware that Joe Ginarte and William Schwitzer use the same Doctor [REDACTED] so there might be some attorney switching going on at these doctor appointments involving William Schwitzer staff of paralegals. **William Schwitzer also uses runners in all 5 boroughs and I am familiar with [REDACTED] from Staten Island who brings in labor law cases.**"

"In the past **Schwitzer has accused me of stealing clients and threatened me with bodily harm**. This was in October of 2015. **I have also observed him threaten other employees of his firm.**"

"**I would also like to add that he keeps a brief case in his office with a large amount of cash and he uses this cash to pay both clients and the runners. By he I mean Mr. Schwitzer uses this cash to bring these cases to his firm.**"
*See* Written Statement attached hereto as Exhibit "C".

97.    Many of the Claimants are undocumented immigrants who do not speak English, and the Claimants, as part of the Fraud Scheme, were instructed, coached and/or pressured by the Runner Defendants (at the direction of the Schwitzer Defendants) to fake their injuries and receive

a myriad of healthcare services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged workplace accident. The Schwitzer Defendants knew or reasonably should have known that the Claimants were faking their injuries and receiving medical services that were unnecessary, excessive, unwarranted and costly and/or not causally related to the alleged workplace accident.

98.    As an example of the coercion, in one such case involving a former Schwitzer Firm client, a claimant testified that he was dissatisfied with the Schwitzer Firm and, after having switched to a new firm, was harassed about his change of attorney and was bribed to return to their firm:

> A few days later, around November 21, 2023, I received phone calls and text messages from employees of William Schwitzer & Associates, including my former paralegal Denise, who insistently asked for explanations about my decision to relieve them as my attorneys, and threatened to cause damage to my legal case. I refused them and blocked their phone numbers.

> Then, on December 5, 2023, Denise came to my house at 1420 White Plains Road, Bronx around 11:00 am. She again insisted that I should return to William Schwitzer & Associates as my legal counsel. She also

> offered me loans for $40,000 and then for $50,000, which I rejected. After refusing her insistence, she told me: "I hope this won't weigh on you", and left my home.
>
> √_____
> Javier Bances Carranza

*See* Plaintiff's Affidavit in the case *Index No. 806956/2023E;Javier Bances Carranza v. 89 Ave Realty LLC et al; Supreme Court of the State of New York; County of Bronx* and attached hereto as Exhibit "D".

99.    , As an incentive to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged workplace accident, the Schwitzer Defendants connected the Claimants to the Funding Defendants who offered cash advances and high-interest litigation funding loans to Claimants proximate to retaining the Schwitzer Defendants and, additionally, via litigation funding sources after they filed suit and after they completed surgery.

100.    Workers' compensation benefits and settlement values increase based on the extent and severity of the claimed medical treatment. By directing Claimants to receive unnecessary, excessive, unwarranted and costly healthcare services, Defendants intentionally, fraudulently, and unlawfully inflated workers' compensation benefits and settlement values from which the Schwitzer Firm and Defendants received financial gain, and which furthered and perpetuated the Fraud Scheme enterprise.

101.    The Claimants received a portion of the high-interest funding loan proceeds and the high-interest funding loans were secured by the settlement payments anticipated from Claimants' workers' compensation claims and/or general liability lawsuits.

102.    Upon information and belief, Schwitzer, retains a direct or indirect ownership interest in the Funding Defendants and is receiving a double recovery on cases from both interest from litigation loans and contingency fees received for settled cases.  By way of example, Schwitzer is both the registered agent and member of Frat Boys with Money, LLC, a Florida limited liability company.  Its mailing address, notwithstanding the Florida organization, is the Schwitzer Firm's address located at 820 2nd Avenue, 10th Floor, New York, NY 10017:



https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityNam
e&directionType=Initial&searchNameOrder=FRATBOYSWITHMONEY%20L210000937510&
aggregateId=flal-l21000093751-ca552ee8-db38-462e-9fec-
715ceb91ef1d&searchTerm=Frat%20Boys%20with%20Money&listNameOrder=FRATBOYSW
ITHMONEY%20L210000937510, last accessed May 14, 2025.

103.     The Schwitzer Defendants utilized Case Cash to provide monies to claimants.  This

is believed to be Case Cash Funding, LLC, **Case Cash, Inc.**, Case Cash GP, LLC and/or Casecash

Express Inc.  These entities are owned and operated, in whole or in part, by Gregory Elefterakis, a

former New York attorney that was disbarred for financial wrongdoing.



104.     Gregory Elefterakis has recently been named in a federal lawsuit alleging civil RICO under a similar scheme demonstrated here.  *See* Case 1:25-cv-02652; *Union Mutual First Insurance Company v. Subin Associates, LLP, et al*; United States District Court for the Eastern District of New York.  Gregory Elefterakis is also the uncle of Dean Liakas who owns and operates Liakas Law, P.C., a firm named in two federal lawsuits alleging civil RICO under a similar scheme demonstrated here.  *See* Case 1:25-cv-01857; *Union Mutual Fire Insurance Company v. Liakas Law, P.C., et al*; United States District Court of the Eastern District of New York; *see also* Case 1:25-cv-00300; *Roosevelt Road Re, Ltd., et al v. Liakas Law, P.C., et al*; United States District Court for the Eastern District of New York.

105.     Upon information and belief, the Runners, including the Runner Defendants, also received a portion of the Claimants' high-interest funding loan proceeds, some of which may have

been further diverted to recompense organized criminal elements for arranging the unlawful immigration of claimants, whom they transported to the New York-New Jersey metropolitan area.

106.    Upon information and belief, the Schwitzer Defendants employ Spanish-based OSHA training courses through sponsorships, advertising and attendance as another method of recruiting and grooming immigrant claimants in furtherance of the Fraud Scheme and the aiding in the unlawful immigration and work authorization of Claimants.

107.    For example, the Schwitzer Defendants advertise themselves at OSHA classes and advertise OSHA classes through their own social media:





108.     In addition, upon information and belief, the Schwitzer Firm, including defendant John Merlino, attends and provides instructions to such classes when, upon further information and belief, such attorneys are not authorized or credentialed to provide such instruction.  Here, defendant John Merlino, is seen addressing an OSHA training course class:



John C. Merlino

109.    These courses are known to advertise in Spanish that OSHA cards can be received the same day; however, full OSHA 10 Hour and OSHA 30 Hour training, with mandatory testing, obviously cannot be completed in a single day:



**"Tarjetes se entregan el mismo dia" translates to "Cards are delivered the same day"**

110.    A student's participation in the course must first be reported to a regional OSHA training center, e.g. Rutgers, who thereafter issue cards for distribution.  Thus, the advertisement, associated with the Schwitzer Defendants, is false unless cards are improperly pre-ordered irrespective of students' actual progress.

111.    In furtherance of the Fraud Scheme, the Medical Provider Defendants provided false diagnoses, the use of their facilities and resources, and unnecessary, excessive, unwarranted,

and costly medical services and/or medical services that were not causally related to the alleged workplace accident, for which the Medical Provider Defendants received compensation from workers' compensation insurance.

112.    The Medical Provider Defendants serially filed incomplete or inaccurate billing records and reports facially calculated to obfuscate how they conspired with each other and the other defendants herein to effect the fraudulent treatment protocol so that observers could not readily discern how a claimant was steered between medical providers, largely excepting only prescriptions for imaging studies, pharmacy medications and the like.

113.    For many bills regarding alleged treatment rendered prior to July 1, 2022, Medical Provider Defendants routinely failed to accurately complete section E, question 3 of the requisite C-4.0 form which asked "Did another health provider treat this injury/illness including hospitalization and/or surgery" by either failing to respond, falsely responding in the negative, providing non sequitur answers such as "Transported by coworker" or by noting hospitalization while omitting any subsequent treatment.

114.    On many bills for which Medical Provider Defendants relied upon the CMS-1500 forms that were permissible prior to July 1, 2022 and mandatory thereafter, box 17 – which designated the name of the referring provider or other source – was typically a) blank, b) contained the name of the physician whose bill it was, or c) was a referral from one member of a Defendant PC to another within the same practice.

115.    Moreover, in the absence of acute fractures or dislocations, none of which are present here, the New York Workers' Compensation Board Medical Treatment Guidelines (collectively, "Guidelines") require patients to fail conservative treatment before escalating to more significant or aggressive procedures such as injections, arthroscopies, or other surgeries.

116.    Specifically, the Mid and Low Back Injury Guidelines and the Neck Injury Guidelines both hold that "[t]herapeutic spinal injections may be used after initial conservative treatments, such as physical and occupational therapy, medication, manual therapy, exercise, acupuncture, have been undertaken." Sections D.6.a and D.3.a., respectively, available online at https://www.wcb.ny.gov/content/main/hcpp/MedicalTreatmentGuidelines/MidandLowBackInjuryMTG2021.pdf                                                                                                        and https://www.wcb.ny.gov/content/main/hcpp/MedicalTreatmentGuidelines/NeckInjuryMTG2021.pdf, last accessed September 22, 2025 (hereinafter "Low Back Guidelines" and "Neck Guidelines," respectively). Both Guidelines further specify that patients must in fact have active therapy prior to injections or any other invasive procedures. Yet in all of these representative cases, the claimants were diverted to courses of largely passive treatment in order to justify invasive – and lucrative – procedures. Compliance with the Guidelines is mandatory pursuant to 12 N.Y.C.R.R. § 324.2(a), such that failure to do so can and does result in the revocation of a medical provider's authorization to treat injured workers in New York State.

117.    The Medical Provider Defendants understood and agreed that in return for providing the false medical documentation needed for lengthier and more significant and invasive Workers' Compensation treatment and thereafter correspondingly higher settlement values, the Schwitzer Defendants would continue to funnel patients to their offices, with, upon information and belief, the ongoing assistance of the Runner Defendants.

118.    The designed inflation of ultimate recovery in the tort action was twofold. First, the existence of a significant Workers' Compensation lien for the moneys paid out by that carrier would form a key component in any settlement demand, since "the compensation carrier shall have a lien on the proceeds of any recovery by the claimant to the extent of compensation and medical

expenses awarded.".") *Granger v. Urda*, 44 N.Y.2d 91, 96 (1978), referencing WCL § 29(1). For example, irrespective of other factors, when a Workers' Compensation lien would be asserted for $500,000.00 paid by that carrier, Schwitzer Defendants would seek a correspondingly higher amount in settlement demands and/or judgment. Second, claims on which spinal injections and surgeries were performed are conservatively calculated to result in an average recovery of $1.5 million on the low settlement side with the median settlement calculated to average $2 million per claim, thereby inflating the facial value of the claims.

119.    As a further incentive to provide the false medical documentation, upon information and belief, at least some Medical Provider Defendants received under the guise of payment for providing courtroom testimony a portion of the loan proceeds that the Funding Defendants provided to Claimants or maintained otherwise unnecessary liens against said recoveries in excess of the New York State Workers' Compensation Medical Fee Schedule.

120.    This additional pre-distribution of funds that would be taken out of the claimant's eventual recovery is often – but not exclusively – made under the guise of soliciting courtroom testimony from the same providers who were paid for their services during the Workers' Compensation phase of the Fraud Scheme. Regardless, the exorbitant compounded interest incurred through the involvement of Funding Defendants would continue to accrue, thereby eating away at the claimant's actual recovery.

121.    Armed with the fraudulently documented medical diagnoses and medical services allegedly related to the workplace accident, the Schwitzer Defendants fraudulently inflated the settlement values of personal injury lawsuits in order to extract greater settlements from general liability carriers, including from Plaintiff Roosevelt.

122.    Similarly, the Schwitzer Defendants fraudulently inflated the settlement values of workers' compensation claims in order to obtain payments to Medical Provider Defendants for unnecessary and/or unperformed services and thereafter to extract greater settlement from workers' compensation carriers, for which Plaintiff Tradesman and others provide administrative, investigative and support services.

123.    After settlement and payment of settlement proceeds in the personal injury action context, based on the high-interest funding loans provided to Claimants, the Funding Defendants expect to receive the bulk of such settlement proceeds. The Funding Defendants give the Claimants just enough money so that they are content to stay with Schwitzer Defendants until the settlement proceeds can be obtained and overwhelmingly divided between these Defendants alone.

**B.    Plaintiffs' Exposure as the Target of the Fraud Scheme**

124.    Like all fraud schemes, the purpose is financial gain. To be certain, the goal of the Fraud Scheme is to secure payments from workers' compensation and general liability claims. The target of such payment is anyone, known or unknown, who will fund such payment(s).

125.    When a workers' compensation claim is initiated, the insurance carrier(s) involved must open a workers' compensation claim and assign both an adjuster and attorney to administer and defend the claim. This in turn necessarily results in immediate and direct costs. Although New York State Workers' Compensation law requires the employer to be named as the "defendant," the intended target for monetary compensation for such claims is not just the employer's insurance carrier, but also anyone else who is required to fund medical and indemnity payments and compensation awards.

126.    Similar to workers' compensation claims, in a general liability claim the insurance carrier involved necessarily opens a general liability claim and assigns both an adjuster and attorney to administer and defend the claim. This is usually a different adjuster and attorney from

the workers' compensation claim. Nonetheless, it also in turn necessarily results in immediate and direct costs.

127. The property owners and general contractors are commonly named defendants in a general liability claim lawsuit. Due to associated subcontract agreements, these lawsuits often result in one or more third-party claims against subcontractors. The Claimants and their attorneys do not always know who or what subcontractors may be brought in or what insurance carriers will ultimately be exposed at the time they implement these claims in furtherance of the scheme. But that is not an issue about which Claimants and their attorneys care because they treat any source of insurance coverage, known or unknown, as a single unit and leave it to the named defendants and third-party defendants to sort it out themselves. Thus, the intended targets for monetary compensation in a general liability lawsuit are all exposed insurance carriers and/or anyone else, excess carriers, reinsurers, etc., known or unknown, who can or will be required to fund settlements.

128. Here, Defendants are sophisticated actors with years of knowledge of personal injuries claims and the workings of liability insurance policies. William Schwitzer and Giovanni Merlino have been licensed attorneys since 1985 and 1999, respectively. Both have coordinated and pursued fraudulent claims with the other Defendants since at least 2018. As such, William Schwitzer and Giovanni Merlino are well aware that the pursuit of personal injury claims result in costs well beyond just settlement and award payments, e.g. costs for the administration of claims, defending lawsuits, etc., and that entities other than a named insurance carrier will incur such costs beginning with the initiation of a claim and continuing through its resolution.

129. A policy of insurance sets forth obligations and liabilities of an insurance carrier when a worker's compensation and/or general liability claim is made against the policy.

130.    In the State of New York, a carrier can relinquish these obligations and liabilities by substituting itself with others.  Such is the case here where Accredited, by agreements, substituted itself with Roosevelt, an insurance carrier, and Tradesman, a managing general agent, thereby placing Plaintiffs[4] in a primary role and Accredited in a secondary role.

131.    In all policies of insurance implicated by the claims at issue herein, Plaintiffs, not Accredited, directly fulfilled and continue to fulfill the obligations of a primary carrier, i.e., with Tradesman issuing policies and administering claims, and Roosevelt effectuating the duty to defend insureds and bearing risk and indemnity.

132.    In all policies of insurance implicated by the claims at issue herein, Plaintiffs, not Accredited, directly sustained and continue to sustain the liabilities of a primary carrier, e.g., the costs of administering, defending and resolving claims, which is why Plaintiffs and not Accredited are the proper parties to institute this action.

133.    In accordance with OGC Opinion No. 05-01-11, this allocation of duties and responsibilities between the insurance carriers is recognized and commonplace in the State of New York.

### i.    Roosevelt's Assumption of Obligations and Liabilities as a Primary Carrier

134.    The relationship between Roosevelt and Accredited is not a standard insurer-reinsurer relationship.[5]  At all times relevant, Accredited was merely a fronting company.  Specifically, Accredited only allowed its name to be used on paper, i.e., the policies were issued in Accredited's name in exchange for a percentage of the premiums earned on such paper.  Accredited

---

[4] To be clear, at all times material hereto, Plaintiffs were operating in compliance with all applicable New York State laws and regulations.

[5] In a standard reinsurance relationship, the primary carrier retains all obligations related to the policy, including the direct payment of expenses.  The primary carrier then seeks reimbursement of expenses from the reinsurer.  The reinsurer, therefore, has no obligations, discretion or authority of the underlying claims against the primary carrier.

did not assume the obligations and liabilities of a primary carrier such as issuing policies, administering claims, posting reserves, defending claims or payment expenses leading up and resolving claims. Rather, Roosevelt and Tradesman assumed them instead.

135. Roosevelt, in particular, incurred the obligations and liabilities to post reserves and directly pay from those reserves the expenses related to a primary insurer's duty to defend[6] and resolve claims brought against policies issued in Accredited's name. This duty to defend includes, but is not limited to, incurring the following costs: medical payments, indemnity payments, filing fees, attorney's fees, expert fees, independent medical exam fees, costs of records, settlements and judgments.

136. In the claims at issue herein, Roosevelt had and did engage its duty to defend which resulted in Roosevelt's direct payment of expenses related to the claims. This includes both workers' compensation and general liability claims, proceedings and lawsuits. For reasons stated below, these claims are fraudulent and were brought in furtherance of the Fraud Scheme. Because these claims never should have been brought at all, Plaintiffs would not have incurred these expenses but for the Defendant's pursuit of the claims in furtherance of the Fraud Scheme.

137. Based upon their history of pursuing personal injury claims, their education and experience and in accordance with the goals of the Fraud Scheme, Schwitzer Defendants herein knew or should have known that these costs were certain to occur and that one or more insurance carrier or party - here Roosevelt - would have to pay them. Moreover, pursuant to New York disclosure rules and laws, Defendants had an opportunity to identify Roosevelt's exposure in all subject claims, even if they failed or intentionally refused to do so.

---

[6] Under New York State law, an insurer's duty to defend (a) is triggered upon the filing of a claim and/or lawsuit and, (b) mandates that such costs be incurred in discharging the duty. Failure to incur such costs, comprising a portion of the damages asserted herein, would result both in default judgment and Plaintiff's violation of law.

138.    At all times relevant herein, Accredited could only re-assume its obligations as the primary financial carrier in the event of Roosevelt's insolvency.  To date, that has not happened.

139.    Further, Accredited reserved the right, but was never obligated or legally mandated (which through operation of the contracts and law, was borne by Roosevelt) to take the lead[7] on accepting, investigating, and adjusting claims on a claim-by-claim basis. In fact, at all relevant times, Accredited never exercised this right.

### ii.    Tradesman's Assumption of Obligations and Liabilities as a Primary Carrier

140.    At all times relevant by agreement, Tradesman, like Roosevelt, was substituted for Accredited and assumed, as managing general agent, some obligations and liabilities related to policies issued in Accredited's name and claims made against same.

141.    Specifically, Tradesman was responsible for brokering and issuing policies.  As a part of those duties, Tradesman was responsible for calculating and collecting premiums on such policies and maintaining records and accounting related to the policies.  All issued policies contained the following notice that demonstrated Tradesman's involvement and relationship with Accredited:

---

[7] At all times relevant herein, Accredited remains financially responsible under the subject policies, however, both Tradesman and Roosevelt incur first line costs.  Such costs do not first pass through Accredited before being incurred or paid.  *See* Figure 2 hereinbelow.



142.    By agreement, Tradesman was also responsible for the payment of all direct expenses it incurred related to the policies it issued:

> Pay its Expenses.  Except for such fees and expenses for which Company is responsible, GA warrants that it is and shall remain responsible for all direct fees and expenses incurred by GA attributable to Policies produced under this Agreement.

143.    In the above provision, "Company" is Accredited and "GA" is Tradesman.  The costs of administering claims, which is incurred upon claim opening, is a direct fee and expense attributable to policies produced under Tradesman's agreement with Accredited.

144.    When a claim is presented against a policy, e.g., a workers' compensation or general liability claim, Tradesman must open the claim, which results in the assignment of an adjuster and appointment of defense counsel.    Compensation for a claim, such as a settlement, cannot be obtained without opening the claim first.  Tradesman's costs to open the type of claims at issue herein are ranging from $1,000.00 up to $5,000.00. These costs are incurred directly by Tradesman, and Tradesman pays it immediately. Therefore, any claim that should not have been presented, e.g., a fraudulent claim, requires Tradesman to incur a cost it should never have had to pay. Moreover, these costs damage Tradesman's business by reducing its profitability on the relevant policy(ies) at issue.

145.    Again, for the reasons stated below, the claims made the subject of this lawsuit are fraudulent.  Yet, the Defendants caused these claims to be opened anyway thereby wrongfully causing Tradesman to incur the costs of administering claims that were not legitimate.

146.    Again, based upon their history of pursuing personal injury claims and their education and experience, Defendants are intimately familiar with insurance claims process and therefore knew or should have known the presentation of a claim to an insurance carrier would result in administration costs, such as the assignment of an adjuster.  In fact, upon information and belief, the Defendants directly communicated with adjusters, including those assigned to the claims made the subject of this lawsuit.

147.    Tradesman bears the risk that the number of claims presented against a policy results in administration costs that exceed the commission Tradesman earns on the policy.  When this occurs, for example, by the filing of fraudulent claims that are illegitimate, the result is a net loss – or lost profit – on the policy.  Accordingly, in the course and practice of Tradesman's business, it necessarily follows that the filing of fraudulent claims (as alleged here) directly reduces the profitability of the policy (or policies) affected by the fraudulent claims.  Accordingly, Tradesman, like Roosevelt, has been directly harmed or injured by Defendants' alleged racketeering activity. At all times relevant herein, the Plaintiffs' exposure to harm or injury began each time the Defendants orchestrated and presented a fraudulent claim and continue(d) until/when the claim is resolved.  *See* Figures 1 and 2.

**Figure 1. - Workers' Compensation Claims**

**Tradesman Paid**

**Claim Opening** – Claim is made to Tradesman, usually by receipt of a C-3 form.

Expense: Claims administration paid by Tradesman

**Tradesman Paid**

**Adjuster Assigned** – Tradesman assigns an adjuster from Gallagher Basset

Expense: Claims administration paid by Tradesman

**Roosevelt Paid**

**Defense Counsel Assigned** – Tradesman assigns an attorney to defend the claim at the Workers' Compensation Board.

Expense: Duty to Defend costs including attorney's fees and fees for investigation, records, experts, depositions, and independent medical exams paid by Roosevelt

**Roosevelt Paid**

**Claim Resolution** –

Claim is resolved usually through settlement or payment of a Workers' Compensation award.

Expense: Settlement (usually lump sum), payment of medical services (paid through pendency of claim), indemnity payment (paid through pendency of claim) paid by Roosevelt

**Figure 2. - General Liability Claims**



Tradesman Paid

**Claim Opening** – Claim is made to Tradesman, usually by receipt of a Summons and Complaint.

Expense: Claims administration paid by Tradesman

Tradesman Paid

**Adjuster Assigned** – Tradesman assigns an adjuster from Gallagher Basset

Expense: Claims administration paid by Tradesman

Roosevelt Paid

**Defense Counsel Assigned** – Tradesman assigns an attorney to defend the lawsuit.

Expense: Duty to Defend costs including attorney's fees and fees for investigation, records, experts, depositions, and independent medical exams paid by Roosevelt

Roosevelt Paid

**Claim Resolution** – Claim is resolved usually through settlement of the lawsuit or payment of a judgment after trial.

Expense: Payment of settlement or judgment against insured paid by Roosevelt, including satisfaction of any Workers' Compensation lien

148.    In the alternative, without waiving the foregoing, Roosevelt brings this action as subrogee of Accredited and under the equitable rights of subrogation, which allow Roosevelt to step into the shoes of Accredited.  In that capacity Roosevelt may maintain this action on behalf of Accredited and recover all damages[8] articulated herein.

## C.    Fraudulent Accident, Treatment and Claim/Lawsuit in Furtherance of Fraud Scheme

149.    Defendants engaged in the Fraud Scheme resulting in a significant number of fraudulent claims being filed; and in furtherance of and as a necessary step for the execution of the Fraud Scheme, the Schwitzer Defendants represented the following individuals who, upon information and belief, were recruited by Runner Defendants and staged an accident and/or claimed injuries unrelated to an alleged accident in claims and lawsuits the Schwitzer Defendants knew were fraudulent, the Medical Provider Defendants provided unnecessary and excessive treatment unrelated to the claimed accident, and the Funding Defendants provided high-interest funding loans, the proceeds of which were redistributed to Defendants. The following individuals are just a fraction of the individuals who participated in the Fraud Scheme between 2018 and the present perpetrated by the Defendants and engaged in numerous predicate acts in connection with such individuals.

### i.    Claimant A

150.    Claimant A, a 33-year-old carpenter employed by Concrete Structures on May 26, 2022 was allegedly involved in a construction accident.

---

[8] Courts consistently recognize that primary insurers suffer a direct injury and thus have RICO standing when they pay fraudulent claims (see *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 71–72 (2d Cir. 2024) (confirming proximate cause and standing for insurer's RICO claims alleging fraudulent medical billing); *Gov't Emps. Ins. Co. v. Mayzenberg*, No. 22-2537, 2024 WL 6292404, at *2 (2d Cir. Nov. 12, 2024) (affirming judgment in favor of insurer on RICO claims against providers who submitted fraudulent claims); *Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 268 (E.D.N.Y. 2011) (insurer adequately pled direct injury from fraudulent billing, sufficient for RICO standing); *Allstate Ins. Co. v. Nazarov*, No. 11-CV-6187, 2015 WL 5774459, at *15 (E.D.N.Y. Sept. 30, 2015) (insurer sufficiently alleged proximate cause between fraud scheme and its payments under policies).

151.    According to sworn deposition testimony, Claimant A was employed for only a week and a half when he allegedly fell from a **platform** (10) ten feet to second-floor concrete below.  Claimant A, who was harnessed and tied off, testified that a co-worker *threw* a piece of plywood disturbing the platform from which he fell. Despite this rendition of events, the accident was allegedly unwitnessed.

152.    Claimant A's Worker's Compensation Employer's First Report of Work-Related Injury C-2 form indicated a second version of how the accident occurred, the scope of the injury and the insurance company targeted as follows:

| Insurer Name | Accredited Surety&Casualty Co |
|---|---|
| Name | Tradesman Program /Accredited |

| Nature of Injury (i.e. Laceration, Burns, Fracture, Strain, etc) | Fall was putting a formwork |
|---|---|
| Part of Body (i.e. left arm, right foot, head, multiple, etc) | Left shoulder |
| Cause of Injury (i.e. Motor Vehicle, Machine, Strain or Injury by lifting, etc) | Himself,Carelessness |

153.    In a contemporaneous Accident Report prepared by All About Safety Consulting, Inc. on the date of the accident, May 26, 2022, a third version of events was indicated:

**Accident/Incident Facts**

_____ was on the Deck doing formwork, and he was on his knee mounting a metal Bracket to close up the column in doing so he put his hand and full weight on a 4x4 Ulara form and it flipped and he fell about 5 to 6 ft down on G-2. he was wearing his harness and yoyo at the time of the Accident.

✱ He was released from the hospital at 11:43 am. Just Scratched and bruised he will be back to work on Tue 5/31/22

154.    Immediately following the accident, Claimant A, claiming severe pain, was transported to the Mount Sinai South Nassau emergency room arriving at 10:26 a.m. On arrival Claimant A's vital signs were normal notwithstanding a claimed severe pain level of ten (10) with complaints of left shoulder and bilateral lower leg pain after a fall from a **roof** in which his legs were allegedly caught in metal rebar slowing his decent to the ground [fourth version of events]. Regardless, Claimant A had full range of motion of the upper and lower extremities, no joint tenderness or swelling.

> 33-year-old male presents with left shoulder, bilateral tib-fib pain secondary to 10 ft fall from roof while doing roof work at work prior to arrival. Patient was wearing a hard hat, restrained by harness that caught him prior to hitting ground with full force. Patient's legs became caught in a metal apparatus on roof prior to fall. No reported head trauma, headache, visual changes, chest pain, shortness of breath, abdominal pain. Fully ambulatory at scene. On no chronic medication.

| • MUSCULOSKELETAL WDL | Full range of motion of upper and lower extremities, no joint tenderness/swelling. |
|---|---|

155.    At the initial encounter in the emergency room, Claimant A reported wearing a hard hat and harness and did not have any complaints of head trauma or loss of consciousness. Claimant A was fully ambulatory and after x-rays confirmed no acute fracture in the left shoulder or lower extremities, Claimant A was discharged from the hospital at 11:55 am, less than 90 minutes after arrival, with an indication that "patient is feeling much better" and instructions to return to work after one day.

| ED RECHECKS: | |
|---|---|
| • Rechecks | Recheck 1 |
| • Recheck 1 Time | 26-May-2022 11:30 |
| • Progress Note 1 | patient is feeling much better |

156.    Notwithstanding mild emergency room findings and instructions to return to work, the next day on May 27, 2022, Claimant A consulted with Aronova & Associates, PLLC, executed a C-3 form to initiate a Worker's Compensation claim, presented to Dr. Jared Rosenberg, M.D. now with complaints of headache, dizziness, neck and back pain. On the same date, Claimant A returned to the emergency room, this time at Jamaica Hospital Medical Center, now reporting a fall from a **ladder** [fifth version] with complaints of a head injury, neck, back, right hand and rib pain for CT scans of his head and neck which returned were unremarkable results.

**Diagnoses**
- Fall from ladder, initial encounter

157.    Approximately a month after Claimant A filed his workers' compensation claim, he changed attorneys to the Schwitzer Defendants who directed various aggressive medical treatment of Claimant A with the collaboration and support of defendants Dr. Alexandre De Moura, Dr. Gianni Persich, Kolb Radiology, Pain Physicians NY, PLLC, Dr. Boleslav Kosharskyy, and Dr. Mehrdad Golzhad.

158.    Claimant A sought physical therapy from Community PT for complaints of pain in the bilateral knees and lumbar spine notwithstanding the objective findings from the ER that showed Claimant A had full range of motion in the upper and lower extremities and no joint tenderness or swelling.  Furthermore, Claimant A reported pain ratings and daily living deficiencies that are incongruent with the emergency room findings one day prior, commencing the Fraudulent Treatment Protocol. Despite the minimal initial emergency room findings, Claimant A proceeded to undergo one hundred and seven (107) sessions of physical therapy at Community PT over the course of next year.

> ▮▮▮▮ currently complains of pain in the left knee, right knee and lumbar spine. Analog pain rating at rest: 7 out of 10 (0=no pain, 10=extreme pain), Analog pain rating during activity ((0 = no pain, 10 = extreme pain) is 9. ▮▮▮▮ also complains of reduced functional abilities including activities of daily living, ambulation on uneven surfaces, ambulation on stairs, household chores, leisure activities and work related activity. He also reports that increasing his activity levels increases his pain. A temporary relief of symptoms is reported from medication (analgesic) and rest.

159.    Notwithstanding findings from the emergency room that showed normal vitals, painless range of motion in the upper extremities, no significant radiological findings and a discharge within 90 minutes of arrival, Claimant A underwent physical therapy for the purpose of generating a sufficient basis upon which to declare a failure of conservative treatment to lay the foundation for surgical recommendation, a integral part of the Fraudulent Treatment Protocol.

> • Physical Examination     MS -no midline spinal tenderness to palpation. Left shoulder with abrasion noted to superior aspect with full, painless range of motion to upper extremity.

160.    Upon referral from Defendant Demetri Koutsospyros, Defendant Thomas Kolb of Kolb Radiology conducted radiological imaging generating reports containing his impressions of Claimant A's right shoulder indicating a tear of the anterior superior labrum. Yet, prior radiology immediately post-accident indicated no acute findings and emergency room records from the date of loss indicated "full range of motion of upper and lower extremities." As more particularly described hereafter, Kolb transmitted this false report knowing that such tear either did not exist or that such tear was degenerative in nature and not causally connected to the subject accident. Kolb further transmitted this report knowing that it would be used as a basis for causally connecting the alleged injury to the subject accident and to administer a course of treatment that would be paid by insurance carriers connected to the subject accident.

161.    Six weeks post-accident, on July 6, 2022, Claimant A presented to Defendants Demetrios Koutsospyros and Boleslav Kosharskyy of Pain Physicians NY now reporting that he

was "structuring a **scaffold** when it collapsed" [sixth version] causing him to fall from a height of ten feet.

> Mechanism of injury: Patient endorses that he was structuring a scaffold when it collapsed causing him to fall from height. Patient endorses that it was about 10 feet.

162.    At his very first visit, the Pain Physicians defendants rendered Claimant A 100% disabled with a myriad of diagnosis relating to his cervical, thoracic and lumber spine, bilateral shoulders, knees and ankles.

163.    The second visit followed the very next day, July 7, 2022, the notes from which were **virtually identical** to the initial visit the day prior, *inclusive of typos and misspellings*, despite being billed under a prolonged evaluation billing code.

164.    At Pain Physicians, Claimant A was administered numerous excessive injections to his neck and back, which were billed as causally related to the accident, yet for which there were no imaging studies indicating any acute injury proximate to the date of accident.

165.    Upon referral by Defendant Koutsospyros, on July 22, 2022 despite prior unremarkable CT scans of his head and neck proximate to the date of the alleged accident and no initial head complaint, Claimant A presented to Defendant Kolb Radiology for a cervical spine MRI where Defendant Thomas Kolb found disc herniations, and head MRI where Defendant Kolb reported increased signal in the right frontal white matter, in furtherance of the Fraudulent Treatment Protocol.

> **IMPRESSION: There is a solitary linear focus of increased signal in the right frontal white matter which may be posttraumatic in origin. Clinical correlation is in order**

166.    Upon the referral by Dr. Krasowski, Claimant A presented to Dr. Andrew Merola in March 2023, who after receiving Dr. Kolb's false radiological findings, promptly recommended cervical spine and neck surgery, in accordance with the Fraudulent Treatment Protocol.

167.    As recommended by Dr. Merola, Defendant De Moura performed cervical discectomy surgery on July 30, 2024. The operation was unnecessary and certainly not causally related to the accident based upon no neck complaints from Claimant A and a normal, non-tender atraumatic neck physical examination on the date of the accident.

168.    Upon referral by Defendant Koutsospyros, Dr. Gianni Persich performed Claimant A's right ankle surgery on January 17, 2023, to repair the rupture of a peroneal tendon, notwithstanding Claimant A ambulating without issue in the emergency room on the date of the accident and prior 2022 radiology reporting no acute injury existed post-accident.

169.    Dr. Kevin Wright and the McCulloch Defendants performed right wrist surgery on Claimant A on September 24, 2024 yet Claimant A did not complain of any issues with his right wrist at the emergency room and indicated that he fell on his left side, not right.

170.    Defendant Golzad treated Claimant A for neurological conditions which included Traumatic Brain Injury and Post-Concussion Syndrome despite no reported head trauma at the emergency room on the date of the accident.

| PHYSICIAN DATE/TIME: | |
|---|---|
| • Time seen by MD: | 26-May-2022 10:35 |
| HISTORY OF PRESENT ILLNESS: | |
| • Associated Symptoms | 33-year-old male presents with left shoulder, bilateral tib-fib pain secondary to 10 ft fall from roof while doing roof work at work prior to arrival. Patient was wearing a hard hat, restrained by harness that caught him prior to hitting ground with full force. Patient's legs became caught in a metal apparatus on roof prior to fall. No reported head trauma, headache, visual changes, chest pain, shortness of breath, abdominal pain. Fully ambulatory at scene. On no chronic medication. |

171.    Despite express indication from Claimant A that he did not strike his head or sustain any injury to his head in the initial emergency room diagnosis Claimant A proceeded to undergo

excessive, unnecessary and not causally related neurological and cognitive therapy under the auspices of Dr. Golzad from September 2022 through June 2023.



172. Claimant A's medical records are replete with inconsistent statements as to how the incident occurred with an evolving mechanism of accident from a fall from a platform to plywood thrown by a co-worker, to a fall from a ladder and then a fall from a scaffold. Under the direction of the Schwitzer Defendants and with the agreement of the Medical Provider Defendants, initial complaints of left shoulder contusion and mild bilateral leg swelling, progressed into a fall from a height (so as to implicate the New York Labor Law) where Claimant A used his right hand to break fall, suffered a concussion and injured all limbs, head, back and neck.

173. Ultimately and in accordance with the Fraudulent Treatment Protocol, Dr. Alexandre De Moura performed an anterior cervical discectomy on July 30, 2024. After submitting a PAR request to the WCB for an associated surgical electrical bone growth stimulator on July 26, 2024 and associated medications on July 29, 2024, Dr. De Moura, without waiting for pre-approval from the worker's compensation insurer, performed the operation on July 30, 2024. On the same date as the surgery, the worker's compensation insurer denied the associated medication and bone stimulator requests, expressly indicting that there "is no approval for said surgery on our end." In keeping with the understanding and agreements with co-defendants, Dr. De Moura performed the surgery without PAR preapproval and outside of the Worker's Compensation Medical Treatment Guidelines, because, upon information and belief, he knew he would be compensated for the surgery regardless of the WCB decision, through litigation financiers, or otherwise.

**LEVEL 1 INSURER RESPONSE**

| 1. | Authorization Requested | | Insurer Response | |
|---|---|---|---|---|
| | Medication (Name/Strength) | Methylprednisolone 4 mg | Insurer Response | Deny |
| | Quantity | 21 | Denial Category | Medical Reasons |
| | Days Supply | 6 | Denial Reason | Other |
| | Type of Drug | Generic | Other Reason | There is no approval for the said surgery on our end. |
| | Refills Requested | 1 | Rationale | This is a Phase A drug which allows up-to 30-day supply. NY MTG recommends Systemic Glucocorticosteroids for acute severe radicular pain for ONE course of 5-14 days. Requested quantity exceeds guideline recommendation. Moreover, there is no approval for the said surgery on our end. This was also confirmed by the RM. As such, we're unable to certify the request. Request is denied |
| | Type of Prescription | New (Including Change in Dosage) | | |
| | Route of Administration | Oral/SL/Buccal | | |

Claim Apportioned    No

Name of the Reviewer    Danielle Allvar    Date    07/30/2024

Reviewer Title    L1 Reviewer

**LEVEL 1 INSURER RESPONSE**

| 1. | Authorization Requested | | Insurer Response | |
|---|---|---|---|---|
| | Therapeutic Category | Narcotic | Insurer Response | Deny |
| | Medication (Name/Strength) | Tylenol #3 300-30 mg | Denial Category | Medical Reasons |
| | Quantity | 21 | Denial Reason | Other |
| | Days Supply | 7 | Other Reason | There is no approved surgery on our end |
| | Type of Drug | Generic | Rationale | This is a perioperative drug, hence requested quantity is within guideline recommendation. NY MTG recommends narcotic analgesics for limited use (not more than seven days) for postoperative pain management. However, there is no approval for the said surgery on our end. This was also confirmed by the RM. As such, we're unable to certify the request. Request is denied. |
| | Refills Requested | 0 | | |
| | Type of Prescription | New (Including Change in Dosage) | | |
| | Route of Administration | Oral/SL/Buccal | | |

Claim Apportioned    No

Name of the Reviewer    Danielle Allvar    Date    07/30/2024

Reviewer Title    L1 Reviewer

174.    Despite the express notification from the WCB that the cervical surgery was not approved, on August 10, 2024, Defendant De Moura through surgical facility Hudson Regional

Hospital transmitted a Health Insurance Claim Form, together with the July 30, 2024 surgical report seeking compensation for medical services to Claimant A.

175.    The Medical Provider Defendants in conjunction with the Schwitzer Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant A, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

176.    Based on such submission of fraudulent claim documents to the NY WCB, payments, payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment to the Medical Provider Defendants.

177.    Schwitzer Defendants electronically submitted fraudulent claim documents to the NY WCB utilizing falsified medical records to bolster and increase the value of Claimant A's workers' compensation claim, thereby inflating settlement value and ultimately, Schwitzer Defendants' financial gain.

178.    In accordance with the purpose and goals of the Fraud Scheme, which is to achieve inflated settlement or verdict values funded by carriers, Schwitzer initiated and continues to pursue litigation, regularly monitor the Medical Provider Defendants and, where needed, engage in discussions regarding the treatment of claimants, transmit false medical reports between all defendants, the Court, defense attorneys and carriers all in furtherance of the Fraud Scheme.

179.    The Schwitzer Defendants provided by mail or by electronic service to all parties and the Queens County Supreme Court fraudulent documents containing false assertions regarding Claimant A's construction accident, the existence, extent and causality of Claimant A's injuries, and the necessity of medical treatment, in order to bolster and add value to Claimant A's personal

injury lawsuit, thereby inflating settlement value and ultimately, all Defendants' financial gain from Claimant A's general liability lawsuit.

## ii.    __Claimant B__

180.    Claimant B, at the age of 28 years, allegedly sustained injuries on January 7, 2021, when he reportedly slipped on black ice and tripped on a garbage bag while working on a construction project in New York. Claimant B had only been on the job for three days before his alleged accident and, notwithstanding his employer's requirement for all employees to work in pairs, Claimant B worked alone and, no one witnessed his alleged accident. Contrary to Claimant B's initial presentation of how the accident occurred, he signed an incident report and wrote that he slipped on plywood.

181.    Although Claimant B alleged severe pain and injury, he was transported to urgent care by Uber rather than to an emergency room by ambulance.  Only after arriving at urgent care, Claimant B transported to an emergency room due to complaints of severe pain.

182.    At the emergency room, Claimant B complained of severe pain to the neck, back, both lower extremities and left shoulder. He reported that he fell on his left neck and arm but denied any loss of consciousness, headache or head trauma.  No swelling was noted.  Claimant B's vital signs were stable, which would not be the case if Claimant B's pain and injury were as severe as he claimed.

- **Chief Complaint Quote:** "EMS reported pt was carrying a Jack Hammer , tripped and fell on a concrete brick, and the Jack Hammer fell over him"

183.    Claimant B listed his insurance as Workers' Compensation, despite only being injured earlier that same day and having yet to commence a Workers' Compensation claim.

---

**FIRST AMENDED COMPLAINT**                                                     **58**



| Financial / Insurance Information | | Authorization#: |
|---|---|---|
| | Primary | Secondary |
| Name: | WORKERS COMPENSATION | SELF-PAY |
| Plan/Code: | Z01Z | SLFJ |
| Group #: | | |
| Policy #: | -999999999- | |
| Subscriber: | ████████████████ | |
| Relation: | Self | Self |

184.    Imaging conducted at the emergency room for the left shoulder, chest and neck showed no acute pathology.  Claimant B was discharged the same day with Flexeril and Tylenol.

185.    In order to initiate a Workers' Compensation claim to retroactively obtain the insurance he had listed in his medical records the day before, Claimant B's retained and consulted with the Schwitzer Defendants the next day and filled out and signed a C-3 form (to initiate a Worker's Compensation claim). Defendants William Schwitzer and/or John Merlino, or those acting on their behalf, also filed a lawsuit on Claimant B's behalf less than two weeks after the alleged accident, asserting personal injuries and damages stemming from negligence at the construction site.  Following retention, Schwitzer Defendants engaged the Medical Provider Defendants as set forth hereinbelow and directed the aggressive and unnecessary medical treatment of Claimant B.

186.    Under the direction of the Schwitzer Defendants and the agreement and care of the Medical Provider Defendants, and irrespective of his previous account of injury and complaints, Claimant B was falsely diagnosed with injuries and received a myriad of medical services. As described below, based on Claimant B's medical and Workers' Compensation records, many of the medical services provided to Claimant B were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

187.    The same day Claimant B retained Schwitzer Defendant, he presented to Defendant Brooklyn Med, a known gatekeeper clinic, ambulating with a cane and complaining of pain to the head, neck, back, left shoulder, right leg, right ankle and both knees.  He completed an intake form which appears to have another patient's information and was declared totally disabled.

188.    Further, Defendant Salehin, also of Brooklyn Med, magnified Claimant B's injuries on his first visit merely one day after the alleged injury by assessing Claimant B to have cervical radiculopathy without first performing any objective testing, e.g. EMG or MRI, and adding headaches to Claimant B's list of alleged injuries.  Claimant B was prescribed excessive physical therapy, which was also allegedly performed at Defendant Brooklyn Med.

189.    Defendant McDonnell of Community Medical conducted multiple MRIs within days and weeks of the alleged accident and reported that Claimant B had injuries to his back, left shoulder and right knee. Claimant B was reported to have a tear in the left shoulder contrary to emergency room records showing no acute pathology.  Claimant B's neck was reported to have a herniation and disc bulge, again, contrary to emergency room records showing no acute pathology.  And, Claimant B made no complaint of right knee pain at his emergency room visit.

190.    Defendant Lebson of North Shore referred Claimant B for MRIs, neurology, orthopedic and pain management evaluations merely a week after the alleged accident.  Dr. Lebson rendered more than 228 dates of treatment between January 10, 2021 and October 30, 2023, which did not relieve Claimant B's purported symptoms notwithstanding the extraordinary amount of treatment.    Although Defendant Lebson performed testing and reported neck and back radiculopathy, the emergency room made no such findings.  Such testing resulted in more alleged conservative therapy including multiple injections.

191.    Defendant Wang of Unicorn also performed extensive therapy on Claimant B including cupping and acupuncture starting from the date of the injury and continuing for more than two years (approximately three times a week).  Claimant B claimed no relief after hundreds of cupping sessions and acupuncture treatments.  Pursuant to the fraudulent treatment protocol, this excessive treatment was used as a foundation for more aggressive treatment, including Claimant B's surgeries.

192.    Defendant Apple of Big Apple treated Claimant B with multiple injections to the back and neck. The injections did not relieve Claimant B of his purported symptoms and were used by the Defendant Medical Providers to support further unnecessary treatment and surgeries. Again, the emergency room concluded that Claimant B only sustained minor injuries which required only over-the-counter medications to alleviate any alleged pain.

193.    After a mere thirteen days after the accident, Defendant Avshalumov of Advanced Ortho recommended surgery on Claimant B at an initial evaluation that only included a physical examination and an alleged failure of conservative treatment, i.e. physical therapy as described above. At the time surgery was recommended by Defendant Avshalumov, Claimant B had only undergone 6 physical therapy sessions, with only 3 of those sessions purportedly treating the left shoulder. The Brooklyn Med Defendants performed such physical therapy and referred Claimant B to the Advanced Orthopedics Defendants.  Defendant Avshalumov performed left shoulder arthroscopy surgery on May 6, 2021 at Surgicore Center of Jersey City even though the emergency room imaging showed no acute pathology and the conservative treatment was improper as such as contrary to medical treatment guidelines and the applicable standard of care.

194.    Defendant Lerman of Total Ortho treated Claimant B for neck and back pain. Contrary to what he told the hospital, Claimant B stated that his accident was a slip and fall on

debris at a jobsite. Specifically, on or about April 7, 2021, Claimant B had an initial visit with Defendant Lerman of Total Ortho who, on an initial visit, recommended lumbar surgery and declared Claimant B totally disabled due to a failure of extensive physical therapy, despite Claimant B only undergoing therapy for approximately 3 months. Defendant Lerman performed Claimant B's back surgery on July 15, 2021, even though imaging at the emergency room had an unremarkable impression.

> **PRESENT ILLNESS INFORMATION**
> Chief Complaint:    The patient presents today with c/o neck and lower back pain
> HPI:
>    S1: Jonas Alonzo Flores is a 28 year old male who presents today with complaints of neck pain that radiates into the left arm associated with numbness and tingling and lower back pain that radiates into bilateral legs associated with numbness and tingling. This problem originated on 01/07/21 as a result of a work related accident, the patient was carrying metal pipes when he slipped and fell on debris. The patient went to City MD and then was taken by ambulance

195.    Despite multiple inconsistent statements regarding how Claimant B's alleged incident occurred, such as testifying that he slipped on black ice and tripped on a garbage bag, that he slipped on plywood, or reporting to providers that a pipe or jack hammer fell on him, the Schwitzer Defendants filed a lawsuit on Claimant B's behalf alleging personal injuries and damages stemming from negligence at the construction site.

196.    Importantly, Claimant B's medical claims were reviewed by Independent Medical Examiners. By November of 2022, it was determined that Claimant B had reached maximum medical improvement as to his left shoulder and lumbar spine. Notwithstanding same, all Medical Provider Defendants thereafter continued to diagnose and treat Claimant B.

197.    Under the direction of the Schwitzer Defendants and the agreement and care of the Medical Provider Defendants, and irrespective of his previous account of injury and complaints, Claimant B was falsely diagnosed with lumbar and cervical herniations and disc bulges, a tear to the left shoulder and right knee injuries following various imaging services by the Community Imaging Defendants.

198.    The Brooklyn Medical Defendants provided extensive physical therapy to Claimant B and referred Claimant B to other providers within the same building (410 Ditmas Avenue) for acupuncture and cupping sessions (from the Unicorn Defendants) and chiropractic treatment (from the North Shore Defendants).  They also referred Claimant B for pain management and steroid injections (from the Big Apple Defendants, also within the same building at 410 Ditmas Avenue), where less than a month after the alleged accident, on February 4 2021, Claimant B received his first lumbar injection (February 4, 2021), a second injection on February 18, 2021 and a third injection on March 04, 2021.

199.    The Back Guidelines expressly state that "[t]he purpose of spinal injections is to facilitate active therapy by providing short-term relief through reduction of pain and inflammation" (D.3.a.iii) and should follow active treatment (D.3.a.v).

200.    Claimant B did not receive active treatment in the three weeks before his unnecessary and premature first lumbar epidural steroid injection. Defendant Salehin's own billing forms and supporting Subjective, Objective, Assessment and Plan, or SOAP notes, reflect that Claimant B was provided only passive modalities in the form of hot/cold packs and TENS electrical stimulation.

201.    Based on Claimant B's medical and workers' compensation records, many of the medical services provided to Claimant B were unnecessary, excessive, and/or unwarranted. For example, *inter alia*, Claimant B was found to have reached maximum medical improvement as of November 2022, but Defendant Medical Providers continued treating Claimant through 2023.

202.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant B, the proceeds of which were then redistributed to Claimant

B, the Runner Defendants who recruited Claimant B, the Medical Provider Defendants who treated Claimant B, and the Legal Service Defendants.

203.    The Medical Provider Defendants and/or Schwitzer Defendants on behalf of the Medical Provider Defendants electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant B, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

204.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

205.    As more particularly described hereafter, each Medical Provider Defendant transmitted their respective reports knowing that such injuries were degenerative in nature and not causally connected to the subject accident.  Every Medical Provider Defendant further transmitted their reports knowing that it would be used as a basis for causally connecting the alleged injury to the subject accident and to administer a course of treatment that would be paid by insurance carriers connected to the subject accident.

206.    Schwitzer Defendants electronically submitted such fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant B's workers' compensation claim, thereby inflating settlement value and ultimately, Schwitzer Defendants' and associated Defendant Medical Providers' financial gain from Claimant B's workers' compensation claim.

207.    In accordance with the purpose and goals of the Fraud Scheme, which is to achieve inflated settlement or verdict values funded by carriers, Schwitzer initiated and continues to pursue

litigation, regularly monitor the Medical Provider Defendants and, where needed, engage in discussions regarding the treatment of claimants, transmit false medical reports between all defendants, the Court, defense attorneys and carriers all in furtherance of the Fraud Scheme.

208.    Schwitzer Defendants also provided by mail or by electronic service to the Bronx County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant B's construction accident, the existence of and the extent of Claimant B's injuries, and the necessity of medical treatment that Claimant B required in connection with the construction accident, in order to falsely bolster and add value to Claimant B's personal injury lawsuit, thereby inflating settlement value and ultimately, Schwitzer Defendants' financial gain from Claimant B's personal injury lawsuit.

209.    Schwitzer Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant B for the release of Claimant B's medical records that Schwitzer Defendants knew or reasonably should have known were false.

### iii.    <u>Claimant C</u>

210.    Claimant C, at the age of 27 years old, allegedly sustained back and knee injuries on October 28, 2021, when reportedly a form fell on him while working on a construction project in New York. While Claimant C alleges that he was employed as a carpenter, he was not employed by Plaintiff's insured.

211.    Contrary to Claimant C's later assertion, his accident occurred at approximately 8:20 a.m. at which time he declined medical attention and continued to work until approximately 12:30 p.m., when he requested to go home. At the time of the alleged incident, Claimant C was improperly tied off to a form panel, when the form panel became loose, causing Claimant C to fall backwards onto a pile of soil. Importantly, Claimant C's incident was witnessed by three coworkers, Miguel Gil Moreno, Pablo Riera and Marcos Lovera who unequivocally reported in

written statements that Claimant C was okay, answered with a laugh, and continued working.



212.    Claimant C did not report the accident immediately, refused medical attention and continued working for over four hours until reporting the incident to his foreman at 12:30 p.m. Claimant C eventually took a taxi to Mount Sinai Hospital, arriving at approximately 3:28 p.m.

213.    Upon arrival at Mount Sinai, Claimant C complained of neck pain and a headache, but on examination his head was atraumatic, and he denied loss of consciousness.



Pt was hit on head by falling wood/dirt Denies LOC.[LC.1]

Head:[MH.1] Normocephalic[JB.1] and[MH.1] atraumatic[

214.     During the same visit, he later reported that he was at work when a large piece of wood 8 feet tall and 100 pounds landed on him *which resulted in 3 to 4 minutes of loss of consciousness,* with complaints of a headache, pain in his right neck, right shoulder, left wrist, right knee, right ankle, and right testicle. A physical examination revealed full neck range of motion.

215.     A head CT revealed no acute injury.

FINDINGS:

There is no evidence of intracranial hemorrhage.   No midline shift or other significant mass effect is noted.

There is no acute loss of gray-white differentiation to suggest infarction.

The ventricles and sulci are normal in size and configuration for the patient's age.

The visualized paranasal sinuses and tympanomastoid spaces are clear. Visualized orbits are unremarkable. There is no displaced calvarial fracture.

Impression:
IMPRESSION:

No acute infarct, acute intracranial hemorrhage, significant mass effect, or midline shift.

216.     A cervical spine CT revealed no acute traumatic fractures or subluxation of the cervical spine.

Impression:
IMPRESSION:

No acute traumatic fracture or subluxation of the cervical spine.

217.     Curiously, though he complained of right testicular pain, a scrotal and testicular doppler (combined with history taken from the Claimant) revealed that Claimant C had an

undescended right testicle, and it was not visualized within the scrotal sac or inguinal canal. This was the only objective positive finding at the emergency room on the date of loss. Claimant C was given Tylenol, diagnosed with a concussion, and discharged home at approximately 8:22 p.m.

218.    Claimant C retained the Law Office of Edmond J. Hakimian, P.C. and filled out and signed a New York C-3 form to initiate a Workers' Compensation claim, which was originally dated September 2021, which **pre-dated** the Claimant's alleged injury. The September date was crossed out by hand and re-dated for November 5, 2021, and now indicated that he suffered injuries to his head, neck, back, bilateral hips, bilateral shoulders, bilateral ankles, bilateral knees, right wrist, and pelvis.



219.    Once Claimant C retained the Schwitzer Firm, the Schwitzer Defendants directed the aggressive and unnecessary medical treatment by the Medical Provider Defendants of Claimant C. Less than one month after the alleged workplace accident, the Schwitzer Defendants filed a lawsuit on behalf of Claimant C alleging personal injuries and damages stemming from a construction site accident.

220.    Under the direction of the Schwitzer Defendants, with the agreement of and under the care of the Medical Provider Defendants, Claimant C was falsely diagnosed with injuries and received a myriad of medical services that were unnecessary, excessive, unwarranted and/or not causally related to the alleged workplace accident.

221.    On November 22, 2021, one day before his lawsuit was filed, Claimant C presented to Defendant Interventional for initial treatment with complaints of radiating neck pain, radiating low back pain, bilateral shoulder pain, bilateral knee pain, pelvic pain, and right-hand pain. He recounted his accident and recanted a vastly different version of events. Claimant C reported that he was walking at a construction site carrying material when 3 beams fell on him from approximately 4 feet above him, knocking him down causing loss of consciousness.

October 28, 2021. The patient says that he was at the construction site when walking and carrying the material when all of a sudden 3 beams fell from about 4 feet higher than him. He was knocked down. The patient says that he was out of it for about 1-2 minutes, his coworkers

222.    Claimant C received physical therapy from Defendant Interventional, a gatekeeper facility that referred Claimant C to various other providers, including Lenox Hill Radiology, Stand-Up MRI of the Bronx, P.C., an orthopedist, podiatrist, pain management specialist and spinal surgeon.  Defendant Interventional conducted excessive physical therapy and generated reports which indicated that treatment was rendered as prescribed, even though such treatment was inadequate, underperformed, not performed at all; or performed for the sole purpose of documenting a foundation for surgical specialists to declare a failure of conservative treatment to justify lucrative surgeries.

223.    Claimant C presented to Dr. Siddhartha Sharma of McCulloch Ortho on December 23, 2021 with complaints of left ankle pain and recounted a different version of how his accident occurred this time that he was working at a construction site when a large metal frame fell on top of him knocking him to the floor. Dr. Sharma of Defendant McCulloch promptly referred Claimant

C        to        Defendant        Lenox        Hill        Radiology        for        radiology.



224.    Claimant C was referred by Defendant Interventional for a neurological evaluation.



225.    On January 5, 2022, Claimant C presented with headaches to Dr. Peter Kwan for a

neurological evaluation due his alleged injuries after a large panel consisting of iron and plywood

fell on him at work. Despite reportedly wearing a hardhat, Claimant C reported to Dr. Kwan that

there was a bump in the back of his head or neck.  Dr. Kwan referred Claimant C to Defendant

Lenox Hill Radiology for a brain MRI and DTI, diagnosed Claimant C with a concussion, rendered

him 100% disabled, and promptly sought to elevate Claimant C's worker's compensation claim to include a head injury.

**The patient gave a related injury history of direct head trauma with loss of consciousness and with a "bump on the back of my head". The head or the brain should be amended to include as the patient's body part of injury due to the accident on 10/28/2021.**

226.    Upon the referral of Dr. Kwan, Claimant C presented to Dr. David Milbauer of Lenox Hill Radiology for a brain DTI on January 24, 2022, which was unremarkable and identified no acute intracranial findings.



227.    Importantly, Dr. Vikas Agrawal of Well Care Neurology, LLC, performed a Workers' Compensation Independent Medical Examination on March 11, 2022, where Claimant C complained of headaches, concluding that Claimant C's neurological examination was normal, no impairment, no need any testing or treatment from a neurological point of view, with an overall excellent prognosis.

228.    Nevertheless, Claimant C continued treatment with Dr. Peter Kwan for approximately an additional two years until August 3, 2023, despite imaging conducted at both Mount Sinai immediately after the accident, and at Lenox Hill Radiology several months later, both indicating that there were no acute intracranial findings.

229. On January 26, 2022, Claimant C presented to Defendant Kosharskyy of Defendant Pain Physicians who first examined Claimant C and immediately recommended trigger point injections to the cervical spine despite a cervical ultrasound showing normal paraspinal muscles, joints with no effusion or inflammatory processes found. Defendant Kosharskyy rendered Claimant C 100% disabled, and performed a series of unnecessary procedures including multiple rounds of extracorporeal shock wave therapy to the lumbar spine, left and right lumbar medial branch blocks, and lumbar radiofrequency ablation. Defendant Kosharskyy also prescribed unnecessary durable medical equipment in the form of multi radiance medical super pulsed laser, pain shield therapy for the lumbar region. When, as predetermined in accordance with the Fraud Scheme, the prerequisite conservative treatment failed, Claimant C was recommended for spinal surgery in accordance with the Fraudulent Treatment Protocol.

230. On September 29, 2022, Claimant C presented to Kolb for a cervical spine MRI, where despite initial full range of motion in the neck and a cervical spine CT finding on the date of the accident indicating no acute traumatic fractures or subluxation of the cervical spine, Defendant Thomas Kolb reported disc herniation impinging the thecal sac, for the purpose of documenting justification for surgical intervention, in furtherance of the Fraudulent Treatment Protocol.

231. On November 9, 2021, Claimant C presented to Defendant Tomasello of Defendant Cross Bay for an initial evaluation with complaints of knee, shoulder, and ankle pain; and at an April 27, 2022 follow up was promptly recommended for right knee surgery. Curiously, Claimant C refused epidural injections (a standard conservative treatment done before surgical intervention) and, despite an absence of any initial right knee complaints in the emergency room, Defendant Tomasello quickly performed a right knee arthroscopic surgery on May 1, 2022 at Fifth Ave

Surgery Center in accordance with the Fraudulent Treatment Protocol as surgical intervention garnishes higher settlement and verdict values.

232.    A mere three months after his right knee surgery, Claimant C presented to Defendant Katzman of Katzman Ortho who, despite an absence of any initial left shoulder complaints in the emergency room, performed a left shoulder arthroscopy on August 5, 2022.

233.    On September 29, 2022, Claimant C presented to Defendant New York Spine Institute and was seen by Defendant de Moura who diagnosed cervical radiculopathy, cervical disc herniation, and lumbar radiculopathy.

234.    In reliance on Defendant Kolb's report of cervical spine MRI herniation findings, at the second visit on December 15, 2022, Defendant De Moura promptly recommended Claimant C for an Anterior Cervical Discectomy and fusion surgery.

> MRI of cervical spine taken September 2022 at Kolb radiology reveals cervical disc herniation C6-7 which correlates with patient symptomology

235.    On February 28, 2023, Defendant de Moura, without performing his own independent radiological review of Claimant C cervical spine, performed an anterior cervical decompression and fusion.. The interplay between the various defendant medical specialties, i.e. gatekeeper, physical therapy, radiology, pain management and ultimately lucrative surgical specialties is demonstrative of the collaboration and agreement among them to inflate fraudulent claims in pursuit of reciprocal ill-gotten financial gains.

236.    At an April 20, 2023 6-week post-surgical follow-up, Claimant C's range of motion was not evaluated, yet the record indicated that he suffered pain during the examination, resulting in a determination that Claimant C was 100% temporarily totally disabled. At a four month post-surgical follow up on June 1, 2023, Claimant C had muscle spasm, neck pain, excessive discomfort

and reduced range of motion; despite failing to measure Claimant's range of motion at the prior visit.  On October 7, 2024, Defendant De Moura recommended Claimant C for further spinal surgery.

237.    On March 28, 2024, despite an absence of any initial right shoulder diagnosis in the emergency room to relate the alleged injury back to the accident date, Defendant Katzman performed a right shoulder arthroscopy on Claimant C, the records from which he submitted to the WCB for compensation for the services provided as causally related to the accident.

238.    Upon information and belief, given the circumstances surrounding the alleged accident and the alleged conservative treatment, the performance of the right knee meniscal and left shoulder arthroscopy was unnecessary, excessive and not causally related to the accident.

239.    In furtherance of the Fraud Scheme, the Schwitzer Defendants in conjunction with the Medical Provider Defendants, recommended, arranged and propelled Claimant C to undergo multiple surgeries in pursuit of reciprocal ill-gotten financial gains.

240.     Insofar as Claimant C's months of excessive physical therapy with no relief may appear as adequate therapy prerequisite to surgical intervention, its excessive nature was purposed to overly paper the claim documentation in support of the surgeries.  As an example, on or about April 11, 2022, Claimant C was re-evaluated and prescribed physical therapy for the right knee consisting of three visits per week for six weeks yet underwent surgery a mere three weeks later on May 1, 2022, before the conservative treatment prescribed by his physician would even be completed, and contrary to the Medical Treatment Guidelines.

241.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant C, the proceeds of which were then redistributed to Claimant

C, the Runner Defendants who recruited Claimant C, the Medical Provider Defendants who treated Claimant C, and the Legal Service Defendants.

242.    Upon information and belief, the Medical Provider Defendants and/or Schwitzer Defendants, on behalf of the Medical Provider Defendants or Claimant C's the WCB attorney, electronically submitted fraudulent claim documents to the NY WCB for authorization and payment for medical services provided to Claimant C, which were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident.

243.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

244.    As more particularly described hereafter, each Medical Provider Defendant transmitted their respective reports knowing that such injuries were degenerative in nature and not causally connected to the subject accident.  Every Medical Provider Defendant further transmitted their reports knowing that it would be used as a basis for causally connecting the alleged injury to the subject accident and to administer a course of treatment that would be paid by insurance carriers connected to the subject accident.

245.    Schwitzer Defendants, or those under their control, electronically submitted fraudulent claim documents to the NY WCB and with the support and collaboration of the Medical Provider Defendants used the fraudulent medical records to falsely bolster and add value to Claimant C's workers' compensation claim, thereby inflating settlement value and ultimately, all Defendants' ill-gotten financial gains from Claimant C's workers' compensation claim.

246.    In accordance with the purpose and goals of the Fraud Scheme, which is to achieve inflated settlement or verdict values funded by carriers, Schwitzer initiated and continues to pursue

litigation, regularly monitor the Medical Provider Defendants and, where needed, engage in discussions regarding the treatment of claimants, transmit false medical reports between all defendants, the Court, defense attorneys and carriers all in furtherance of the Fraud Scheme.

247. Schwitzer Defendants also provided by mail or by electronic service to the Supreme Court, Bronx County and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant C's construction accident, the existence of and the extent of Claimant C's injuries, and the necessity of medical treatment required in connection with the construction accident, in order to falsely bolster and add value to Claimant C's personal injury lawsuit, thereby inflating settlement value and ultimately, Schwitzer Defendants' ill-gotten financial gain from Claimant C's general liability lawsuit.

248. Schwitzer Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases signed by Claimant C for the release of Claimant C's medical records, documentation that the Schwitzer Defendants knew or reasonably should have known was false.

### iv. Claimant D

249. Claimant D, at the age of 44 years, allegedly sustained injuries on August 11, 2020, when he reportedly slipped and fell off a ladder approximately ten to fifteen feet while working on a construction project in New York. Claimant D reported that he had been employed as a laborer for three weeks at the time of the alleged incident. Yet, Claimant D was terminated prior to the date of his alleged accident and appeared impermissibly at the jobsite on the date of the alleged incident without prior authorization under the guise of retrieving his tools. While exiting the jobsite with his tools, Claimant D used an egress ladder when he then fell at most 2 feet while navigating between the second and third floors of the structure.

250.    Claimant D was taken to the emergency room at Bellevue Hospital via EMS at approximately 8:30 am with complaints of head, neck, back, and left shoulder pain. Upon arriving at the ER, Claimant then complained of pain in his shoulders, left knee, right ankle, elbows, hips, right ear and headaches.  Claimant D reported to emergency room personnel that he fell fifty feet, despite the EMS report indicating that a bystander reported that the Claimant fell from a significantly lower height of 10-15 feet.

> Lvl 1 trauma activation s/p fall 50ft, sent to trauma slot. Trauma team paged. Second story stated pt fell from 10-15 feet.
>
> "Electronically signed by Ya Peng Zhao, RN at 08/11/20 1235"

251.    Claimant D underwent x-rays and CT scans of his wrists which were negative for any injury. CT scans of his head, neck, chest, cervical spine, thoracic spine, lumbar spine, and abdomen were also negative for any injury. Despite a claimed loss of consciousness, Claimant D did not have a concussion and was discharged home the same day at 5:35 pm with Tylenol and left arm sling for a possible shoulder dislocation without any evidence of fracture.

252.    Two days later, on August 13, 2020, Claimant D presented to Defendant Brooklyn Med, where he complained of pain to additional areas of his body not indicated during his emergency room visit 48 hours prior, including his head, right shoulder, right elbow, left hip, right hip and right ear pain.  The initial exam had a handwritten note indicating that Claimant D fell from a "defective" and unstable ladder. He was prescribed physical therapy 3 to 4 times a week, but the record fails to specify what areas of Claimant D's body required therapy.

253.    The following day, on August 14, 2020, Claimant D retained the Schwitzer Defendants who directed the aggressive and unnecessary medical treatment of Claimant D irrespective of his varying accounts of injury and initiated a Worker's Compensation claim by the filing of a C-3 form stating "fell from a height" with no indication of whether a ladder was

involved, or the alleged height of the fall. The form claimed injuries to Claimant D's head, neck, back, left shoulder and right ear. Defendant William Schwitzer, or those acting on his behalf, also filed a lawsuit on Claimant D's behalf less than one month after the alleged accident. Despite the multiple inconsistent statements Claimant D provided to the emergency room, the Medical Provider Defendants, and Workers' Compensation Board regarding how the alleged incident occurred (fell 10-15 feet off a ladder or that he fell down a staircase of approximately 8 feet landing on his left side or fell 50 feet), the Schwitzer Defendants filed a lawsuit on behalf of Claimant D alleging personal injuries and damages stemming from negligence at the construction site.

254.    The same day Claimant D retained the Schwitzer Defendants, Claimant D commenced chiropractic therapy, physical therapy and acupuncture with the 410 Ditmas Defendants.

255.    Defendant Brooklyn Med referred Claimant D to Defendant North Shore (operating out of the same address as Defendant Brooklyn Med; 410 Ditmas Avenue) on August 14, 2020, where he underwent chiropractic treatment multiple times a week from 2020 through 2023. Similarly, Claimant D underwent years of acupuncture, with the majority of records indicating that he obtained moderate relief from the treatment. Despite those records, Defendants Lerman and Kumar, discussed *supra*, determined that Claimant D was a candidate for surgical intervention **within 3 months** of the date of the alleged injury.

256.    Lara Kossover, DC of Defendant Brooklyn Med also referred Claimant D to Community Imaging for a cervical MRI on August 28, 2020. Community Imaging reported bulges at C3-C4 through C6-7, with herniations at C5-C6 through C6-C. The report was completely silent on whether the MRI was reflective of acute or chronic conditions.

257.    Defendant Salehin of Defendant Brookyln Med also referred Claimant D to Defendant Big Apple Pain Management (also located at 410 Ditmas Avenue) for pain management. Claimant D presented for an initial evaluation on September 3, 2020, at which time he was diagnosed with cervical facet syndrome and cervical radiculopathy and immediately underwent his first of three cervical epidural steroid injections. The first injection occurred **less than one month after his alleged accident**. Defendant Apple also diagnosed Claimant D with lumbar facet syndrome and lumbar radiculopathy and made his lumbar diagnosis without having conducted or reviewed any diagnostic testing, as his record indicated that a lumbar MRI was still pending. Despite this lack of testing, Defendant Apple determined that Claimant D required a series of three lumbar epidural steroid injections, all completed by October of 2020, merely 2 months from the date of the alleged incident. During that 2-month period, Claimant D's PT and acupuncture records indicate that he was obtaining relief from acupuncture and cupping procedures and was tolerating PT modalities well. As Claimant D was, at the time, obtaining relief from PT, acupuncture and cupping (all considered conservative treatment), Claimant D's care should not have included injections, which is a more aggressive form of treatment to be performed only after conservative treatment fails to provide relief.

258.    At the same time, Claimant D also presented to Defendants Lerman and Kumar of Defendant Total Ortho for an initial evaluation on September 30, 2020, where he was treated for neck and back pain. The initial evaluation was devoid of any information specific to the Claimant and included no assessment or plan of care. Despite the incomplete record, Claimant D presented for his second visit on November 2, 2020, at which time an anterior cervical discectomy and fusion was recommended by Defendant Lerman. The same record indicated that Claimant D had already undergone 3 cervical epidural injections since his alleged accident approximately 3 months prior

with no relief. At this visit, Defendant Lerman declared that merely 3 months of PT was sufficient to determine that conservative treatment had failed and that Claimant D warranted surgical intervention. On December 1, 2021, Claimant D underwent an anterior cervical discectomy and fusion which was performed by Defendant Kumar at Bayonne Medical Center. Claimant D underwent yet another surgery on March 1, 2023, where Defendant Kumar and Dr. Jeyamohan performed a lumbar laminectomy again at Bayonne Medical Center.

259.    Claimant D retained the Schwitzer Firm, and the Schwitzer Defendants directed the aggressive and unnecessary medical treatment of Claimant D.  William Schwitzer, or those acting on his behalf, filed a lawsuit on Claimant D's behalf less than a month after the alleged accident. Despite the multiple inconsistent statements Claimant D provided to the emergency room the Medical Provider Defendants, and Workers' Compensation Board regarding how the alleged incident occurred (he fell 10-15 feet off a ladder or that he fell down a staircase of approximately 8 feet landing on his left side or fell 50 feet), the Schwitzer Defendants proceeded to file a lawsuit on behalf of Claimant D alleging personal injuries and damages stemming from negligence at the construction site.

260.    Under the direction of the Schwitzer Defendants and the agreement and care of the Medical Provider Defendants, and irrespective of his previous account of injury and complaints,

261.    Under the direction of Schwitzer Defendants and the care of the Medical Provider Defendants, despite findings of no acute injury to the cervical or lumber spine at the emergency room (see below), Claimant D was diagnosed with casually related cervical and lumbar herniations and disc bulges following various imaging services by Defendant Community Imaging.

**Impression**

IMPRESSION:
1.  No acute intracranial injury.
2.  No acute cervical spine injury.
3.  No acute facial fracture.
4.  No acute intrathoracic injury. Intact aorta.
5.  No acute intra-abdominal injury.
6.  No pelvic fracture.
7.  No acute thoracolumbar spine injury.
8.  Metallic radiodensities at the left inferomedial orbit, prostate, lower anterior abdominal wall, and left inguinal region appear remote in nature.

Final report dictated by   and signed by Mark Bernstein, MD,  8/11/2020 8:58 AM

262.    The false diagnoses made by the Medical Provider Defendants resulted in excessive and unnecessary conservative treatments beginning 2020 and ongoing in 2024, including multiple injections to the back which were carried out within the first 3 months after the alleged accident. The excessive physical therapy, chiropractic care, acupuncture, cupping, and unnecessary pain management treatment were performed by known gatekeeper clinics whose role in the Fraud Scheme is to provide documentation supporting justification for surgeries, i.e. indications that conservative treatment was provided and failed.

263.    With the assistance and support of the Medical Provider Defendants, Claimant D was expeditiously recommended for surgical procedures in order to increase the settlement and/or verdict value of Claimant D's personal injury action and declared him to be totally disabled notwithstanding the negative diagnostic imaging performed at the emergency room. For example, Defendant Apple administered cervical epidural steroid injections less than 30 days after the alleged injury occurred and the commencement of conservative treatment such as physical therapy. Similarly, Defendant Lerman recommended surgical intervention after merely 3 months of alleged conservative treatment, contrary to the Neck Guidelines which generally provide that "surgical consultation should occur after at least 6 months of non-surgical treatment consistent with the medical treatment guidelines." (Neck Guidelines at section E.2). Such conservative treatment, if

performed, consisted of only PT, acupuncture, and chiropractic care and three epidural injections within a mere six-week period after the accident.

264.    As described above, based on Claimant D's medical and workers' compensation records, many of the medical services provided to Claimant D were unnecessary, excessive, and/or unwarranted and were not causally related to the alleged workplace accident. For example, Claimant D's anterior cervical discectomy and fusion and lumbar laminectomy performed by Dr. Kumar were unnecessary and not causally related to the alleged workplace accident as Claimant D's emergency room records from the date of the alleged accident indicated unremarkable radiological imaging for his cervical, thoracic, and lumbar spine, coupled with no evidence of any failure of conservative care.

265.    Upon information and belief, the Funding Defendants provided high-interest litigation funding loan to Claimant D, the proceeds of which were then redistributed to Claimant D, the Runner Defendants who recruited Claimant D, the Medical Provider Defendants who treated Claimant D, and the Legal Service Defendants.

266.    Schwitzer Defendants, or those under their control, electronically submitted fraudulent claim documents to the NY WCB and used the fraudulent medical records and assertions to falsely bolster and add value to Claimant D's workers' compensation claim, thereby inflating settlement value and ultimately, Schwitzer Defendants' financial gain from Claimant D's workers' compensation claim.

267.    Based on such submission of fraudulent claim documents to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment directly to the Medical Provider Defendants.

268.    As more particularly described hereafter, each Medical Provider Defendant transmitted their respective reports knowing that such injuries were degenerative in nature and/or not causally connected to the subject accident.   Every Medical Provider Defendant further transmitted their reports knowing that it would be used as a basis for causally connecting the alleged injury to the subject accident and to administer a course of treatment that would be paid by insurance carriers connected to the subject accident.

269.    In accordance with the purpose and goals of the Fraud Scheme, which is to achieve inflated settlement or verdict values funded by carriers, Schwitzer initiated and continues to pursue litigation, regularly monitor the Medical Provider Defendants and, where needed, engage in discussions regarding the treatment of claimants, transmit false medical reports between all defendants, the Court, defense attorneys and carriers all in furtherance of the Fraud Scheme.

270.    Schwitzer Defendants provided by mail or by electronic service to the Kings County Supreme Court and to all named parties in the personal injury lawsuit, fraudulent documents containing false assertions regarding Claimant D's construction accident, the existence of and the extent of Claimant D's injuries, and the necessity of medical treatment that Claimant D required in connection with the construction accident, in order to falsely bolster and add value to Claimant D's personal injury lawsuit, thereby inflating settlement value and ultimately, Schwitzer Defendants' financial gain from Claimant D's personal injury lawsuit.

271.    Schwitzer Defendants provided by mail or by electronic service to defense counsel medical authorizations and HIPAA releases, pursuant to a power of attorney to execute HIPAA releases on behalf of Claimant D, for the release of Claimant D's medical records that Schwitzer Defendants knew or reasonably should have known were false.

272.     Plaintiffs have properly set forth the scope of Defendants' enterprise and further established the pattern by way of the preceding specific examples, by which Defendants' sprawling scheme can be broken down into cognizable portions. Such use of exemplar claims has long been recognized as sufficient for Rule 9(b) purposes. *See, e.g., Allstate Ins. Co. v. Lyons*, 843 F.Supp.2d 358, 372-73 (E.D.N.Y. 2012) *State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F.Supp.2d 212, 227-228 (E.D.N.Y. 2009).

### D.     Defendants' Participation in the Fraud Scheme

273.     At all relevant times, Defendants constituted an association-in-fact enterprise and were engaged in, and the activities of which affected, interstate commerce, and each of the Defendants participated in the operation or management of the enterprise.  Each of the Defendants in turn benefited financially and professionally from their participation in the enterprise.

### i.     Legal Service Defendants' Participation in the Fraud Scheme

274.     Since at least 2018, the Schwitzer Firm has been involved in a substantial number of lawsuits and, upon information and belief, workers' compensation claims, the majority of which involved purported construction work injuries, covered by various insurers and reinsurers, including Roosevelt, as well as those serviced by Plaintiffs Tradesman and others, in furtherance of and as a necessary step for the execution of the Fraud Scheme.

275.     Defendant Schwitzer is the founder and senior partner of Schwitzer Firm, directing the Schwitzer Firm's representation of the Claimants.

276.     At all times relevant, Schwitzer Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runners, including the Runner Defendants, to recruit construction workers (*i.e.*, Claimants) to stage workplace accidents and/or falsely claim injuries unrelated to the alleged accidents.

277.    At all times relevant, Schwitzer Defendants represented Claimants in personal injury lawsuits and/or workers' compensation claims and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits and workers' compensation claims, assigning duties and responsibilities to attorneys/employees of Schwitzer Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit, and to the NY WCB.

278.    Schwitzer Defendants directed the Claimants to seek medical treatment from the Medical Provider Defendants, knowing and understanding that the Medical Provider Defendants would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants.

279.    Schwitzer Defendants intentionally submitted or caused the filing of and submission of fraudulent assertions and medical documentation to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims.

280.    Schwitzer Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate construction accidents, the existence of injuries, and the necessity of medical treatment that Schwitzer Defendants knew or reasonably should have known were false.

281.    Based on such fraudulent medical documentation submitted to the NY WCB, payments, including payments made by or on behalf of Plaintiffs, were issued by mail and/or by ACH payment to Schwitzer Firm for distribution to the Claimants.

282.    This unlawful conduct worked to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating settlement value and ultimately, Schwitzer Defendants' financial gain from the claims and lawsuits.

### ii.    Runner Defendants' Participation in the Fraud Scheme

283.    Upon information and belief, since at least 2018, the Runner Defendants have been involved in recruiting Claimants into staging and/or perpetuating fake construction accidents at various construction sites throughout New York.

284.    Upon information and belief, the Runner Defendants communicated with the Claimants and Schwitzer Defendant through telephone calls, texts, emails and mail.

285.    The Runner Defendants, engaged in numerous acts in furtherance of and as a necessary step for the execution of the Fraud Scheme. Among other things, the Runner Defendants referred and/or transported Claimants to Schwitzer Defendants so that Claimants could retain Schwitzer Defendants to a) direct Claimants' medical treatment from Medical Provider Defendants; b) direct Claimants to obtain high-interest funding loans from Funding Defendants; c) direct, authorize, coordinate and control the prosecution of Claimants' personal injury lawsuit; and d) direct, authorize, coordinate and control the prosecution of Claimants' workers' compensation claims.

286.    Upon information and belief, the Runner Defendants participated in meetings with Claimants and Schwitzer Defendants in furtherance of and as a necessary step for the execution of the Fraud Scheme.

287.    Upon information and belief, Runner Defendants would typically be referred to internally as "investigators" or "brokers" for their roles in bringing in claimants and facilitating the initial phases of the Fraud Scheme, though other known descriptors include "paralegal" and

"client services liaison", potentially in recognition of roles they serve in later phases of the Fraud Scheme.

288.    The Runner Defendants received a portion of the proceeds from the high-interest funding loans provided by the Funding Defendants.

### iii.    Funding Defendants' Participation in the Fraud Scheme

289.    Upon information and belief, since at least 2018, the Funding Defendants have been involved in providing high-interest funding loans to Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

290.    To incentivize Claimants to attest to fraudulent accidents and injuries and to undergo unnecessary surgery and/or surgery not causally related to the alleged workplace accident, the Funding Defendants offered high-interest litigation funding loans to Claimants to be secured by the settlement payments anticipated from Claimants' workers' compensation claims and/or personal injury lawsuits, and paid Claimants a portion of the high-interest funding loan proceeds.

291.    The Funding Defendants distributed the remaining proceeds of the high-interest funding loan directly, and/or indirectly through the Schwitzer Defendants, to the Runner Defendants, the Medical Provider Defendants, and the Schwitzer Defendants.

292.    Upon information and belief, the Funding Defendants communicated distribution of the proceeds of the funding loan through email and/or text message as well as via use of the telephone.

293.    Upon information and belief, the Funding Defendants have received or have the right to receive the majority of or significant part of the Claimants' portion of the settlement proceeds from Claimants' workers' compensation claims and/or personal injury lawsuits.

### iv.    Kolb Defendants' Participation in the Fraud Scheme

294.    Since at least 2018, Kolb Radiology, P.C. has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

295.    Defendant Thomas M. Kolb, M.D., as a radiologist and a principal of Kolb Radiology, P.C., controlled and directed the medical services provided to Claimants, who were referred to Kolb Radiology, P.C. by gatekeeper clinics, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter relied upon by treating providers to justify procedures irrespective of the whether the findings were degenerative, not acute, and/or unrelated to workplace injury.

296.    As part of the Fraud Scheme, Kolb Radiology, P.C. Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

297.    As part of the Fraud Scheme, Kolb Radiology, P.C. Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

298.    As part of the Fraud Scheme, Kolb Radiology, P.C. Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants and other Medical Provider Defendants knowing that the fraudulent medical documentation would be used to falsely

bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

299.    The Kolb Defendants knowingly profited from compensation for the alleged imaging and diagnostic services rendered by Defendant Kolb and/or any other employee/agent of Kolb Radiology, P.C., that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

300.    Kolb Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Kolb and/or any other employee/agent of Kolb Radiology, P.C. provided imaging and diagnostic services and received compensation for such services.

**v.    NYC MNO Defendants' Participation in the Fraud Scheme**

301.    Since at least 2018, NYC MNO Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

302.    Since at least 2019, NYC MNO Practice, has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

303.    Defendant Golzad, as an neurologist and a principal, agent and/or employee of NYC MNO Practice controlled and directed the medical services provided to Claimants by NYC MNO Practice, including overseeing employees in their evaluating, diagnosing and performing neurological assessment and medical treatment that was unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme, as described herein.

304.    As part of the Fraud Scheme, NYC MNO Defendants intentionally created  and submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

305.    As part of the Fraud Scheme, NYC MNO Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

306.    As part of the Fraud Scheme, NYC MNO Defendants provided fraudulent medical documentation by mail, facsimile and/or email to the Schwitzer Defendants and other Medical Provider Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

307.    NYC MNO Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Defendant Golzad, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

308.    NYC MNO Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Golzad

and/or other employee/agent of NYC MNO Practice provided medical and diagnostic services and received compensation for such services.

**vi.**   **Brooklyn Med Defendants' Participation in the Fraud Scheme**

309.    Since at least 2018, Brooklyn Med has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

310.    Defendant Salehin, as an internist and a principal of Brooklyn Med, located at the Medical & Wellness Center on 410 Ditmas Avenue, Brooklyn, New York, controlled and directed the medical services provided to Claimants by Brooklyn Med, including evaluating, diagnosing and referring Claimants for a variety of services, including physiotherapist evaluation, physical therapy, pain management, and neurology consultation, that were not indicated and/or inconsistent with the initial report of the alleged accident and complaints initially reported in the emergency room, as described herein.

311.    Brooklyn Med Defendants referred Claimants to Community Imaging Defendants for imaging services and radiographic reports and used or relied upon such medical documentation from Community Imaging Defendants, which were fraudulent, to render and recommend additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

312.    Brooklyn Med Defendants not only provided physical therapy at its location, they also referred Claimants to other medical providers located in the same building at the Medical & Wellness Center on 410 Ditmas Avenue: a) North Shore Defendants for chiropractic adjustments; b) Unicorn Defendants for acupuncture treatment; c) Advanced Defendants for orthopedic evaluations and surgeries; and d) Apple Defendants for pain management and injections. These

services were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident.

313.    Brooklyn Med Defendants also referred Claimants to Total Defendants for evaluations and surgeries that were not medically necessary and/or not causally related to the alleged workplace accident.

314.    As part of the Fraud Scheme, Brooklyn Med Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization, and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

315.    As part of the Fraud Scheme, Brooklyn Med Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

316.    As part of the Fraud Scheme, Brooklyn Med Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

317.    Brooklyn Med Defendants knowingly profited from compensation for the alleged medical and physical therapy services rendered by Defendant Salehin and/or any other employee/agent of Brooklyn Med, that were unnecessary, excessive, unwarranted and/or costly,

and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

318.    Brooklyn Med Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Salehin and/or any other employee/agent of Brooklyn Med provided medical and physical therapy services and received compensation for such services.

### vii.    Community Imaging Defendants

319.    Since at least 2018, Community Imaging has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

320.    Defendant McDonnell, as a radiologist and a principal of Community Imaging, controlled and directed the medical services provided to Claimants, who were referred to Community Imaging by Brooklyn Med, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter relied upon by treating providers to justify procedures irrespective of the fact that so-called "abnormal" findings are degenerative, and not acute, and to be expected by the age of 40 and should not be the focus of treatment related to workplace injury. Low Back Guidelines at B.2.

321.    As part of the Fraud Scheme, Community Imaging Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

322.    As part of the Fraud Scheme, Community Imaging Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

323.    As part of the Fraud Scheme, Community Imaging Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

324.    Community Imaging Defendants knowingly profited from compensation for the alleged imaging and diagnostic services rendered by Defendant McDonnell and/or any other employee/agent of Community Imaging, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

325.    Community Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant McDonnell and/or any other employee/agent of Community Imaging provided imaging and diagnostic services and received compensation for such services.

### viii.    North Shore Defendants' Participation in the Fraud Scheme

326.    Since at least 2018, North Shore has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

---

**FIRST AMENDED COMPLAINT**                                                                 **94**

327.    Defendant Lebson, as a chiropractor and a principal of North Shore, controlled and directed the chiropractic adjustments provided to Claimants, who were referred to him by Brooklyn Med, with which North Shore shared the same building and address (410 Ditmas Avenue, Brooklyn, New York). As described herein, the chiropractic adjustments were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident but were ordered to further the fraudulent treatment protocol component of alleged conservative care prefatory to injections and surgeries.

328.    As part of the Fraud Scheme, North Shore Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged workplace accident.

329.    As part of the Fraud Scheme, North Shore Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

330.    As part of the Fraud Scheme, North Shore Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

331.    North Shore Defendants knowingly profited from compensation for the alleged chiropractic adjustments rendered by Defendant Lebson and/or any other employee/agent of North Shore that were unnecessary, excessive, unwarranted, and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

332.    North Shore Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Lebson and/or any other employee/agent of North Shore provided chiropractic adjustments and received compensation for such services.

### ix.    Unicorn Defendants' Participation in the Fraud Scheme

333.    Since at least 2018, Unicorn has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

334.    Defendant Wang, as an acupuncturist and a principal of Unicorn, controlled and directed the acupuncture treatments provided to Claimants, who were referred to him by Brooklyn Med, with which Unicorn shared the same building and address (410 Ditmas Avenue, Brooklyn, New York). As described herein, the acupuncture treatments were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident.

335.    In contrast to the rote prescription of acupuncture and near-identical treatment notes, it is not recommended for either routine use or "for treatment of acute, subacute, radicular, or postoperative low back pain" but "may be recommended as treatment of non- acute back pain as a limited course during which time there are clear objective and functional goals that are to be achieved." Low Back Guidelines at D.1.

336.    As part of the Fraud Scheme, Unicorn Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

337.    As part of the Fraud Scheme, Unicorn Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

338.    As part of the Fraud Scheme, Unicorn Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

339.    Unicorn Defendants knowingly profited from compensation for the alleged acupuncture treatments rendered by Defendant Wang and/or any other employee/agent of Unicorn Acupuncture, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

340.    Unicorn Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Wang and/or any

other employee/agent of Unicorn Acupuncture provided acupuncture treatments and received compensation for such services.

<b>x.     Apple Defendants' Participation in the Fraud Scheme</b>

341.    Since at least 2018, Big Apple has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

342.    Defendant Apple, as a pain management specialist and a principal of Big Apple, controlled and directed the medical services provided to Claimants by Big Apple, including evaluating and providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident as described herein. Claimants were referred to him by Brooklyn Med, with which Big Apple shared the same building and address (410 Ditmas Avenue, Brooklyn, New York).

343.    As part of the Fraud Scheme, Apple Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

344.    As part of the Fraud Scheme, Apple Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

345.    As part of the Fraud Scheme, Apple Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

346.    Apple Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Defendant Apple and/or any other employee/agent of Big Apple, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

347.    Apple Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Apple and/or any other employee/agent of Big Apple provided medical and diagnostic services and received compensation for such services.

### xi.    Total Defendants' Participation in the Fraud Scheme

348.    Since at least 2018, Total Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

349.    Defendant Lerman, as an orthopedic surgeon and associate director of spine surgery of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating and recommending surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, as described herein.

350.    Defendant Kumar, as an orthopedic surgeon and a member of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, as described herein.

351.    As part of the Fraud Scheme, Total Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

352.    As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

353.    As part of the Fraud Scheme, Total Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

354.    Total Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Defendants Lerman, Kumar, and/or any other employee/agent of Total Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally

related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

355.    Total Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Lerman, Kumar and/or any other employees/agents of Total Ortho provided medical and diagnostic services and received compensation for such services.

### xii.    BL Pain Defendants' Participation in the Fraud Scheme

356.    Since at least 2018, BL Pain has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

357.    Since at least 2018, Pain Physicians has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

358.    Since at least 2018, LR Med has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

359.    Defendant Kosharskyy, as an anesthesiologist and interventional pain management and a principal of BL Pain and Pain Physicians, controlled and directed the medical services provided to Claimants by BL Pain and Pain Physicians, including evaluating, diagnosing and serially providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme, as described herein.

360.    Defendant Koutsospyros, as an anesthesiologist and interventional pain management and employee of BL Pain, Pain Physicians and/or LR Med, controlled and directed the medical services provided to Claimants by BL Pain, Pain Physicians and LR Med, including evaluating, diagnosing and serially providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme, as described herein.

361.    As part of the Fraud Scheme, BL Pain Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

362.    As part of the Fraud Scheme, BL Pain Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

363.    As part of the Fraud Scheme, BL Pain Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

364.    BL Pain Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Defendants Kosharskyy, Koutsospyros, and/or any other employee/agent of BL Pain, Pain Physicians and/or LR Med, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

365.    BL Pain Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Kosharskyy, Koutsospyros, and/or any other employee/agent of BL Pain, Pain Physicians and/or LR Med provided medical and diagnostic services and received compensation for such services.

### xiii.    Katzman Defendants' Participation in the Fraud Scheme

366.    Since at least 2018, Katzman Defendants have been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

367.    Defendant Katzman, an orthopedic surgeon and a principal of Katzman Ortho, controlled and directed the medical services provided to Claimants by Katzman Ortho, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme, as described herein.

368.    As part of the Fraud Scheme, Katzman Defendants intentionally created and submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary,

excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

369.    As part of the Fraud Scheme, Katzman Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

370.    As part of the Fraud Scheme, Katzman Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

371.    Katzman Defendants knowingly profited from compensation for the  medical and diagnostic services rendered by Defendant Katzman and/or any other employee/agent of Katzman Defendants, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

372.    Katzman Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Katmzan and/or any other employee/agent of Katzman Defendants provided medical and diagnostic services and received compensation for such services.

### xvi.    <u>Community PT's Participation in the Fraud Scheme</u>

373.    Since at least 2018, Community PT has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

374.    Community PT provided physical therapy at its location and such services were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme, as described herein.

375.    As part of the Fraud Scheme, Community PT submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

376.    As part of the Fraud Scheme, Community PT provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

377.    As part of the Fraud Scheme, Community PT provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

378. Community PT knowingly profited from compensation for the alleged medical and physical therapy services rendered, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

379. Community PT also knowingly profited from the increased number of patients who were referred to it as part of the Fraud Scheme for whom it provided medical and physical therapy services and received compensation for such services.

### xv.   Cross Bay Defendants' Participation in the Fraud Scheme

380. Since at least 2018, Cross Bay Practice has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of the Fraud Scheme.

381. Tomasello, as an orthopedic surgeon and a principal of Cross Bay Practice, controlled and directed the medical services provided to Claimants by Cross Bay Practice, including evaluating and performing surgeries that were not medically necessary and/or not causally related to the alleged accidents and referring Claimants to the Medical Provider Defendants for radiological services, as described herein.

382. As part of the Fraud Scheme, Cross Bay Defendants intentionally created and submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in the Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

FIRST AMENDED COMPLAINT                                                      106

383.    As part of the Fraud Scheme, Cross Bay Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident.

384.    As part of the Fraud Scheme, Cross Bay Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

385.    Cross Bay Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Tomasello and/or any other employee/agent of Cross Bay Practice, which were unnecessary, excessive, unwarranted and/or costly and were not causally related to the alleged workplace accident but were rendered in furtherance of the Fraud Scheme.

386.    Cross Bay Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Tomasello and/or any other employee/agent of Cross Bay Practice provided medical and diagnostic services and received compensation for such services.

### xvi.    McCulloch Defendants' Participation in the Fraud Scheme

387.    Since at least 2018, McCulloch Ortho has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

388.     Since at least 2019, McCulloch Ortho, through selective use of NY S&J has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

389.     Defendant Wright, as an orthopedic surgeon and a principal, agent and/or employee of McCulloch Ortho and/or NY S&J, controlled and directed the medical services provided to Claimants by McCulloch Ortho and/or the NY S&J name, including overseeing employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme, as described herein.

390.     As part of the Fraud Scheme, McCulloch Defendants intentionally created  and submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

391.     As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

392.     As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants'

workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

393.    McCulloch Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Defendant Wright, Dr. Sharma and any other employees/agents of McCulloch Ortho or NY S&J, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

394.    McCulloch Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Wright and/or any other employee/agent of McCulloch Ortho or NY S&J provided medical and diagnostic services and received compensation for such services.

### xvii.    NYSI Defendants' Participation in the Fraud Scheme

395.    Since at least 2018, NYSI Defendants have been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

396.    Defendant de Moura, an orthopedic surgeon and a principal of NYSI, controlled and directed the medical services provided to Claimants by NYSI, including evaluating, recommending and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme, as described herein.

397.    As part of the Fraud Scheme, NYSI Defendants intentionally created and submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for

authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

398.    As part of the Fraud Scheme, NYSI Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

399.    As part of the Fraud Scheme, NYSI Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

400.    NYSI Defendants knowingly profited from compensation the alleged medical and diagnostic services rendered by Defendant de Moura and/or any other employee/agent of NYSI, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

401.    NYSI Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant de Moura and/or any other employee/agent of NYSI provided medical and diagnostic services and received compensation for such services.

        **xviii.**   **Interventional Defendants' Participation in the Fraud Scheme**

402.    Since at least 2018, Interventional has been involved in the medical treatment of numerous Claimants involving purported construction work injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

403.    Defendant Abramov, as a pain management specialist and a principal, agent and/or employee of Interventional, controlled and directed the medical services provided to Claimants by Interventional, including evaluating and providing epidural steroid injections that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged workplace accident, as described herein.

404.    As part of the Fraud Scheme, Interventional Defendants intentionally created and submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Tradesman, the NY WCB and others involved in Claimants' workers' compensation claims for authorization and to seek compensation for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

405.    As part of the Fraud Scheme, Interventional Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident.

406.    As part of the Fraud Scheme, Interventional Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants'

workers' compensation claims and personal injury lawsuits, thereby inflating the settlement value of such claims and lawsuits.

407.     Interventional Defendants knowingly profited from compensation for the alleged medical and diagnostic services rendered by Defendant Abramov and/or any other employee/agent of Interventional, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

408.     Interventional Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendant Abramov and/or any other employee/agent of Interventional provided medical and diagnostic services and received compensation for such services.

E.     **Defendants' Pattern of Racketeering Activity**

393. The pattern of racketeering engaged in by Defendants involving a scheme to defraud Plaintiffs and others, began on or before 2018, and continues to the present day, and includes among others the following specific predicate acts:

i.     **Claimant A**

409.     As stated above, many of the medical services provided to Claimant A were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because the claimant's initial account of the accident and minor complaints of injury to his left shoulder and bilateral legs, with discharge from the emergency room in under two hours with indication  with instructions to return to work after one day, does not correlate to the subsequent invasive treatment, (6) six surgery(s) and neurological treatment rendered as part of the fraudulent treatment protocol.

410.    As such, each of the below identified medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

411.    On or about **October 07, 2022**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendants William Schwitzer and John Merlino, as agents/employees of **Schwitzer Firm** at the direction of William Schwitzer and John Merlino, caused to be transmitted **to defense counsel** by mail, facsimile or email an **Amended Verified Complaint**, falsely attesting to the construction accident, the existence and/or extent of Claimant A's injuries, causation and the necessity of Claimant A's medical treatment.  The transmitted Amended Verified Complaint was false because the accident did not occur as alleged, as demonstrated by the multiple shifting accounts hereinabove, and the injuries claimed did not exist proximate to the accident as reflected by Claimant A's emergency room records.

412.    On or about **June 27, 2023**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendants William Schwitzer and John Merlino, as agents/employees of **Schwitzer Firm** at the direction of William Schwitzer and John Merlino, caused to be transmitted **to defense counsel** by mail, facsimile or email a **Verified Bill of Particulars**, falsely attesting to the construction accident, the existence and/or extent of Claimant A's injuries, and the necessity of Claimant A's medical treatment.  The transmitted **Verified Bill of Particulars** was false because the accident did not occur as alleged, as demonstrated by the multiple shifting accounts hereinabove, and the injuries claimed did not exist proximate to the accident as reflected by Claimant A's emergency room records.

413.    On or about **January 12, 2024**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendants William Schwitzer and John Merlino, as owners/agents/employees of the **Schwitzer Firm** and/or at the direction of William Schwitzer and John Merlino, caused to be transmitted **to defense counsel** by mail, facsimile or email a **Supplemental Verified Bill of Particulars**, falsely attesting to the construction accident, the existence and/or extent of Claimant A's injuries, and the necessity of Claimant A's medical treatment.  The transmitted **Supplemental Verified Bill of Particulars** was false because the accident did not occur as alleged, as demonstrated by the multiple shifting accounts hereinabove, and the injuries claimed did not exist proximate to the accident as reflected by Claimant A's emergency room records.

414.    On or about **February 22, 2024**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendants William Schwitzer and John Merlino, as owners/agents/employees of the **Schwitzer Firm** and/or at the direction of William Schwitzer and John Merlino, caused to be transmitted **to defense counsel** by mail, facsimile or email a **Third Supplemental Verified Bill of Particulars**, falsely attesting to the construction accident, the existence and/or extent of Claimant A's injuries, and the necessity of Claimant A's medical treatment.  The transmitted **Third Supplemental Verified Bill of Particulars** was false because the accident did not occur as alleged, as demonstrated by the multiple shifting accounts hereinabove, and the injuries claimed did not exist proximate to the accident as reflected by Claimant A's emergency room records.

415.    On or about **September 26, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Community PT** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning physical**

**therapy for Claimant A performed on September 7, 2022,** based on purported injuries.  Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injuries to justify physical therapy existed as reflected by Claimant A's emergency room records.  These records were available **to Community PT** and based on such records, **Community PT** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Community PT** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for its services, to increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

416.    On or about **July 28, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Community PT** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning physical therapy for Claimant A performed in June of 2023,** based on purported injuries.  Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred, or did not occur as alleged, as demonstrated hereinabove and no injuries to justify physical therapy existed as reflected by Claimant A's emergency room records.  These records were available **to Community PT** and based on such records, **Community PT** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Community PT** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for its services, increase

patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

417.    On or about **January 26, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Community PT** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning physical therapy for Claimant A performed on January 13, 2023,** based on purported injuries.  Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injuries to justify physical therapy existed as reflected by Claimant A's emergency room records.  These records were available **to Community PT** and based on such records, **Community PT** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Community PT** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

418.    On or about **September 19, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Defendant Kolb of Kolb Radiology,** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form of a brain MRI for Claimant A performed on July 22, 2022,** based on purported **head** injury.  Such reports were submitted as if Claimant A's purported head were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury

to the head existed as reflected by Claimant A's initial emergency room records which indicated that Claimant A was wearing a hard hat, did not have any complaints of head trauma or loss of consciousness.  These records were available to **Kolb** and based on such records, **Kolb** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Kolb** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

419.    On or about **October 2, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Defendant Kolb of Kolb Radiology,** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form of a Right hip MRI for Claimant A performed on July 28, 2022,** based on purported **right hip** injury.  Such reports were submitted as if Claimant A's purported hip injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to the right hip existed as reflected by Claimant A's emergency room records.  These records were available **to Kolb** and based on such records, **Kolb** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Kolb** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

420.    On or about **September 26, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Kolb of Kolb Practice** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form of a Left Hip MRI for Claimant A performed on July 28, 2022,** based on purported **left hip injury**. Such report was submitted as if Claimant A's purported injury was causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his left hip existed as reflected by Claimant A's emergency room records.  These records were available **to Kolb** and based on such records, **Kolb** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Kolb** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

421.    On or about **January 20, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Persich** of **All County Practice** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and operative report of a Right Ankle surgery for Claimant A performed on January 17, 2023,** based on purported right ankle injury.  Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his right ankle existed as reflected by Claimant A's emergency room records. These records were available **to Persich** and based on such records, **Persich** knew or should have known that the treatments were neither necessary nor causally connected to the alleged

accident. Notwithstanding the same, **Persich** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

422.    On or about **March 6, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Gianni Persich** of **All County Practice** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form with application for a lower leg splint for Claimant A dated February 8, 2023** based on purported right ankle injury. Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his right ankle existed as reflected by Claimant A's emergency room records. These records were available **to Persich** and based on such records, **Persich** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Persich** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

423.    On or about **October 22, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Persich** of **All County Practice** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and operative report of a Left Ankle surgery for Claimant A performed on September 10, 2024,** based on purported left ankle injury. Such reports were submitted as if Claimant A's purported injury were

causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his left ankle existed as reflected by Claimant A's emergency room records. These records were available **to Persich** and based on such records, **Persich** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Persich** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

424. On or about **December 19, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Wright** of McCulloch Ortho caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and record of medical examination on December 14, 2023 of Claimant A** based on purported **right wrist injury**. Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his right wrist existed as reflected by Claimant A's emergency room records. These records were available **to Wright** and based on such records, **Wright** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Wright** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

425.    On or about **October 15, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Wright** of McCulloch Ortho caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and surgical notes for surgery performed on September 24, 2024 on Claimant A** based on purported **right wrist injury**.  Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his right wrist existed as reflected by Claimant A's emergency room records. These records were available **to Wright** and based on such records, **Wright** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Wright** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

426.    On or about **August 10, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant de Moura of NYSI** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and surgical records for surgery performed on July 30, 2024 on Claimant A** based on purported **neck injury**.  Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his neck existed as reflected by Claimant A's emergency room records. These records were available to **de Moura** and based on such records, **de Moura** knew or should have known that the treatments were

neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **de Moura** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

427.    On or about **November 20, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant de Moura of NYSI** caused to be transmitted by mail, facsimile or email **to the NY WCB a Prior Authorization Request for Claimant A for physical therapy**, based on purported **back and neck injury**.  Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his back and neck existed as reflected by Claimant A's emergency room records. These records were available **to de Moura** and based on such records, **de Moura** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **de Moura** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

428.    On or about **August 9, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Koutsospyros with BL Pain/Pain Physicians** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning medical services performed at Pain Physicians for Claimant A on July 06, 2022,** based on purported **back injuries**.  Such reports were submitted as if Claimant A's purported

injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his back existed as reflected by Claimant A's emergency room records. These records were available **to Koutsospyros** and based on such records, **Koutsospyros** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Koutsospyros** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

429. On or about **July 27, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Koutsospyros with BL Pain/Pain Physicians** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning medical services performed at Pain Physicians for Claimant A on July 13, 2023,** based on purported **back injuries**. Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his back existed as reflected by Claimant A's emergency room records. These records were available **to Koutsospyros** and based on such records, **Koutsospyros** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Koutsospyros** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

430.    On or about **July 5, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Koutsospyros with BL Pain/Pain Physicians** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning medical services performed at BL Pain for Claimant A on June 19, 2023,** based on purported **back injuries**.  Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his back existed as reflected by Claimant A's emergency room records. These records were available **to Koutsospyros** and based on such records, **Koutsospyros** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Koutsospyros** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

431.    On or about **July 5, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Kosharskyy with BL Pain/Pain Physicians** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning medical services performed at Pain Physicians for Claimant A on June 21, 2023,** based on purported **back injuries**.  Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his back existed as reflected by Claimant A's emergency room records. These records were available **to Kosharskyy** and based on such records,

**Kosharskyy** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Kosharskyy** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

432.    On or about **March 13, 2025,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **LR Med** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form concerning injections for Claimant A performed at Pain Physicians on February 20, 2025,** based on purported **back injuries**.  Such reports were submitted as if Claimant A's purported injuries were causally connected to Claimant A's accident and treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no injury to his back existed as reflected by Claimant A's emergency room records. These records were available **to LR Med** and based on such records, **LR Med** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **LR Med** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

433.    On or about **January 31, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Golzad of NYC MNO Practice** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and evaluation notes for Claimant A for services rendered on January 03, 2023,** based on purported **post-concussion syndrome with traumatic vision injury**.  Such reports were submitted as if Claimant

A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and Claimant A did not sustain a concussion or traumatic injury to his vision as reflected by Claimant A's emergency room records. These records were available **to Golzad** and based on such records, **Golzad** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Golzad** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled

434. On or about **November 20, 2024,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Golzad of NYC MNO Practice** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form and neurological evaluation notes for Claimant A for services rendered on November 1 through 4, 2024,** based on purported **neurological injury**. Such reports were submitted as if Claimant A's purported injury were causally connected to Claimant A's accident and treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and Claimant A did not sustain any neurological injury as reflected by Claimant A's emergency room records. These records were available **to Golzad** and based on such records, **Golzad** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Golzad** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment

for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits to which they would otherwise not be entitled.

### ii.    Claimant B

435.    As stated above, many of the medical services provided to Claimant B were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident because despite his varied accounts of alleged accident, when he presented to the emergency room, imaging studies did not show any evidence of acute injury and his subsequent treatment is materially similar to the others utilizing the fraudulent treatment protocol rather than any internally consistent account of injury and treatment. As such, each of the below identified medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

436.    On or about **January 13, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **John C. Merlino, William Schwitzer & Associates** or an employee of the William Schwitzer & Associates, P.C. caused to be transmitted to the **NY WCB** by mail, facsimile or email a **C-3 Form** and **OC-400 Forms**, falsely attesting to the construction accident, the existence and/or extent of Claimant B's injuries. The transmitted **C-3 Form** is false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records.

437.    On or about **January 20, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **William Schwitzer & Associates** or an employee of the William

Schwitzer & Associates, P.C. caused to be transmitted **to defense counsel** by mail, facsimile or email a **Summons** and **Verified Complaint**, falsely attesting to the construction accident, the existence and/or extent of Claimant B's injuries, and the necessity of Claimant B's medical treatment. The transmitted Summons and Verified Complaint is false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records.

438.    On or about **March 17, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Brooklyn Med** caused to be transmitted by mail, facsimile or email **to the NY WCB a progress notes for physical therapy to the thoracic spine, lumbar spine, and bilateral knees from February 2021 for Claimant B** based on purported injuries. Such reports were submitted as if Claimant B's purported injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries to Claimant B's neck and back existed as reflected by Claimant B's emergency room records. These records were available **to Brooklyn Med** and based on such records, **Brooklyn Med** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Brooklyn Med** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

439.    On or about **March 26, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Brooklyn Med** caused to be transmitted by mail, facsimile or email **to the NY WCB a progress notes for a physical evaluation and physical therapy to the**

thoracic spine, lumbar spine, and bilateral knees from January 2021 for Claimant B based on purported injuries. Such reports were submitted as if Claimant B's purported injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries to Claimant B's neck and back existed as reflected by Claimant B's emergency room records. These records were available **to Brooklyn Med** and based on such records, **Brooklyn Med** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Brooklyn Med** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

440. On or about **April 16, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Brooklyn Med** caused to be transmitted by mail, facsimile or email **to the NY WCB a progress notes for physical therapy sessions to the thoracic spine, lumbar spine, and bilateral knees from March 2021 for Claimant B** based on purported injuries. Such reports were submitted as if Claimant B's purported injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries to Claimant B's neck and back existed as reflected by Claimant B's emergency room records. These records were available **to Brooklyn Med** and based on such records, **Brooklyn Med** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Brooklyn Med** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase

patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

441.    On or about **October 18, 2023**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **William Schwitzer & Associates** or an employee of the William Schwitzer & Associates, P.C. caused to be transmitted **to defense counsel** by mail, facsimile or email a **Verified Bill of Particulars**, falsely attesting to the construction accident, the existence and/or extent of Claimant B's injuries, and the necessity of Claimant B's medical treatment.  The transmitted **Verified Bill of Particulars** is false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records.

442.    On or about **November 15, 2023**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Brooklyn Medical Practice, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form and report of physical therapy progress notes for left shoulder and neck treatments in October 2023 for Claimant B** based on purported left shoulder and neck injuries.  Such reports were submitted as if Claimant B's purported left shoulder and neck injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records. These records were available **to Brooklyn Medical Practice, P.C.** and based on such records, **Brooklyn Medical Practice, P.C.** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Brooklyn Medical Practice, P.C.** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for

his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

443.    On or about **March 17, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Lebson of North Shore** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form for Claimant B** based on purported back and neck injuries.  Such reports were submitted as if Claimant B's purported back and neck injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records. These records were available **to medical provider Todd L. Lebson** and based on such records, **medical provider Todd L. Lebson** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Todd L. Lebson** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

444.    On or about **October 25, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Lebson of North Shore** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form and CMS-1500 for Claimant B** based on purported back and neck injuries.  Such reports were submitted as if Claimant B's purported back and neck injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as

reflected by Claimant B's emergency room records. These records were available **to medical provider Todd L. Lebson** and based on such records, **medical provider Todd L. Lebson** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Todd L. Lebson** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

445.    On or about **January 17, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **North Shore Family Chiropractic P.C**. caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form including notes for back and neck therapy for December 2022 for Claimant B,** based on purported back and neck injuries.  Such reports were submitted as if Claimant B's purported back and neck injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records. These records were available **to North Shore Family Chiropractic P.C.** and based on such records, **North Shore Family Chiropractic P.C.** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **North Shore Family Chiropractic P.C.** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

446.     On or about **August 9, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Vadim Lerman of Total Ortho** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form and a July 15, 2021 back surgery operative report for Claimant B based** on purported back injury. Such report was submitted as if Claimant B's purported back injury was causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records. These records were available **to medical provider Vadim Lerman** and based on such records, **medical provider Vadim Lerman** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Vadim Lerman** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increased patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

447.     On or about **March 03, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Community Medical Imaging, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB an Ancillary Medical Report with a left shoulder MRI on January 11, 2021, for Claimant B, based** on purported left shoulder injury.  Such reports were submitted as if Claimant B's purported left shoulder injury was causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records. These records were available **to Community Medical Imaging, P.C** and based on such records, **Community Medical Imaging,**

**P.C.** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Community Medical Imaging, P.C.** continued a course of treatment, prepared records reflecting the same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

448.    On or about **April 7, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Vadim Lerman** caused to be transmitted by mail, facsimile or email **to the NY WCB a C-4 Authorization form requesting back surgery for Claimant B based** on a purported back injury.  Such report was submitted as if Claimant B's purported back injury was causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records. These records were available **to medical provider Vadim Lerman** and based on such records, **medical provider Vadim Lerman** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Vadim Lerman** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

449.    On or about **March 30, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Stan Avshalumov** caused to be transmitted by mail, facsimile or email **to the NY WCB a MG-2 Attending Doctor's Request for Approval of Variance and Insurer's Response concerning left shoulder surgery for Claimant B based** on

purported left shoulder injury.  Such report was submitted as if Claimant B's purported left shoulder injury was causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records. These records were available **to medical provider Stan Avshalumov** and based on such records, **medical provider Stan Avshalumov** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Stan Avshalumov** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

450.     On or about **June 16, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendants Wang and Unicorn Acupuncture, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Progress Report for acupuncture treatment performed in May 2021 for Claimant B, based** on purported left shoulder, cervical spine, and lumbar spine injuries.  Such reports were submitted as if Claimant D's purported left shoulder, cervical spine, and lumbar spine injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records. These records were available **to Defendants Wang and Unicorn Acupuncture, P.C.** and based on such records, **Wang** and **Unicorn** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Wang** and **Unicorn** continued a course of treatment,

prepared records reflecting the same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

451.    On or about **January 18, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendants Wang and Unicorn Acupuncture, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Progress Report for acupuncture treatment performed in December 2021 for Claimant B, based** on purported left shoulder, cervical spine, and lumbar spine injuries.  Such reports were submitted as if Claimant D's purported left shoulder, cervical spine, and lumbar spine injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records.  These records were available **to Defendants Wang and Unicorn Acupuncture, P.C.** and based on such records, **Wang** and **Unicorn** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Wang** and **Unicorn** continued a course of treatment, prepared records reflecting the same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

452.    On or about **May 15, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendants Wang and Unicorn Acupuncture, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Progress Report for acupuncture treatment performed in March 2023 for Claimant B, based** on purported left shoulder, cervical spine, and lumbar spine injuries.  Such reports were submitted as if Claimant B's purported left

shoulder, cervical spine, and lumbar spine injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant B's emergency room records. These records were available **to Defendants Wang and Unicorn Acupuncture, P.C.** and based on such records, **Wang** and **Unicorn** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Wang** and **Unicorn** continued a course of treatment, prepared records reflecting the same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

453.    On or about **April 28, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Richard Apple, M.D. of Big Apple Pain Management. P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Notice of Treatment Issue/Disputed Bill Issue form and records dated March 4, 2021 documenting a follow-up after Claimant B's second lumbar epidural spine injection and recommending a third.** Such reports were submitted as if Claimant B's purported lumbar spine injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records. These records were available **to Apple and Big Apple Pain Management** and based on such records, **Apple and Big Apple Pain Management** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Apple and Big Apple Pain Management** continued a course of treatment, prepared records reflecting same and

thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

454.    On or about **April 12, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Richard Apple, M.D. of Big Apple Pain Management. P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Notice of Treatment Issue/Disputed Bill Issue form and records dated February 18, 2021 documenting a follow-up visit after Claimant B's first lumbar epidural spine injection.** Such reports were submitted as if Claimant B's purported lumbar spine injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records.  These records were available **to Apple and Big Apple Pain Management** and based on such records, **Apple and Big Apple Pain Management** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Apple and Big Apple Pain Management** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

455.    On or about **March 31, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Richard Apple, M.D. of Big Apple Pain Management. P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Notice of Treatment Issue/Disputed Bill Issue form and records dated February 2, 2021 documenting Claimant B's lumbar epidural spine injection.** Such reports were submitted as if Claimant B's purported

lumbar spine injuries were causally connected to Claimant B's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant B's emergency room records. These records were available **to Apple and Big Apple Pain Management** and based on such records, **Apple and Big Apple Pain Management** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Apple and Big Apple Pain Management** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

### iii.    Claimant C

456.   As stated above, many of the medical services provided to Claimant C were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident which did not result in any discernible injuries beyond his initial subjective claims of a purported head injury, which were false because no injury to his head existed as evidenced by Claimant C continuing to work for four hours post-accident confirmed by his co-worker eye witnesses, and as reflected by Claimant C's emergency room radiology finding no evidence of acute head, neck or cervical spine CT acute traumatic injury. Claimant C was discharged from the emergency room after just five hours, with sole objective finding of right testicle injury, and with instructions to return to work. As such, each of the below medical documents, claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire

fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

457.    On or about **November 23, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, Defendants William Schwitzer and John Merlino, members and/or employees of the **Schwitzer Firm**, and/or at the direction of William Schwitzer and John Merlino, caused to be transmitted to counsel by mail, facsimile, email or NYSCEF e-filing a **Summons and Verified Complaint**, falsely attesting to the construction accident, the existence and/or extent of Claimant C's injuries, and the necessity of Claimant C's medical treatment.  The transmitted Summons and Verified Complaint is false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's initial and emergency room records.

458.    On or about **July 29, 2022**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, the **Schwitzer Defendants** and/or an employee of William Schwitzer & Associates, P.C. and/or at the direction of Schwitzer Defendants, caused to be transmitted **to defense counsel** by mail, facsimile or email a **Verified Bill of Particulars**, falsely attesting to the construction accident, the existence and/or extent of Claimant C's injuries, and the necessity of Claimant C's medical treatment. The transmitted **Verified Bill of Particulars to defense counsel** is false because no such accident occurred as alleged as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's initial and emergency room records.

459.    On or about **October 26, 2022**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Schwitzer Defendants** and/or an employee of William Schwitzer & Associates, P.C. at the direction of Schwitzer Defendants, caused to be transmitted to **defense counsel** by mail, facsimile or email a **Supplemental Verified Bill of Particulars**, falsely attesting

to the construction accident, the existence and/or extent of Claimant C's injuries, and the necessity of Claimant C's medical treatment. The transmitted **Supplemental Verified Bill of Particulars to defense counsel** is false because no such accident occurred as alleged as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's initial or emergency room records.

460.    On or about **March 17, 2022**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Peter Kwan, MD**, caused to be transmitted by mail, facsimile or email to the **NY WCB a C-4.0 Doctor's Initial Report** and report of Claimant C's **January 5, 2022** examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.   These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Peter Kwan**. caused to be transmitted by and based on such records, **medical provider Peter Kwan** caused to be transmitted by knew or should have known that the treatments were neither necessary nor connected to the alleged accident.   Notwithstanding the same, **medical provider Peter Kwan** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

461.    On or about **September 15, 2023**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Peter Kwan, MD**, caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and report of Claimant C's **August 3, 2023** examination based on purported injuries.  Such report was submitted as if Claimant

C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary. These records, however, are false because no such accident occurred as alleged as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records and independent medical examiner reports. These records were available to medical provider **Peter Kwan, MD,** and **Kwan** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, medical provider **Kwan** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

462.    On or about **August 9, 2022,** in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Dr. Barry M. Katzman**, **Katzman Orthopedics PC** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and a report of its July 19, 2022 examination during which Katzman recommended left shoulder arthroscopy. Such reports were submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Barry M. Katzman** and based on such records, **medical provider Barry M. Katzman** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **medical provider Barry M. Katzman** continued a course of treatment, prepared records reflecting same and thereafter

transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

463.    On or about **August 23, 2022**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Dr. Barry M. Katzman**, **Katzman Orthopedics PC** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and a report of **August 5, 2022 left shoulder arthroscopy surgery** for purported shoulder injuries. Such reports were submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Barry M. Katzman** and based on such records, **medical provider Barry M. Katzman** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, medical **provider Barry M. Katzman** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

464.    On or about April 19, 2024, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Dr. Barry M. Katzman**, **Katzman Orthopedics PC** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim Form** and report of its March 19, 2024 examination during which medical provider **Barry M. Katzman** recommended right shoulder arthroscopy.  Such reports were submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated

hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Barry M. Katzman** and based on such records, medical provider **Barry M. Katzman** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, medical provider **Barry M. Katzman** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

465.    On or about April 24, 2024, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343**, Barry M. Katzman**, **Katzman Orthopedics PC** caused to be transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form** and an **operative report of a March 28, 2024 right shoulder arthroscopy** for purported shoulder injuries. Such reports were submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **Barry M. Katzman** and based on such records, medical provider **Barry M. Katzman** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding same, medical provider **Barry M. Katzman** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

466.    On or about **February 8, 2022**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Peter Tomasello, DO, Cross Bay Orthopedic Surgery, P.C.** caused to be transmitted by mail, facsimile or email to the NY WCB a **Health Insurance Claim Form** and report of **Claimant C's November 9, 2021** initial examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.   These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Peter Tomasello** caused to be transmitted by and based on such records caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.   Notwithstanding the same, **medical provider Peter Tomasello** to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

467.    On or about **June 28, 2022**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Peter Tomasello, DO, Cross Bay Orthopedic Surgery, P.C.** caused to be transmitted by mail, facsimile or email to the NY WCB a **Health Insurance Claim Form** and report of **Claimant C's April 27, 2022** follow up examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.   These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to

medical provider **Peter Tomasello** caused to be transmitted by and based on such records caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Peter Tomasello** to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

468.    On or about **October 30, 2024**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Vadim Abramov, Interventional Physical Medicine& Rehabilitation, P.C.** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and report of Claimant C's **November 22, 2021** initial examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Vadim Abramov**. caused to be transmitted by and based on such records, **medical provider Vadim Abramov** caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Vadim Abramov** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

469.    On or about **March 14, 2023**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Dr. Vadim Abramov, Interventional Physical Medicine& Rehabilitation, P.C.** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and report of Claimant C's **January 17, 2022** examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Vadim Abramov** caused to be transmitted by and based on such records, **medical provider Vadim Abramov** caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **medical provider Vadim Abramov** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

470.    On or about **July 13, 2023,** in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Vadim Abramov, Interventional Physical Medicine & Rehabilitation, P.C.** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and report of **Claimant C's June 28, 2023** examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were

available to medical provider **Vadim Abramov**. caused to be transmitted by and based on such records, medical provider **Vadim Abramov** caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

471.    On or about **November 5, 2024**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Vadim Abramov, Interventional Physical Medicine & Rehabilitation, P.C.** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form** and report of Claimant C's **October 23, 2024** examination based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to medical provider Vadim Abramov, caused to be transmitted by and based on such records, **medical provider Vadim Abramov** caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, medical provider **Vadim Abramov** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

472.    On or about **January 13, 2022**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Siddhartha Sharma, DPM of McCulloch Orthopaedic Surgical Services, PLLC** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form and report of Claimant C's December 23, 2021 initial examination** based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Siddhartha Sharma** caused to be transmitted by and based on such records caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Siddhartha Sharma** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

473.    On or about **January 20, 2022**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Siddhartha Sharma, DPM of McCulloch Orthopaedic Surgical Services, PLLC** caused to be transmitted by mail, facsimile or email to the **NY WCB a Health Insurance Claim Form and report of Claimant C's December 23, 2021 initial examination** based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records

were available to **medical provider Siddhartha Sharma** caused to be transmitted by and based on such records caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Siddhartha Sharma** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

474.    On or about **February 14, 2022**, in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Boleslav Kosharskyy, MD of BL Pain** caused to be transmitted by mail, facsimile or email to the **NY WCB a C-4.2 Doctor's Progress Report** and report of **Claimant C's January 27, 2022 examination** based on purported injuries.  Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **medical provider Boleslav Kosharskyy,** caused to be transmitted by and based on such records **medical provider Boleslav Kosharskyy** caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider Boleslav Kosharskyy** caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

475.    On or about **December 27, 2024,** in furtherance of the Fraud Scheme, and in violation of 18U.S.C. §§ 1341 or 1343, **Dr. Boleslav Kosharskyy, MD, Pain Physicians NY** caused to be transmitted by mail, facsimile or email to the NY WCB a **Health Insurance Claim Form** and report of Claimant C's **December 15, 2024** examination based on purported injuries. Such report was submitted as if Claimant C's injury was causally connected to Claimant C's accident and that treatment was for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **Boleslav Kosharskyy**. caused to be transmitted by and based on such records, **Boleslav Kosharskyy** caused to be transmitted by knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Boleslav Kosharskyy**. caused to be transmitted by continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

476.    On or about **November 9, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Thomas M. Kolb of Kolb Radiology** caused to be transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form** and a report of its **September 29, 2022 cervical spine MRI** of Claimant C based on a purported neck injuries. Such report was submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment was for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were

available to **Kolb Radiology** and based on such records, **Kolb Radiology** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Kolb Radiology** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

477.    On or about **November 9, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Thomas M. Kolb of Kolb Radiology** caused to be transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form** and a report of its **July 25, 2022 bilateral knee MRIs** of Claimant C based on a purported knee injuries. Such report was submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **Kolb Radiology** and based on such records, **Kolb Radiology** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Kolb Radiology** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

478.    On or about **November 9, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Thomas M. Kolb of Kolb Radiology** caused to be transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form** and a

report of its **July 26, 2022 left shoulder MRI** of Claimant C based on a purported upper extremity injuries. Such report was submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **Kolb Radiology** and based on such records, **Kolb Radiology** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Kolb Radiology** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

479.    On or about **June 12, 2023**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Dr. Kolb of Kolb Radiology** caused to be transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form** and a report of its **May 22, 2023 lumbar spine MRI** of Claimant C based on a purported back injuries.  Such report was submitted as if Claimant C's injuries were causally connected to Claimant C's accident and that treatment was for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to **Kolb Radiology** and based on such records, **Kolb Radiology** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Kolb Radiology** continued a course of treatment, prepared records reflecting same and thereafter

transmitted them to obtain payment for his services, increase patient referrals and provide the Legal

Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

480.    On or about **March 2, 2023**, in furtherance of the Fraud Scheme, and in violation

of 18 U.S.C. §§ 1341 or 1343, **Alexandre Barbosa de Moura, New York Spine Institute** caused

to be transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form**

and a report of its **February 9, 2023** examination during which **Alexandre Barbosa De Moura**

**recommended an anterior cervical discectomy of the C6-C7 vertebral segments.** Such reports

were submitted as if Claimant C's injuries were causally connected to Claimant C's accident and

that treatment for such was warranted and necessary. These records, however, are false because

no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected

by Claimant C's emergency room records. These records were available to medical provider

**Alexander De Moura** and based on such records, medical provider medical provider **Alexander**

**De Moura** knew or should have known that the treatments were neither necessary nor causally

connected to the alleged accident. Notwithstanding the same, medical provider **Alexander De**

**Moura** continued a course of treatment, prepared records reflecting same and thereafter

transmitted them to obtain payment for his services, increase patient referrals and provide the Legal

Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

481.    On or about **March 5, 2023**, in furtherance of the Fraud Scheme, and in violation

of 18 U.S.C. §§ 1341 or 1343, **Alexandre de Moura, New York Spine Institute** caused to be

transmitted by mail, facsimile or email **to the NY WCB** a **Health Insurance Claim Form** and a

report of an operative report of a **February 28, 2023 anterior cervical discectomy of the C6-C7**

**vertebral segments,** for purported neck injuries. Such reports were submitted as if Claimant C's

injuries were causally connected to Claimant C's accident and that treatment for such was

warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant C's emergency room records. These records were available to medical provider **Alexandre Barbosa de Moura** and based on such records, medical provider **Alexandre Barbosa de Moura** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, medical provider **Alexandre Barbosa de Moura** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

### iv.      Claimant D

482.    As stated above, many of the medical services provided to Claimant D were unnecessary, excessive and/or not warranted and were not causally related to the alleged workplace accident wherein Claimant D fell from a ladder two feet while retrieving his tools from a work site from which he was recently fired by a subcontractor. Upon emergency room evaluation Claimant D's was able to look in all directions with no pain or discomfort, denied tenderness in the neck or paranesthesia of the upper extremity, resulting in removal of the cervical collar. The alleged contusion of the lower extremities and left shoulder was minimal, all CT scans negative for acute injury and the shoulder injury was treated with a sling prior to discharge from the hospital on the same day. Nevertheless, after retention of the Schwitzer Defendants, the Medical Provider Defendants ordered the standard protocol suite of services from imaging studies to physical therapy, chiropractic and acupuncture followed by injections and ultimately surgery, cervical discectomy and lumber laminectomy, despite the confirmed absence of even a neck or back complaint at the initial emergency room visit. As such, each of the below medical documents,

claim documents submitted to the NY WCB, and the case documents filed/provided in the personal injury action were transmitted by mail or wire, in violation of 18 U.S.C. § 1341 (mail fraud) or § 1343 (wire fraud), in furtherance of and as a necessary step for the execution of the Fraud Scheme and/or contained statements that Defendants knew or should have reasonably known were fraudulent:

483.     On or about **September 8, 2020**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **William Schwitzer & Associates** or an employee of the William Schwitzer & Associates, P.C. caused to be transmitted **to defense counsel** by mail, facsimile or email a **Summons and Verified Complaint**, falsely attesting to the construction accident, the existence and/or extent of Claimant D's injuries, and the necessity of Claimant D's medical treatment.  The transmitted Summons and Verified Complaint is false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant D's emergency room records.

484.     On or about **October 22, 2020**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **William Schwitzer & Associates** or an employee of the William Schwitzer & Associates, P.C. caused to be transmitted **to defense counsel** by mail, facsimile or email a **Verified Bill of Particulars**, falsely attesting to the construction accident, the existence and/or extent of Claimant D's injuries, and the necessity of Claimant D's medical treatment.  The transmitted **Verified Bill of Particulars** is false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant D's emergency room records.

485.     On or about **September 3, 2020**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **John Merlino, William Schwitzer & Associates** or an

employee of the William Schwitzer & Associates, P.C. caused to be transmitted **to the NY WCB** by mail, facsimile or email a **C-3 and OC-400 Forms dated August 14, 2020**, falsely attesting to the construction accident, the existence and/or extent of Claimant D's injuries.  The transmitted **C-3 Form** is false because no such accident occurred as demonstrated hereinabove, Claimant D was not employed by Infinity Dev. Corp as a laborer, and no such injuries existed as reflected by Claimant D's emergency room records.

486.    On or about **September 29, 2020**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Salehin of  Brooklyn Medical Practice, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form and report of physical therapy treatment indicating injuries including headaches, neck pain, right and left shoulder pain, left and right elbow, back pain, left and right hip pain with 9 dates of service in August 2023 for Claimant D.** Such reports were submitted as if Claimant D's purported left shoulder, right elbow, cervical and lumbar spine injuries were causally connected to Claimant D's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant D's emergency room records.  These records were available **to Salehin and Brooklyn Medical Practice, P.C.** and based on such records, **Brooklyn Medical Practice, P.C.** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **Brooklyn Medical Practice, P.C.** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

487.    On or about **November 14, 2020,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Vadim Lerman of Orthopaedics Spine & Sports Medicine** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form with evaluation and recommendation for C6-C7 anterior cervical discectomy and fusion surgery dated November 2, 2020 for Claimant D,** based on purported neck injuries. Such reports were submitted as if Claimant D's purported neck injuries were causally connected to Claimant D's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant D's emergency room records. These records were available **to Lerman and Orthopaedics Spine & Sports Medicine** and based on such records, **Lerman and Orthopaedics Spine & Sports Medicine** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Lerman and Orthopaedics Spine & Sports Medicine** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

488.    On or about **December 16, 2021**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Todd Lebson of North Shore** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form and report of chiropractic treatment indicating injuries to the lower back with 6 dates of service in November 2021 for Claimant D.** Such reports were submitted as if Claimant D's purported lumber spine injuries were causally connected to Claimant D's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred

as demonstrated hereinabove and no such injuries existed as reflected by Claimant D's emergency room records. These records were available **to Lebson and North Shore** and based on such records, **Lebson and North Shore** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Lebson and North Shore** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

489. On or about **October 12, 2020**, in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant Richard Apple, M.D. of Big Apple Pain Management. P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Health Insurance Claim form and initial evaluation dated September 3, 2020 of Claimant D immediately recommending cervical spine injections at the first visit.** Such reports were submitted as if Claimant D's purported cervical spine injuries were causally connected to Claimant D's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injuries existed as reflected by Claimant D's emergency room records. These records were available **to Apple and Big Apple Pain Management** and based on such records, **Apple and Big Apple Pain Management** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Apple and Big Apple Pain Management** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

490.    On or about **September 24, 2020,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendants McConnell** and **Community Medical Imaging, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB an Ancillary Medical Report with a left shoulder MRI on August 26, 2020, for Claimant D, based** on purported left shoulder injury.  Such reports were submitted as if Claimant D's purported left shoulder injury was causally connected to Claimant D's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant D's emergency room records.  These records were available to **McConnell** and **Community Imaging** and based on such records, **McConnell** and **Community Imaging** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **McConnell** and **Community Imaging** continued a course of treatment, prepared records reflecting the same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

491.    On or about **November 7, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendant McConnell of Community Medical Imaging, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB an Ancillary Medical Report with a lumber spine MRI on April 12, 2021, for Claimant D, based** on purported back injury.  Such reports were submitted as if Claimant D's purported back injury was causally connected to Claimant D's accident and that treatment for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant D's emergency room records.  These records

were available **to Defendants McConnell and Community Imaging** and based on such records, **McConnell and Community Imaging** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **McConnell and Community Imaging** continued a course of treatment, prepared records reflecting the same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

492.    On or about **January 21, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Abishek Kumar** of **Defendant Orthopedics Spine & Sports Medicine d/b/a Total Ortho** caused to be transmitted by mail, facsimile or email **to the NY WCB a HIC-1500 based upon an Operative Report dated December 1, 2021 for Claimant D's Cervical discectomy and fusion** based on purported neck injury. Such report was submitted as if Claimant D's purported cervical injury was causally connected to Claimant D's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant D's emergency room records. These records were available to medical provider Defendants **Kumar** and **Total Ortho** and based on such records, **medical provider** Defendants **Kumar** and **Total Ortho** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **medical provider** Defendants **Kumar** and **Total Ortho** continued a course of treatment, performed a cervical discectomy and fusion, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

493.    On or about **March 13, 2023,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Abhishek Kumar** of **Defendant Orthopedics Spine & Sports Medicine d/b/a Total Ortho** caused to be transmitted by mail, facsimile or email **to the NY WCB a C-4 Authorization form for L5-S1 laminectomy back surgery performed on March 1, 2023 Claimant D** based on purported back injury.  Such report was submitted as if Claimant D's purported back injury was causally connected to Claimant D's accident and that treatment and surgery for such was warranted and necessary.  These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant D's emergency room records.  These records were available **to medical provider** Defendants **Kumar** and **Total Ortho** and based on such records, **medical provider** Defendants **Kumar** and **Total Ortho** knew or should have known that the surgery neither necessary nor causally connected to the alleged accident.  Notwithstanding the same, **medical provider** Defendants **Kumar** and **Total Ortho** continued a course of treatment, performed back surgery on March 1, 2023, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

494.    On or about **June 18, 2021,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **medical provider Stanislav Avshalumov of Advanced Orthopedics and Joint Preservation** caused to be transmitted by mail, facsimile or email **to the NY WCB a Doctor's Progress Report with recommendation for left shoulder surgery dated May 7, 2021 for Claimant D based** on purported left shoulder injury.  Such report was submitted as if Claimant D's purported left shoulder injury was causally connected to Claimant D's accident and that treatment for such was warranted and necessary.  These records, however, are false because no

such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant D's emergency room records. These records were available **to medical provider Defendants Avshalumov** and **Advanced Ortho** and based on such records, **medical provider Defendants Avshalumov** and **Advanced Ortho** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **medical provider Defendants Avshalumov** and **Advanced Ortho** continued a course of treatment, prepared records reflecting same and thereafter transmitted them to obtain payment for his services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

495.    On or about **March 14, 2022,** in furtherance of the Fraud Scheme, and in violation of 18 U.S.C. §§ 1341 or 1343, **Defendants Wang and Unicorn Acupuncture, P.C.** caused to be transmitted by mail, facsimile or email **to the NY WCB a Progress Report for acupuncture treatment performed in February 2022 for Claimant D, based** on purported left cervical, lumber, left shoulder and right hip injuries. Such reports were submitted as if Claimant D's purported cervical, lumber and right hip injuries were causally connected to Claimant D's accident and that treatment for such was warranted and necessary. These records, however, are false because no such accident occurred as demonstrated hereinabove and no such injury existed as reflected by Claimant D's emergency room records. These records were available **to Defendants Wang and Unicorn Acupuncture, P.C.** and based on such records, **Wang** and **Unicorn** knew or should have known that the treatments were neither necessary nor causally connected to the alleged accident. Notwithstanding the same, **Wang** and **Unicorn** continued a course of treatment, prepared records reflecting the same and thereafter transmitted them to obtain payment for his

services, increase patient referrals and provide the Legal Services Defendants with a basis to obtain insurance benefits they would otherwise not be entitled.

**F.    Claimant Summary and Defendant's Participation in Pattern of Racketeering Activity**

496.    During the course of the representative underlying litigation and workers' compensation claims mentioned herein, the Defendants continuously pressured and coerced Claimants to engage in claims and medical treatment they otherwise would not have and fabricated and transmitted documentation like those mentioned hereinabove containing false information and representations about injuries and medical treatment, which constitutes a combination of mail and wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343 and bribery pursuant to NY Penal Code § 215.05.

497.    The Defendants' actions are alleged to be a part of their ordinary course of business in relation to their employment and affiliation with the enterprise.

498.    Further, several of the claims detailed herein, and numerous others, are active and ongoing.  Thus, the Defendants' actions outlined constituted a pattern of racketeering activity, the predicate acts engaged in were directly related to the common purpose of the enterprise, are representative of Defendants' pattern and course of practice, took place over a period of several years, and are likely to continue into the future unless stopped.

**IV.    PLAINTIFFS' JUSTIFIABLE RELIANCE**

499.    Tradesman and Roosevelt (individually and as subrogee of Accredited)  are under a statutory obligation to promptly and fairly pay or object to claims within 45 days. *See* New York Workers' Compensation § 13-5(1).

500.    The invoices and documentation supporting the claims and litigation submitted to Tradesman, Roosevelt, Accredited, the NY WCB, the New York Unified Court System, and others,

contained materially false statements and were designed to mislead and conceal such materially false statements (and/or otherwise containing material omissions) in violation of New York Insurance Law § 403, New York Penal Law § 176.05 and New York Workers' Compensation Law § 114. Under such laws, Defendants' conduct as demonstrated herein constitutes fraud. The Fraud Scheme was designed to and did take advantage of this limited timeframe in which to timely pay or object within 45 days and often submitted multiple bills contemporaneously, further constraining the ability of Roosevelt to object or uncover fraudulent billing.

501.    The invoices and documentation supporting the Fraud Scheme submitted to Tradesman and/or Gallagher Bassett, the New York State Workers' Compensation Board, the New York Unified Court System, and others contained materially false statements and were designed to conceal materially false statements.

502.    As to the general liability suits, Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that Defendants were engaged in misrepresentations, omissions, concealment of material facts, and fraudulent conduct. As demonstrated hereinabove, the mechanism of the Fraud Scheme was to generate facially valid claims to complicate detection of fraud.

503.    As such, Plaintiffs justifiably and reasonably relied on them as facially valid.

504.    As demonstrated above, the mere filing of the subject Complaints in the State Courts mandated an actionable level of reliance – Tradesman had to open and process the claim and Roosevelt was forced to rely on the misrepresentation of the Defendants insofar as the retention of attorneys, investigators, and experts was necessary to avoid default judgments; these are actions Plaintiffs would not have taken (or had to take) but for the knowing misrepresentations made by the Defendants.

505.    The numerous subsequent Supplemental Bills of Particulars filed related to fraudulent treatment rendered through the Fraud Scheme were further relied upon, by necessity, in prolonged and unnecessary legal costs, independent medical examinations, experts, investigations, and other expenses.

506.    New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit - even if the allegations are false or groundless, the insurer has a duty to defend its insured. By law, each and every fraudulent claim and lawsuit immediately and directly triggered mandated expenses by Plaintiffs in discharging their duty to defend its insured.

507.    Each Complaint, Bill of Particulars, bill, lien, and individual medical record created and transmitted by the Defendants, when viewed in isolation, does not reveal its fraudulent nature. Only when the bills and supporting documentation are viewed together as a whole, in conjunction with their repeated use in numerous cases, do the patterns emerge revealing the fraudulent nature of these submissions.

508.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiffs, required Plaintiffs to, at minimum, rely on such submissions in incurring further fees and costs in discharging its legal obligation to provide a defense to its insured, resulted in prolonged litigation, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement. As to settlements made because of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected using ordinary due diligence. Any payments

made were issued after Plaintiff had engaged in reasonable due diligence and were made in reasonably justifiable reliance.

509.    As such, Roosevelt justifiably and reasonably relied on submitted claims as facially valid and was fraudulently induced to direct payment on, at minimum, dozens of claims.  As a matter of claims handling, Tradesman had no choice but to rely on the claim's validity and incur the costs of opening the claim.

510.    Additionally, regardless of truth, falsity, or any descriptor along that spectrum, correspondence was sent *via* mail as well as various transmissions sent over the wires which were performed as necessary steps to and in furtherance of the Fraud Scheme, and as components of an overall scheme or artifice to defraud, or to otherwise obtain money under false pretenses.

### V.    DAMAGES

511.    As a result of the Fraud Scheme, Plaintiffs have suffered damage to their business or property.

512.    Plaintiff Roosevelt (individually and as subrogee of Accredited) is a reinsurer which underwrites policies and provides reinsurance that directly and immediately covers, in lieu of the paper insurer, the various workers' compensation claims and personal injury lawsuits filed and prosecuted as a component of the Fraud Scheme.  Roosevelt is contractually obligated to step into the shoes of the primary insurer in providing payment for claims and lawsuits and guarantees payment on claims.  Pursuant to its Quota Sharing Reinsurance Agreement ("QSRA"), Roosevelt is expressly and completely liable to directly pay all losses that would otherwise be borne by a primary carrier, including settlements, payments pursuant to court order and all other costs, expenses and fees incurred in connection with the investigation or settlement or – as here – contesting the validity of claims.  As such, Roosevelt is a party directly and ultimately damaged by the Fraud Scheme.

513.    Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has therefore incurred expenses paid as coverage for the claims and lawsuits filed and/or prosecuted by the Legal Defendants on behalf of Claimants.  These claims would not have been incurred but for the perpetuation of the Fraud Scheme.

514.    Roosevelt further incurred expenses directly pursuant to its express obligations under the QSRA in contesting the validity of the claims through the investigation that led to this action as well as this and other similarly derived actions. Roosevelt is therefore the insurance- or reinsurance-issuing entity that possesses standing to prosecute this action.

515.    But for Defendants' perpetration of the Fraud Scheme, Roosevelt's expenses paid would be measurably less because the Claimants' injuries, if any, would not be inflated and/or manufactured, the medical services necessary to treat any accident-related injury, if any, would be less significant, and litigation would not be as prolonged, resulting in lower settlement value of such claims and lawsuits and thus, less litigation expenses. In most instances as alleged herein, the incurred costs would have been $0 as it is alleged the claims were entirely fraudulent and should never have been brought.

516.    Such damages further include the payments made as fraudulently inflated settlements in both Workers' Comp and general liability suits due to Defendants' conduct as alleged.

517.    Each and every predicate act contributed to the damages incurred, as the scheme is designed to reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the

scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

518.    Further, Plaintiffs' business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business. Due to Defendants' perpetration of the Fraud Scheme, Roosevelt has incurred general liability claim adjustment expenses progressively rising from $14,020,890.00 in 2018 to $36,362,147.00 in 2019 (159% increase from 2018), to $58,694,694.00 in 2020 (61% increase from 2019), to $91,334,395.00 in 2021 (56% increase from 2020), and to $142,127,559.00 in 2022 (56% increase from 2021 and 914% increase in four years).

519.    Between 2021 and 2022 alone, Roosevelt's net outstanding liability under general liability reinsurance increased from $81,267,474.00 to $119,069,641.00, an increase of nearly 47% notwithstanding the COVID-19 pandemic during 2020, which led to the single largest one-year decline for the construction industry in New York City since 1990. *See* Office of the New York State Comptroller, "The Construction Industry in New York City: Recent Trends and Impact of COVID-19," March 3, 2022, at 3. *See* https://www.osc.ny.gov/files/reports/osdc/pdf/report-3-2021.pdf, incorporated herein by reference, last accessed January 16, 2025.

520.    While in the context of Sherman Act analysis, the Supreme Court has stated that "reinsurance is so closely tied to the terms of the primary insurance contract that one of the two categories of reinsurance (assumption reinsurance) substitutes the reinsurer for the primary or "ceding" insurer and places the reinsurer into contractual privity with the primary insurer's

policyholders." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 806 (1993), internal citations omitted.

521.    Regardless of whether there is any privity involved, "custom and usage have established a gentility and unity of interest between the reinsured and its reinsurer." *Continental Casualty Co. v. Stronghold Ins. Co.*, 77 F.3d 16, 22 (2d Cir. 1996), internal citation omitted.

522.    Roosevelt's ongoing payments made pursuant to the QSRA further accrued its rights to bring and maintain this action under longstanding New York precedent, since "if we hold that plaintiff may properly make a claim as … equitable subrogee, as we do, it becomes unnecessary to determine whether plaintiff also has a valid claim as contractual subrogee". *Century Prop. & Cas. Ins. Corp. v McManus & Richter, P.C.,* 226 A.D.3d 1, 10 (1st Dept. 2024), *quoting Fed. Ins. Co. v. Arthur Andersen & Co.*, 75 N.Y.2d 366, 371 (1990).

523.    Whether formulated as derived from its contractual obligations under the QSRA or equitably independent of the QSRA's express term, Roosevelt falls well within the anticipated category of damaged person whom RICO and its predecessor model the Clayton Act "bring to bear the pressure of "private attorneys general" on a serious national problem for which public prosecutorial resources are deemed inadequate" and aim to compensate the same type of injury; each requires that a plaintiff show injury "in his business or property by reason of" a violation." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 151 (1987), internal citation omitted.

524.    Therefore, it is irrelevant as to whether Defendants in fact knew that Roosevelt itself was a financial target as they perpetuated their scheme as opposed to, *inter alia*, Workers' Compensation insurance carriers, other general liability insurance carriers, excess insurance carriers, the New York State Insurance Fund, or the general public of New York State. Roosevelt

has standing as a plaintiff directly, proximately and foreseeably injured in its business or property as a foreseeable result of Defendants' conduct as set forth herein.

525.    The drastically escalating cost of construction-related claims in both the Workers' Compensation and general liability areas stands in marked contrast to the overall decreasing number of workplace injuries, which in New York City reportedly decreased from 759 in 2018 to 554 in 2022 (a 27% decrease). *See e.g.*, "2022 New York City Construction Safety Report," at https://www.nyc.gov/assets/buildings/pdf/con_safe_2022.pdf, incorporated herein by reference, last accessed December 19, 2024. The number of workplace incidents decreased from 1,193 in 2018 to 751 in 2022, a 37% decrease. *Id.*

526.    In an April 2024 study, the New York Civil Justice Institute indicated that insurance costs in New York are higher than any other state and that insurance professionals warn that the market is headed toward a crisis that will have long term implications for consumers." *See https://acrobat.adobe.com/id/urn:aaid:sc:us:2de7b5f8-2913-4ed4-8ec4-625d1ca07466,* incorporated herein by reference, last accessed December 19, 2024.

527.    The study goes on to say that construction insurance costs are the highest when compared to nearby states such as Connecticut, New Jersey and Pennsylvania at a rate of 12.5% of a project's costs versus 2.5%, respectively. *Id.*

528.    Further, the study cites information that an average  New York Labor Law § 240(1) claim will settle for above $1 million, however, if there is a neck or back surgery involved, the claim value averages between $2 million to $3 million or more. *Id.*

529.    In the face of fraudulent insurance claims, much like the defendants' Fraud Scheme, the New York Legislature has introduced a bill making the staging of a construction accident and

the encouraging and assisting of the same, a Class E Felony in the State of New York. That bill is currently pending.

530.    Plaintiff Tradesman serves as a managing general agent that provides management services to various insurers and reinsurers, including Plaintiff Roosevelt, including general liability and workers' compensation services from underwriting through claims handling and subsequent administrative and legal actions, specifically focusing on safety management and effective handling of claims within the construction industry.

531.    As a direct and foreseeable result of the fraudulent scheme, Tradesman was obligated under the terms of the General Agency Agreement to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business; the exclusive claim adjustment firm Gallagher Bassett could not properly manage the significant numbers of fraudulent claims and specialized personnel were required at Tradesman's expense.

532.    Tradesman made substantial payments and sustained significant damage in connection with its management of the policies that cover the various claims and lawsuits filed and prosecuted by the Legal Service Defendants as part of the Fraud Scheme. These payments directly resulted in lost profits.  This would not have occurred but for the Fraud Scheme and pattern of racketeering activity described herein. Tradesman's ability to earn commissions is also directly attributable to the amount of the reserves maintained to pay claims and expenses. With thousands of fraudulent claims, the ability of the carrier to maintain proper reserves becomes impossible. Once that occurs, the program, and thus, Tradesman, would face closure.

533.    Tradesman is further damaged due to artificially inflated loss ratios caused by the fraudulent scheme, since when a loss ratio exceeds a certain percentage, such as 60%, the

commission due to the reinsurer will increase and Tradesman has been directly responsible for paying additional commissions resulting in a direct loss.

534.    Due to Defendants' perpetration of the Fraud Scheme, numerous insurance carriers have ceased to write Workers' Compensation and/or general liability policies in the State of New York, which has resulted in further damage to Tradesman's business.

535.    Defendants' patterns of fraudulent conduct caused injury to Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Plaintiffs to calculate damages with specificity at this stage in the litigation (whereas Plaintiffs' damages continue to accrue), Plaintiffs' injuries include, but are not limited to the following:

    a.    Plaintiff Roosevelt – Litigation expenses, as well as any actual and consequential damages for the payments (from the first dollar) Plaintiff made to the Schwitzer Defendants, Medical Provider Defendants or others due to Defendants' pattern of fraudulent conduct in connection with claims made under New York's Workers' Compensation Law and New York's Labor Law, the exact amount to be determined at trial.

    b.    Plaintiff Tradesman – Actual and consequential damages for the expenses incurred for the administration of these claims and the retention of additional staff to perform investigative and support services for claims wherein the Defendants submitted or caused to be submitted claims/demands for monetary payments in connection with New York's Workers' Compensation Law and New York's Labor Law

beyond the normal scope of claims, the exact amount to be determined at trial.

    c.  Plaintiff Tradesman – Actual and consequential damages due to artificially high loss ratios incurred as a result of fraudulent claims and expenses incurred due to the meritless claims for which Tradesman itself is responsible for paying under the General Agency Agreement and amendments thereto, the exact amount to be determined at trial.

## VI.    CAUSES OF ACTION

<u>**COUNT I**</u>
<u>**RICO Violation (§ 1962(c))**</u>
<u>**(Against All Defendants)**</u>

    536.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety. At all times relevant herein, Defendants constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce, and foreign commerce. Each of the Defendants participated in the operation and/or management of the Fraud Scheme enterprise by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) which Schwitzer Firm orchestrated, coordinated and led. The transactions and predicate acts occurred over a substantial period of time through to the present and present a credible risk of continuing into the future. This conduct included innumerous acts of mail and wire fraud under 18 USC §§ 1341 and 1343, including the related violations detailed regarding Claimants A-D, Travel Act violations under 18 USC § 1952, Bribery under New York Penal Law § 215.00, as well as through an incalculable number of additional acts in the same pattern and practice which are within the exclusive knowledge of Defendants which Plaintiffs cannot readily ascertain without discovery. In

addition to any legitimate transactions, the course of conduct of this enterprise included a pattern of racketeering activity carried out by Defendants. *See, supra.*

537.    Each of the Defendants knowingly and willfully associated with the association-in-fact enterprise and conducted and participated in the conduct of the enterprise's affairs, directly and indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

538.    The pattern of racketeering activity in which the Defendants engaged involved numerous specific transactions as described in detail in this Complaint, at least two per Count 1 Defendant with at least one causing Plaintiffs direct and proximate harm, including but not limited to the following predicate acts each as a necessary step in the Fraud Scheme, in relation with Claimants A-D: Schwitzer Defendants' filing of Verified Complaints in violation of 18 USC § 1343, Schwitzer Firm's mailings of Bills of Particulars and case related documents in violation of 18 USC § 1341, Travel Act violations under 18 USC § 1952 in arranging and coordinating out of state surgeries, – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

539.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents. The remaining alleged predicate acts do not require heightened pleadings under Rule 9(b).

540.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

---

**FIRST AMENDED COMPLAINT**                                                                 **175**

(1) An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(2) Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(3) Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

(4) Such other relief as the Court deems just and proper.

## COUNT II
### RICO Violation (§ 1962(d))
### (Against All Defendants)

541.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

542.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Fraud Scheme enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

543.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in or otherwise conspired to engage in involved numerous specific acts and conduct as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Travel Act violations under 18 USC § 1952 and bribing a witness under New York law (NY Penal Code § 215) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

544.    The predicate acts of mail fraud, wire fraud, and bribing a witness or victim also involved the transmission and use of false and misleading documentation in furtherance of the

Defendants' scheme to defraud Plaintiffs in connection with submitting, filing, prosecuting and asserting workers' compensation claims and personal injury lawsuits arising out of fraudulent construction accidents.

545.    As a result of the pattern of racketeering activity, Plaintiffs have suffered damage to their business and property.

WHEREFORE, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for:

(1) An award of Plaintiffs' actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

(2) Plaintiffs' reasonable attorneys' fees, expenses, costs, and interest;

(3) Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and

(4) Such other relief as the Court deems just and proper.

### COUNT III
### Common Law Fraud
### (Against Legal Service Defendants and Medical Provider Defendants (collectively, "Count III Defendants"))

546.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

547.    The Count III Defendants made misrepresentations of facts, deliberately concealed, omitted materials facts that they had a duty to disclose in connection with their claims for compensation and/or payment under New York law.

548.    These misrepresentations of fact by the Count III Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries and the necessity of treatment.

549.    The Count III Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

550.    The Count III Defendants made these misrepresentations in furtherance of the scheme to defraud Plaintiffs by submitting claims for payment of workers' compensation and general liability insurance benefits.

551.    The Count III Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiffs to make payments for claims that were not legitimate.

552.    Plaintiffs reasonably and justifiably relied, to their detriment, on the truthfulness of the Count III Defendants' representations concerning their eligibility to receive payments of workers' compensation and general liability insurance benefits, and without knowledge of the Count III Defendants' scheme and artifice to defraud them.

553.    The Count III Defendants knew, or should have known, that Plaintiffs would so rely on and intended that they so rely on their truthfulness.

554.    But for the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiffs would not have paid workers' compensation and general liability insurance benefits.

555.    Plaintiffs at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count III Defendants were engaged in misrepresentations, omissions, and fraudulent conduct.

556.    As a direct and proximate cause of the Count III Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count III Defendants, Plaintiffs have been damaged. Plaintiffs' damages include, but are not necessarily

limited to, benefit payments, administration costs, investigative and defense costs paid by Plaintiffs to the Count III Defendants or caused by the Count III Defendants.

557.    Because the Count III Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Count III Defendants, and each of them, jointly and severally, for:

      (1) An award of Plaintiffs' actual and consequential damages to be established at trial;

      (2) Plaintiffs' costs, including, but not limited to, investigative costs incurred in the detection of the Count III Defendants' illegal conduct; and

      (3) Such other relief as the Court deems just and proper.

### COUNT IV
### Aiding and Abetting Fraud
### (Against All Defendants)

558.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

559.    All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count III.

560.    As set forth in detail, *supra*, each Defendant provided substantial assistance to advance such fraud's commission.

561.    But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

562.    As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

---

**FIRST AMENDED COMPLAINT**                                                                 **179**

563.    Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, and each of them, jointly and severally, for:

(1) An award of Plaintiff's actual and consequential damages to be established at trial;

(2) Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and,

(3) Such other relief as the Court deems just and proper.

<u>**COUNT V**</u>
<u>**Unjust Enrichment**</u>
<u>**(Against Legal Service Defendants and Medical Provider Defendants**</u>
<u>**(collectively, "Count V Defendants"))**</u>

564.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

565.    As described above, the Count V Defendants conspired to induce Plaintiffs to make or expend numerous and substantial payments to them or others.

566.    The Count V Defendants were never eligible to make claims or seek compensation under New York law because, at all relevant times, the accidents, injuries and treatment were fraudulent.

567.    When Plaintiffs paid the Count V Defendants and others, Plaintiffs reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Count V Defendants, or those persons working under their control, made concerning the Count V Defendants' eligibility to make claims or seek compensation under New York law.

568.    Each and every payment that Plaintiffs made or were caused to make to the Count V Defendants and others during the course of the Fraud Scheme constitutes a benefit that the Count V Defendants sought and voluntarily accepted.

569.    Throughout the course of their scheme, the Count V Defendants wrongfully obtained from Plaintiffs benefit payments as a direct and proximate result of the unlawful conduct detailed above.

570.    Retention of those benefits by the Count V Defendants would violate fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs demand judgment against the Count IV Defendants, and each of them, jointly and severally, for:

(1) An award of Plaintiffs' actual and consequential damages to be established at trial; and

(2) Such other relief as the Court deems just and proper.

**COUNT VI**
**General Business Law § 349**
**(Against Legal Service Defendants, Medical Provider Defendants, and Funding Defendants (collectively, "Count VI Defendants"))**

571.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

572.    New York State General Business Law ("GBL") § 349 provides that (a) "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful," and (h) "any person who has been injured by reason of any violation of this section may bring an action… to recover his actual damages... [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff."

573.    It is well-established that virtually all commercial activity which involves goods or services rendered to public consumers, including rendering legal and medical services, and providing loans and/or advances, are subject to the provisions of GBL § 349.

574.    It is equally well-established that a deceptive practice need not reach the level of common-law fraud to be actionable under § 349, and intent to defraud and justifiable reliance are not elements of a statutory claim.

575.    As set throughout this Complaint, supra, each of the Count VI Defendants have engaged in deceptive acts and practices in the conduct of their businesses; particularly, in the furtherance of the Fraud Scheme.

576.    GBL § 349 provides that any party which has been injured by such deceptive acts and practices may recover their actual damages thereto, [and t]he Court may award reasonable attorney's fees to a prevailing plaintiff.

577.    The alleged conduct of Defendants as set forth above and herein has dramatic and widespread effects on consumers extending far beyond the direct damage caused by the instant deceptive acts and practices in furtherance of the Fraud Scheme. The Fraud Scheme itself has a broader impact on consumers at large.

578.    The Fraud Scheme, and its various permutations amongst similar schemes and overlapping actors, have an impact locally – clogged Court dockets, needless investigative, legal, other claims and defense-related spend, and fraudulently obtained settlements and awards  - and nationally, wrongfully driving up the cost of legitimate insurance business operations, resulting in needlessly escalating premiums to the ultimate consumers of liability insurance and the cost of healthcare (i.e., everyone).

579.    This phenomenon and its effects have recently begun to attract media attention. New York Post, June 16, 2024: MS-13, Russian mobsters use migrants in elaborate injury scam — even getting spinal surgery to pull it off ("Insurance insiders claim losses have tripled since the pandemic, with payouts so massive they're driving up the cost of living for all New Yorkers… The scams are ballooning costs for insurance, housing, construction, food, utilities, and basic living expenses"); ABC News, October 4, 2024: 7 On Your Side investigation finds dozens of injury lawsuits from people living in same apartment buildings ("We have a system that allows for fraudulent claims, leads to million dollars settlements and it raises the cost of insurance premiums across the board," Brian Sampson, president of the Empire State Chapter of the Associated Builders & Contractors, said. "We need to find a way to get it to stop."); ABC News, March 17, 2024: Construction workers in NY faking falls on sites part of larger fraud scheme, lawsuit claims ("'These fraudulent acts have emerged as widespread insurance scams which lead to inflated costs in construction and housing throughout New York State,' said Assemblyman David Weprin.").

580.    The deceptive trade practices of the Count VI Defendants – the Fraud Scheme – occurred and is continuing to occur in New York, Count VI Defendants maintain a business presence in New York, and the effects are felt by consumers at large in New York.

581.    Under these circumstances, an entity such as Plaintiff has standing to pursue claims for violations of GBL § 349. Count VI Defendants are liable to Plaintiff for compensatory damages and the attorneys' fees incurred in bringing and prosecuting this Action.

**WHEREFORE**, Plaintiff demands judgment against Defendants for:

(1) An award of Plaintiff's actual damages to be established at trial;

(2) Plaintiff's attorneys' fees incurred in the preparation and prosecution of this Action; and,

---

**FIRST AMENDED COMPLAINT**                                                                 **183**

(3) Such other relief as the Court deems just and proper.

**COUNT VII**
**Declaratory Relief Pursuant to 28 U.S.C. § 2201**
**(Against Legal Service Defendants and Medical Provider**
**Defendants (collectively, "Count VII Defendants"))**

582.    Plaintiffs incorporate herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

583.    Pursuant to 18 U.S.C. § 2201(a), the Court may determine the rights and legal obligations of the parties.

584.    There is an actual case and controversy between Plaintiffs on the one hand, and the Count VII Defendants on the other hand, as to all charges for examinations, treatments, testing, injections, surgeries, and physical therapy that have not been paid to date and through the pendency of this litigation. Plaintiffs contend these Count VII Defendants are not entitled to compensation for any of these charges.

585.    Because these Count VII Defendants have made false and fraudulent statements and otherwise engaged in the fraudulent conduct described above with the intent to conceal, mislead and misrepresent material facts and circumstances regarding each claim submitted, these Count VII Defendants are not entitled to any compensation for alleged services relating to any of the claims at issue.

WHEREFORE, Plaintiffs demand judgment against Defendants for:

(1) A declaration that the Count VII Defendants, at all times relevant, have submitted claims and bills to Plaintiffs for staged accidents and unnecessary healthcare services in violation of New York law;

(2) Declare that the Count VII Defendants' activities are unlawful;

---

**FIRST AMENDED COMPLAINT**                                                    **184**

(3) Declare that Plaintiffs have no obligation to pay any pending, previously denied, and/or future workers' compensation or general liability insurance claims submitted by the Count VII Defendants; and

(4) Such other relief as the Court deems just and proper.

## VII.    JURY TRIAL DEMAND

586.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: September 23, 2025

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By:   /s/ William J. Clay

**WILLIAM J. CLAY**
**MICHAEL A. GRAVES**
**AARON E. MEYER**
1985 Forest Lane
Garland, Texas 75042
Telephone: 214-736-9433
Facsimile:  214-736-9994
Service Email: service@thewillislawgroup.com

***ATTORNEYS FOR THE PLAINTIFFS***
**ROOSEVELT ROAD RE, LTD. individually, and as subrogee of  ACCREDITED CASUALTY AND SURETY COMPANY and TRADESMAN PROGRAM MANAGERS, LLC**